UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


| | |
|---|---|
| ELI LILLY AND COMPANY, | ) |
| | ) Cause No. |
| Plaintiff, | ) 1:10-CV-01376-TWP-DKL |
| | ) Indianapolis, Indiana |
| vs. | ) **August 19, 2013** |
| | ) 9:03 a.m. |
| TEVA PARENTERAL MEDICINES, | ) |
| INC., APP PHARMACEUTICALS, | ) |
| LLC, PLIVA HRVATSKA D.O.O., | ) |
| TEVA PHARMACEUTICALS USA, | ) |
| INC., BARR LABORATORIES, INC., | ) |
| | ) |
| Defendants. | ) |


**V O L U M E   I**


**Before the Honorable**
**TANYA WALTON PRATT**


OFFICIAL REPORTER'S TRANSCRIPT OF
BENCH TRIAL


Court Reporter:                    David W. Moxley, RMR, CRR, CMRS
                                   United States District Court
                                   46 East Ohio Street, Room 340
                                   Indianapolis, Indiana  46204


PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

**APPEARANCES**

**For Plaintiff:**

Adam L. Perlman, Esq.
David M. Krinsky, Esq.
Dov P. Grossman, Esq.
Bruce R. Genderson, Esq.
Megan A. Hughes, Esq.
Andrew V. Trask, Esq.
Williams & Connolly, LLP
725 Twelfth Street, N.W.
Washington, DC  20005

Jan M. Carroll, Esq.
Barnes & Thornburg, LLP
11 South Meridian Street
Indianapolis, IN  46204-3535

James P. Leeds, Esq.
Eli Lilly and Company
Lilly Corporate Center
Indianapolis, IN  46285

**For Defendants:**

Daryl L. Wiesen, Esq.
Goodwin Procter, LLP
53 State Street
Boston, MA  02109

Michael B. Cottler, Esq.
Emily L. Rapalino, Esq.
Elaine Herrmann Blais, Esq.
Natasha E. Daughtrey, Esq.
Brian J. Prew, Esq.
Goodwin Procter, LLP
620 Eighth Avenue
New York, NY  10018

Kandi Kilkelly Hidde, Esq.
E. Ashley Paynter, Esq.
Bingham McHale LLP
2700 Market Tower
10 West Market Street
Indianapolis, IN  46204-4900

Ali I. Ahmed, Esq.
APP Pharmaceuticals, LLC
Three Corporate Drive
Lake Zurich, IL  60047

## I N D E X

**PLAINTIFF'S WITNESS**                                    **PAGE**

MARK RATAIN

Direct Examination by Ms. Rapalino .............84

## I N D E X   O F   E X H I B I T S

**TRIAL EXHIBIT**                                         **PAGE**

337 ........................................227

Vol. 1-4

```
 1                    (In open court.)

 2          THE COURT:  Good morning, everyone.

 3          We are on the record.  This is Eli Lilly and

 4   Company, plaintiff, versus Teva Parenteral Medicines, APP

 5   Pharmaceuticals, Pliva -- how do you pronounce the --

 6          MR. WIESEN:  Your Honor, unfortunately, I still

 7   haven't been able to determine how to pronounce that Croatian

 8   term.

 9          THE COURT:  But it is spelled H-R-V-A-T-S-K-A

10   Pharmaceuticals, U.S.A -- I'm sorry -- Teva, Teva

11   Pharmaceuticals U.S.A. and Barr Laboratories are the

12   defendants, and our case number is 1:10-CV-1376.  And we are

13   here this morning for a bench trial on a patent infringement

14   matter.

15          And why don't we have attorneys state their names

16   for the record, beginning with the plaintiff's table?

17          MR. PERLMAN:  Good morning, Your Honor.  Adam

18   Perlman from Williams & Connolly on behalf of the plaintiff,

19   Eli Lilly.  If I can introduce the remainder of our table, to

20   my left, my colleague Bruce Genderson.

21          MR. GENDERSON:  Good morning.

22          MR. PERLMAN:  Mr. Dov Grossman.

23          MR. GROSSMAN:  Good morning, Your Honor.

24          THE COURT:  Good morning.

25          MR. PERLMAN:  David Krinsky.
```

Vol. 1-5

1           MR. KRINSKY:  Good morning, Your Honor.

2           THE COURT:  Good morning.

3           MR. PERLMAN:  Behind Mr. Krinsky, Megan Hughes.

4           MS. HUGHES:  Good morning, Your Honor.

5           THE COURT:  Good morning.

6           MR. PERLMAN:  Andrew Trask.

7           THE COURT:  Good morning.

8           MR. PERLMAN:  Back at the table, in-house from Eli

9   Lilly, Steve Caltrider.

10          James Leads, also from Eli Lilly.

11          THE COURT:  Good morning.

12          MR. PERLMAN:  Of course, you know Jan Carroll from

13  Barnes & Thornburg.

14          MS. CARROLL:  Good morning.

15          THE COURT:  Good morning, Counsel.

16          MR. PERLMAN:  I have a couple more introductions,

17  Your Honor.  In the courtroom we have Sue Mahoney, who is the

18  president of Lilly Oncology.

19          THE COURT:  Good morning.

20          MR. PERLMAN:  And we also have Michael Harrington,

21  who is the general counsel of Eli Lilly & Company.

22          THE COURT:  Good morning.

23          All right.  Thank you, Mr. Perlman.

24          And at our defendant's table?

25          MR. WIESEN:  Good morning, Your Honor.

1          Daryl Wiesen from Goodwin Procter on behalf of all

2     the defendants, and with me today I have Emily Rapalino from

3     Goodwin Procter.

4               THE COURT:  Good morning.

5               MR. WIESEN:  Michael Cottler from Goodwin Procter.

6               MR. COTTLER:  Good morning, Your Honor.

7               THE COURT:  Good morning.

8               MR. WIESEN:  Elaine Blais.

9               MS. BLAIS:  Good morning, Your Honor.

10              MR. WIESEN:  Kandi Hidde from Bingham Greenbaum.

11              THE COURT:  Good morning.

12              MR. WIESEN:  And out in the gallery we have Brian

13    Prew and Natasha Daughtrey from Goodwin Procter.

14              THE COURT:  Good morning.

15              MR. WIESEN:  And from the clients, Jon Wise from

16    Teva Pharmaceuticals and Jack Silhavy and Ali Ahmed from

17    Fresenius Kabi, formerly APP Pharmaceuticals.

18              THE COURT:  Okay.  Good morning.

19              And before we begin, I do apologize that it's so

20    very warm in here, but apparently it's a building-wide

21    problem, and they're working on it, and it should get cooler

22    as the day progresses.  So we'll just have to grin and bear

23    it.

24              All right.  Lawyers, I think we're going to begin

25    with the tutorial, and how are you all going to do that

Vol. 1-7

1  presentation?  The Court gave you 30 minutes total.

2          MR. PERLMAN:  So, Your Honor, when I proposed doing

3  this, I said it would be objective and nonadversarial, and

4  Mr. Wiesen and I have worked out a joint presentation.

5          THE COURT:  Wonderful.

6          MR. PERLMAN:  And so the way we thought we would do

7  it is that we would both stand here.  We've divided it up, so

8  we're each taking certain parts.  The other one may chime in,

9  if necessary.  We're optimistic it's not going to happen

10 much --

11         THE COURT:  Okay.

12         MR. PERLMAN:  -- but we're going to give it a whirl.

13         THE COURT:  Sounds good.

14         MR. WIESEN:  And we've jointly prepared a set of

15 slides, as well, that took a little negotiating but we think

16 might be helpful.

17         MR. PERLMAN:  It might be helpful if I hand those

18 up.

19         THE COURT:  You may.

20         Thank you.  If you have one for the clerk -- Tanesa,

21 you don't need one, or do you?

22         MR. PERLMAN:  The law clerk.

23         THE COURT:  The law clerk.

24         Do you want one, Tanesa?

25         David, the court reporter might.

1              All right.  Counsel, you may.

2              MR. PERLMAN:  Thank you, Your Honor.

3              As you know, this case is about pemetrexed, which is

4    an antifolate, and so we'll begin with a discussion of what a

5    folate is and the folate pathway.

6              "Folates" is a term that refers to a class of

7    compounds that are essential for various biochemical reactions

8    in the human body.  Those processes include synthesizing

9    several of the major building blocks of DNA and RNA.  Folates

10   occur naturally in a variety of foods, and there are a variety

11   of different forms of folate that the body uses.  And they are

12   generally referred to as reduced folates, which is a term that

13   you're going to hear a bunch in this trial.

14             The body makes various forms of reduced folates from

15   the folates that people obtain from food.  Another example of

16   a folate is folic acid, which you may have heard of.  It's a

17   vitamin.  Folic acid is the most common folate used as a

18   dietary supplement, but it doesn't occur widely naturally in

19   nature.  For a variety of reasons, that's the form that's most

20   easy to put into a pill, and so that's what you can buy at the

21   health food store.

22             Folic acid is not itself usable by the body, but the

23   body converts it into reduced folates that the cells of the

24   body can use.  Now, within the cells in the human body, there

25   are what are called enzymes, which are substances that carry

1   out various reactions that, among other things, help transform

2   one molecule into another molecule.  As relevant to this case,

3   there are a number of different enzymes in cells in the human

4   body that convert one folate into another form of folate and

5   which as part of the same reactions also cause chemical

6   changes to other compounds that you're going to hear about.

7            Now, the various reactions that convert one form of

8   folate to another form of folate within the body are referred

9   to as the folate pathway, or the folate cycle sometimes, and

10  that's what we have up on the screen.  Now, nobody panic.  We

11  don't have to understand the entirety of this diagram in order

12  to follow this case.  But what I wanted to show you is the

13  whole thing is complicated, and what you're seeing here is a

14  cycle where various enzymes facilitate a series of reactions

15  in which different forms of folate are used to make a host of

16  different products.  And what happens is the various forms of

17  folates cycle through this process over and over again.

18           Now, I'm going to highlight three of these that are

19  going to play a role in this case.  They are TS, DHFR and

20  GARFT.  And they each have an impenetrably long technical

21  name, but they are commonly referred to by these acronyms, and

22  we're going to endeavor to do that here so as to avoid

23  confusion.

24           THE COURT:  Okay.

25           MR. PERLMAN:  Let's focus in on the part of the

1   pathway that uses these enzymes, and there's also a fourth one

2   on here that we circled called AICARFT.  Each of these enzymes

3   is involved in chemical reactions that use folates in order to

4   make various building blocks of DNA.  So, the folate interacts

5   with the enzyme, a particular reaction occurs, and the output

6   of it is something that is usable by the cell to make DNA.

7         Cells need DNA in order to be able to divide and

8   grow and produce more cells, and cells need to do that or they

9   can't stay living.  And so the process by which these enzymes

10  convert folate into DNA is necessary for cell division and

11  reproduction.

12        Now let's talk about antifolates.  Pemetrexed, which

13  is the compound Lilly sells as Alimta, is an antifolate.

14  Antifolates are a class of compounds that interfere with the

15  natural reactions of the folates.  So, the idea is to block

16  the cell division and thus kill cancer cells by doing so

17  because the cancer cells are dividing out of control, and if

18  you prevent them from making DNA, they can't divide anymore,

19  and the idea is you'll kill the cancer.

20        So, the folates work, as I said, by binding to the

21  various enzymes that I put on up on the screen.  Antifolates

22  work by binding to the same enzyme in place of the folate.

23  When the antifolate binds to the enzyme, the antifolate

24  doesn't allow the enzyme to run the reaction that it would

25  normally want to do with the folate; and the building block of

1  DNA that it would normally make can't get made.  It's not a

2  perfect analogy, but the way this is commonly thought of is,

3  think of the enzyme like a lock, and the folate and the

4  antifolate are both keys that fit into the lock, but only the

5  folate can turn the lock.  And so when the antifolate is in

6  the lock, it blocks the folate from getting there, and also

7  the lock doesn't turn, and so the reaction that the lock

8  begins doesn't take place.

9        And so the concept behind using antifolates to treat

10  cancer is that the antifolate will compete with the natural

11  folate for interaction with these enzymes in the folate

12  pathway and disrupt the ability to make DNA.  So, I'm showing

13  this here graphically.  Antifolates, it's not sort of one size

14  fits all.  The different antifolates inhibit the enzymes of

15  the pathway to a different degree and different strength,

16  depending on which particular antifolate you're talking about.

17        The example that I've put on up on the screen, one

18  of the enzymes pemetrexed blocks or inhibits is the enzyme TS,

19  and so the X is indicating that pemetrexed would interact with

20  TS and block the folate from interacting with TS.

21        The effect of that is blocking the synthesis of one

22  of the building blocks of DNA.  This is the rationale, or one

23  of the rationales, by which pemetrexed treats cancer.  The

24  idea is that the antifolate binds to and interacts with the

25  enzyme instead of the reduced folate, and then the rest of

1  this process sort of to the left of where the upper X is

2  doesn't happen, and the DNA doesn't get made.

3          And so let's do it graphically.  On the previous

4  slide, the DNA was made, the cells split, you had more cells,

5  and in the case of cancer, the cancer would continue to grow.

6  The rationale behind using an antifolate for chemotherapy is

7  that cancer cells divide more often than many normal, healthy

8  cells.  And because that cell division requires DNA, rapidly

9  dividing cells like cancer cells need more DNA than less

10  rapidly dividing cells.  And so when you interfere with the

11  action of one or more of the enzymes involved in making the

12  building blocks of DNA, you can -- that can lead to inhibition

13  of tumor growth, death of the tumor cells and shrinkage or

14  elimination of the tumor.

15          The problem is, that happens in all cells, not just

16  cancer cells, the blocking of the making of DNA.  And there

17  are also healthy, normal cells in the body that divide rapidly

18  like cancer cells do.  Examples might be in the bone marrow or

19  the gastrointestinal tract.  Antifolates affect them, too,

20  which leads to certain toxicities or severe side effects for

21  the patient that you'll hear about during the trial.

22          MR. WIESEN:  Another thing we're going to be talking

23  about during the trial, Your Honor, is the concept or

24  something called the homocysteine.  Homocysteine is another

25  substance that's in the body, mainly in the blood, and you can

1    measure how much homocysteine there is in the blood of an

2    individual person.  There are a number of reasons that

3    homocysteine might be elevated, might be high, in a person's

4    blood, and some of those reasons are related to the folate

5    pathway that we've been talking about.

6           We've put up on the slide that we've circled where

7    in the folate pathway you can see homocysteine plays a role,

8    just to orient you on the complicated graphic that Mr. Perlman

9    showed you earlier.  And similarly, we can show you a smaller

10   part of the pathway that includes the homocysteine reaction

11   that you'll hear about.  And let me walk you through what's

12   going on here.

13          We created a graphic that's, I think, a little bit

14   more accessible than the pathway as drawn by some of the

15   experts so we can show what's going on.

16          At one point in the pathway there's a reaction

17   between two substances called -- homocysteine is one of them.

18   We have that on the left here in orange; and on the right, we

19   have what's called MTHF.  That's one of the reduced -- one of

20   the specific reduced folates that Mr. Perlman was referring

21   to, and even though MTHF is a reduced folate, importantly, it

22   cannot be used by any of the enzymes in the folate pathway to

23   make DNA.  We put that on the slide.  This one can't be used

24   to make DNA, and there's only one way in which this MTHF or

25   methyltetrahydrofolate, some of the experts will refer to it

1  as, can be converted to a form of folate that then becomes

2  usable elsewhere in the pathway.  And it's through this

3  reaction that we're about to run through.

4         So when the cell operates properly, there's a

5  chemical reaction between homocysteine and

6  methyltetrahydrofolate or MTHF.  And it takes part in an

7  enzyme that we've shown just as a chemical reaction in the

8  middle.  And the output of that is called THF or

9  tetrahydrofolate and the substance called methionine.

10        The homocysteine gets converted.  The methionine,

11 the MTHF gets converted to THF, and the -- unlike the MTHF,

12 the THF is an active folate that the other enzymes in the cell

13 can use.  So it's important that the MTHF be converted by this

14 process into THF.  If for whatever reason this reaction

15 doesn't happen and the MTHF is not converted to THF or that

16 doesn't happen efficiently -- it may happen some but not

17 enough in the cell -- the folate, which is now stuck in the

18 MTHF form is often referred to as trapped because it's stuck

19 in a form that the cells can't use to make DNA.

20        And this concept you will hear described as the

21 methyl trap or the methyl folate trap, and what that's

22 referring to is that the reduced folates are trapped in the

23 MTHF form that can't otherwise be used in the pathway.  So let

24 us show you what happens if the patient is folate deficient,

25 and we're going to start with an extreme example.

1        Let's assume somebody has absolutely no folate or no

2    MTHF.  That's not really going to happen but for explaining

3    the process, the concept is useful.  If that's the case, then

4    this process won't proceed.  If there's no MTHF to go into the

5    chemical reaction, the chemical reaction doesn't occur and the

6    homocysteine can't be converted into methionine.

7        If the homocysteine is not converted into

8    methionine, the amount of homocysteine in the blood goes up.

9    And so you can -- and in the absence of the folate and the

10   absence of the THF, which is also not created when there's no

11   MTHF, that will have an impact on the other parts of the

12   folate pathway where these folates come out and continue to

13   cycle through.  For the purposes of the tutorial, we're still

14   just going to stay focused on this reaction, but it's

15   important that you understand this is a small part of the

16   bigger reaction that occurs.

17       The same thing basically happens if a patient is low

18   in folate, not none but low, what will happen is that the

19   reaction will happen some.  It will form some -- the MTHF will

20   go through the chemical reaction with homocysteine and THF,

21   with a little bit of THF and methionine will be formed, but

22   the amount of homocysteine in the blood will still go up

23   because there's not enough MTHF to have the reaction run as

24   efficiently as possible.

25       So if there's a folate deficiency, the amount of

1  homocysteine in the patient's blood will go up.  It keeps

2  being formed by the cycle but isn't transformed from

3  homocysteine to methionine.  And that's why elevated

4  homocysteine is referred to sometimes as a marker or a signal

5  that a patient may be folate deficient.

6       You are also going to hear some about vitamin B12 in

7  this case.  Vitamin B12 also plays into this reaction.

8  Although it's unrelated to folate, like folate, vitamin B12 is

9  an essential nutrient.  It's a vitamin, and up until now we've

10  been calling this chemical reaction literally a black box on

11  the slide.  Well, let's take a look at a little bit more what

12  happens in the reaction.  There we go.

13       The enzyme that's involved in the transformation of

14  MTHF to THF has the roll-off-your-tongue name methionine

15  synthase, and there's not a great abbreviation for that one.

16  It's what people tend to call it, unfortunately.  Vitamin B12,

17  as we've shown here, fits into -- or actually it's technically

18  a derivative of vitamin B12, is necessary for this reaction to

19  proceed.  It's called the cofactor, and it helps the

20  methionine synthase process this reaction.

21       So let's assume for a minute there's no B12, back to

22  our extreme example, this time with no B12.  We've got plenty

23  of MTHF but no B12.  The process doesn't go forward, the

24  reaction doesn't occur, and homocysteine builds up in the cell

25  in the same way and in the blood the same way as if there were

1   no folate.

2          Let's look at the same situation if there's a
3   deficiency, a small amount of B12 but not a full amount to
4   have the reaction run efficiently.  Again, some homocysteine
5   is converted to methionine.  Some methyltetrahydrofolate or
6   MTHF is converted to THF, but the homocysteine will go up in
7   the blood because the conversion is not happening efficiently.
8   And this is why elevated homocysteine can also be an indicator
9   of a vitamin B12 deficiency.  Because with both folate
10  deficiency or vitamin B12 deficiency, you can see the
11  homocysteine go up because this particular reaction doesn't
12  run efficiently.

13          Now, there's at least one more substance in the
14  blood that's going to come up in the trial.  It is called
15  methylmalonic acid.  It's actually a term that's in the patent
16  as well.  That one does have an abbreviation, it tends to be
17  called MMA, and we'll try and call it that.

18          MMA is not involved in the folate pathway.  If a
19  patient has elevated amounts of MMA in their blood, that,
20  however, can be a marker for a deficiency of B12 as well
21  because of yet another reaction that we'll show you.  There's
22  another reaction in the totally different part of the cell,
23  and for our purposes in this case, what that reaction is, what
24  it's used for really doesn't matter at all.  And we're not
25  even really going to talk about it.

1           What's important for us to understand is that

2    there's this substance called methylmalonyl-CoA.  We're

3    showing that on the slide, and the methylmalonyl-CoA interacts

4    with another enzyme.  And the way, if you catch on, the way

5    these are often named is there's an "ase" added at the end, so

6    methylmalonyl-CoA mutase is the enzyme that converts

7    methylmalonyl-CoA.

8           And what happens with vitamin B12 is it acts here as

9    well to assist in a particular conversion of methylmalonyl-CoA

10   to succinyl-CoA, and for this reaction to occur, vitamin B12

11   is required.  If the patient doesn't have enough vitamin B12,

12   like we were looking at in the other reaction, the

13   methylmalonyl-CoA gets converted to something else called MMA,

14   and so that -- in this situation, in this other reaction, a

15   shortfall of vitamin B12 can lead to an increase in the

16   presence of MMA in the blood, and so MMA can also be a marker

17   or a signal that there's a deficiency of vitamin B12.

18           MR. PERLMAN:  All right.  So just to sort of recap

19   where we are, elevated homocysteine can be the result of low

20   levels of folate or low levels of B12, as well as other

21   things.  Elevated MMA is an indicator of low levels of B12,

22   and so if you look at both substances at the same time, that

23   can help distinguish what type of deficiency a patient has.

24   So we've put together a graphic that hopefully will be helpful

25   in explaining this.

1          We're purposely oversimplifying here to focus just

2    on folate and vitamin B12 as potential causes for elevated

3    homocysteine.  There are other causes, but for the tutorial,

4    this is complicated enough.  All right.  So in the

5    first slide, as a patient's folate levels go down, the

6    homocysteine levels will go up, which is why elevated

7    homocysteine can be an indicator of low folate.

8          Now, let's add B12 to the equation.  When B12 levels

9    go down, homocysteine goes up and MMA goes up.  And so the

10   combination of these two markers allows doctors to try to

11   narrow down the reasons for why a patient might have elevated

12   homocysteine.  If the homocysteine is elevated but the MMA is

13   not, that indicates that whatever is causing the homocysteine

14   to go up, it is probably not a vitamin B12 deficiency, because

15   if there were a vitamin B12 deficiency, the MMA levels would

16   probably go up too.

17         Now, on the other hand, if both homocysteine and MMA

18   levels are elevated, that indicates that the patient likely

19   has at least low levels of vitamin B12.  Now, there may also

20   be other causes for the elevated homocysteine, like low levels

21   of folate, but what you can at least conclude in that

22   situation when both markers are up is that low levels of B12

23   are likely playing a role in the elevated homocysteine.

24         MR. WIESEN:  Your Honor, the case is also going to

25   go beyond just this folate pathway.

1          MR. PERLMAN:  Very disappointing.

2          MR. WIESEN:  I know.  Something else you will hear

3   about in the case is the drug development process.  After a

4   new drug is discovered, work is done to develop the drug and

5   determine whether it can be safely and effectively given to

6   patients.  Work begins in the preclinical phase.  This refers

7   to before it's given to humans.  And it includes tests in test

8   tubes, in cells, in live animals, but not humans.

9          From the preclinical phase, if a drug looks

10  successful and promising, a drug may move into clinical

11  trials, and those clinical trials are generally considered in

12  different phases, which you will hear about in the case.  The

13  first clinical trials, the first trials in humans --

14  clinically usually are first in humans -- are called Phase 1

15  trials, and these are designed principally to figure out a

16  safe dose for patients.  They can provide other information as

17  well, and there will be an issue in the case about how and

18  what other information can be ascertained from such trials.

19          One thing we should note is that Phase 1 clinical

20  trials for chemotherapy drugs, in general, are a little

21  different than most Phase 1 trials.  For most Phase 1 drugs,

22  the trial is conducted in healthy patients.  But for

23  chemotherapy drugs, they're conducted in patients who have

24  cancer because the drugs can have serious toxicities

25  associated with them for all the reasons we've just talked

1    about, about what chemotherapy drugs and antifolates can do.

2            Phase 2 trials, not surprisingly, come after Phase 1

3    trials.  They're usually done using the safe and promising

4    doses and schedules that were determined in a Phase 1 trial.

5    Phase 2 trials usually focus on trying to determine if the

6    drug works in a particular type of cancer rather than in

7    cancer generally.

8            And following Phase 2 trials, if there are promising

9    results, a drug may move into a phase three phase or phase

10   three trials.  Phase three trials are controlled trials for

11   FDA approval of the drug, and they measure both safety and

12   efficacy and are almost always required by the FDA before they

13   will approve a drug.

14           MR. PERLMAN:  And so that concludes our prepared

15   tutorial.  We brought it in about six and a half minutes

16   early, and so if Your Honor has questions, we're happy to

17   answer those or else we're happy to proceed.

18           THE COURT:  That was helpful, very helpful.  We can

19   move into opening statements and --

20           MR. WIESEN:  We've agreed the defendants will go

21   first since we have the burden of proof.  I have binders with

22   slides if people would like them.  We'll also show them on the

23   screen.  I can distribute them.

24           THE COURT:  I would like one.

25           MR. WIESEN:  Good morning, Your Honor.

1          THE COURT:  Good morning, Counsel.

2          MR. WIESEN:  The defendants in this case are two

3   pharmaceutical companies, Teva Pharmaceuticals and Fresenius

4   Kabi, which was previously known as APP Pharmaceuticals.  What

5   brings us here today is that each of these companies has told

6   the FDA that they believe the patent-in-suit is invalid, and

7   have requested that the FDA approve their applications to

8   manufacture and sell a generic versions of Eli Lilly's

9   pemetrexed product.

10         The regulatory filing that both of the companies

11  made challenges the '209 patent, and is part of a legal

12  structure that Congress put in place nearly 30 years ago to

13  allow companies like the defendants to challenge patents and

14  attempt to bring less expensive generic products to market.

15         In 1984, Congress passed the Hatch-Waxman Act.  The

16  statute allows the generic pharmaceutical company to file

17  what's called an Abbreviated New Drug Application, which is

18  usually called an ANDA, A-N-D-A.  The application is called

19  abbreviated because the generic companies can rely upon the

20  safety and efficacy data developed by the brand company.  This

21  allows the generic companies to develop their products for

22  less money, allows them to sell the products to patients and

23  doctors at substantial discounts.

24         In adopting the Hatch-Waxman Act, Congress sought to

25  establish a balance between branded and generic pharmaceutical

1    companies.  As part of that balance, Congress adopted 35

2    U.S.C. 271 E.  It's that section of the U.S. code of the

3    patent statute that allows Eli Lilly to bring this lawsuit

4    before the generic companies have launched a product.

5            In adopting the act, Congress recognized branded

6    companies would have an incentive to seek as many patents as

7    possible to extend their monopoly as long as possible.  The

8    act is designed to allow generic companies, as both Teva and

9    Fresenius to challenge those patents in court and ensure that

10   a monopoly is not improperly extended by an invalid patent.

11           There's no dispute in this case that under this

12   structure, Lilly's been able to reap substantial benefits from

13   its development of pemetrexed.  No matter what the results of

14   this case, Lilly will have at least 13 years of exclusive

15   sales, allowing them to make billions of dollars in profits.

16           Lilly received an earlier primary patent on the

17   pemetrexed molecule itself, which doesn't expire until 2017.

18   And the reason that patent doesn't expire until 2017 is an

19   extension they got as part of the Hatch-Waxman Act, part of

20   the balance and tradeoff that Congress adopted.

21           Through this case, Lilly seeks to extend its

22   exclusivity for another five years until 2022 by using a

23   secondary patent, the '209 patent.  The single patent at

24   issue here doesn't claim pemetrexed as a molecule.  It doesn't

25   claim using pemetrexed to treat some new disease.  They didn't

1   go find out "We thought it treated one thing, but it actually

2   treats something else."

3          Instead, the patent claims only giving a combination

4   of vitamins with pemetrexed on the idea that nutritional

5   deficiencies in patients receiving chemotherapy may increase

6   the toxicity or side effects for those patients.

7          The trial is going to focus on the invalidity of

8   this patent over the next two weeks.  The Court will hear

9   testimony and evidence concerning invalidity defenses that can

10  be put into two alternative categories.  First, the assorted

11  claims are obvious based on what would have been known by a

12  person skilled in the art as of the filing date of the

13  application, or actually a year before the filing date.

14          A person of ordinary skill looked at everything that

15  was out there about antifolates, about the folate pathway,

16  about pemetrexed.  And including yet another Eli Lilly patent,

17  they concluded that the claims are obvious and the patents

18  should be declared invalid.

19          The second bucket of arguments that I'll get to in a

20  little while concerns the disclosures in the patent

21  specification.  Simply put, although the patent purports to

22  claim a regimen for effectively administering pemetrexed, it

23  leaves out a critical detail.  You can read the entire patent,

24  and the thing you won't find is the dose and schedule to give

25  pemetrexed.  And that's a violation of another portion of the

1  patent statute.

2          Before we turn to the defenses in a little more

3  detail, I want to spend a few minutes looking at the patent

4  itself.  It's TX1, and it's patent 7,727,209, which we'll

5  call the '209 patent.

6          Initially in this case, Eli Lilly asserted all of

7  the claims in the patent, and there are about 21 or 22 of

8  them.  But shortly before we filed the pretrial briefs, they

9  dropped most of the claims, and we're litigating now only

10  eight of them, Claims 9, 10, 12, 14, 15, 18, 19, and 21.

11          I've put up on the screen Claim 1, and some of the

12  claims that are asserted are dependent claims.  So they start

13  with Claim 1 and add other details.  And I want to spend a

14  minute looking at it.  Claim 1 is a method for administering

15  pemetrexed disodium to a patient in need thereof comprising

16  administering an effective amount of folic acid and an

17  effective amount of methylmalonic acid lowering agent,

18  followed by administering an effective amount of pemetrexed

19  disodium wherein the methylmalonic acid lowering agent comes

20  from this specified list.

21          In the trial, the case is going to focus on one

22  methylmalonic acid lowering agent so we don't need to worry

23  about most of the list.  It's going to focus on vitamin B12.

24  In many ways, although it may not look it, this claim is

25  straightforward.

1          Claim 1 of the '209 patent claims giving these

2    well-known vitamins, folic acid and vitamin B12, before giving

3    a patient pemetrexed.  It's all it covers.  Previously, the

4    Court has looked at this patent and entered a claim

5    construction order that provides a little more clarity on

6    what's covered by the patent.  And I want to just note quickly

7    two of the claim constructions entered by the Court.

8          First, the Court construed vitamin B12 to be

9    cyanocobalamin, one of the specific B12 vitamins that falls

10   into that general category, and much of the evidence in the

11   case will therefore focus on cyanocobalamin.

12         Another claim term that was construed, I think

13   through an agreement of the parties in the end, was the term

14   effective amount of pemetrexed disodium.  And for this case,

15   that means an amount of pemetrexed disodium that is capable of

16   providing a therapeutic benefit to the patient in need

17   thereof.

18         So, if we look at this construction and think about

19   the claims, all that is required by the claim is that the

20   dosing regimen for pemetrexed be capable of providing a

21   benefit to patients.  And to prove that the claim is obvious,

22   defendants need only prove it would be obvious what's claimed,

23   that the invention would be capable of providing a benefit to

24   patients.

25         We don't have to establish that it's obvious that

1    the FDA would have approved the drug.  We don't have to

2    establish that had Lilly sought a different dosing schedule,

3    it would have failed.  We don't have to establish that this is

4    the best -- it was obvious that this was the best dosing

5    schedule out there, because the claims don't require that.

6            All we have to prove is that the claims, as written

7    and as construed, are obvious, and that's that it would have

8    been obvious that giving folic acid and vitamin B12

9    pretreatment with pemetrexed would have provided a therapeutic

10   benefit to a patient.

11           Now, the claims asserted by Eli Lilly in this case

12   still do add some standard doses and schedules or

13   administration routes for folic acid and vitamin B12 to the

14   general concept of pretreating with vitamins.  If we look at

15   Claim 12, it serves as an example.

16           If we look at this, we see that what's added to the

17   claim of giving pemetrexed is A, a particular dose of folic

18   acid.  That's 350 micrograms to about a thousand micrograms of

19   folic acid, which is .35 milligrams to one milligram, if I'm

20   doing my math right, and an administration of about

21   500 micrograms to about 1500 micrograms of vitamin B12.  So,

22   half a milligram to 1.5 milligrams.

23           The evidence in the case will be that these are

24   standard doses of folic acid and vitamin B12 routinely

25   administered by people of ordinary skill in the art.

1          Let me turn, then, to the first category of

2    defenses.  These two related but separate defenses,

3    obviousness and obviousness-type double patenting, are based

4    on what was known by a person of ordinary skill in the art

5    before Lilly filed the patent application.  The evidence will

6    show that the claims of the patent were obvious based on a

7    series of publications concerning antifolates generally and

8    pemetrexed in particular.  And when the Court considers all

9    the evidence as a whole, as required by the patent statute,

10   this evidence will establish that the claims are clearly and

11   convincingly invalid.

12          Now, I want to note that many of the extensive

13   publications and patents you're going to hear about concerning

14   pemetrexed, before Lilly applied for the patent application

15   here, were actually published by Lilly's own researchers.

16          Lilly didn't keep its research on this compound

17   secret.  They made a conscious choice to disclose and publish

18   information on pemetrexed for all to see.  Why they did that

19   doesn't matter here.  Whether it was done to keep their

20   investors happy about how their pipeline was doing, or whether

21   they were publishing it because scientific knowledge is useful

22   and good to publish, it doesn't make a difference to this

23   case.

24          What matters is that Lilly chose to disclose this

25   research, and the law on the subject is clear.  Once the

Vol. 1-29

1   information is disclosed, it's given to the public.  Lilly

2   can't take it back later.

3           So for purposes of analyzing the validity of the

4   patent, a person of ordinary skill in the art would have

5   access to all of these publications.  And we'll get to it in

6   more detail in a minute, but not only did Lilly publish this

7   information in abstracts and papers about pemetrexed, they

8   also patented a method of administering an antifolate

9   generally, which includes pemetrexed with folic acid

10  pretreatment.  That now expired patent, which I'll show you

11  later is called the '974 patent, after the last three

12  numbers in its patent, and it was filed years before the

13  '209 patent.

14          The '974 is here.  It's Trial Exhibit 916.

15          Let me turn to obviousness in a little more detail.

16  As set forth by the Supreme Court nearly 50 years ago in

17  Graham versus John Deere, obviousness requires the Court to

18  consider evidence on four issues:  The scope and content of

19  the prior art, differences between the claimed subject matter

20  and the prior art, the level of ordinary skill in the art, and

21  secondary indicia of non-obviousness.  We'll run through the

22  evidence that you'll hear on each of these four factors.

23          Obviousness doesn't require that every element of

24  the claim have been previously disclosed in one single prior

25  art reference.  To the contrary, obviousness generally assumes

1  that there isn't one reference that discloses all of the

2  details of the invention.

3        The obviousness inquiry for the Court will be the

4  question of whether, in light of all of the evidence, all of

5  the prior art taken together, it would have been obvious to a

6  person of ordinary skill in the art to combine that art and

7  come up with the invention.

8        So what will the evidence be?  Let's start with the

9  scope and content of the prior art.  The parties have worked

10 together and stipulated to most of the prior art.  We agree

11 what is -- we could at least agree on publication dates for

12 things, but that's not to say that there's nothing for this

13 Court to decide.

14       The dispute's going to be about what the person of

15 ordinary skill in the art would read from these references.

16 When they sat down and read them, what would it teach?  What

17 would they take away from them?

18       Just a few minutes ago, we presented our joint

19 tutorial on the technology in the case, and some of this will

20 be undisputed.  For example, pemetrexed is a chemotherapy drug

21 in the class of antifolates.  Dr. Mark Ratain, a well

22 respected oncologist at the University of Chicago, with over

23 25 years of experience researching and treating cancer, will

24 testify on behalf of the defendants.  They will explain that

25 like all chemotherapy drugs, pemetrexed -- excuse me, Your

1  Honor.  They'll explain that like all chemotherapy drugs,

2  pemetrexed kills cells in the body, killing as few healthy

3  cells as possible while killing as many cancer cells as

4  possible.  But it's very difficult to achieve that balance.

5        The same way pemetrexed kills cancer cells by

6  interfering with the folate pathway, as Mr. Perlman and I

7  explained, is the same way it kills healthy cells.  Killing

8  the cancer cells is, generally speaking, good.  It's why

9  pemetrexed works as a chemotherapy agent.

10       The killing of healthy cells is bad.  It explains

11  most of the toxicity of pemetrexed.  The evidence at trial

12  will be that a person of ordinary skill in the art was looking

13  for a dosing regimen for pemetrexed which, by 1999, was known

14  as a very promising antifolate that hit the cancer cells as

15  hard as possible while sparing as many of the healthy cells.

16       The folate pathway that the parties described

17  earlier exists in cells throughout the body, and creates the

18  building blocks for DNA which are necessary for cells to

19  reproduce.  The Court's going to hear a fair amount of

20  testimony about this pathway beginning with Dr. Ralph Green,

21  who's a distinguished professor at the University of

22  California-Davis.

23       Dr. Green has spent his career studying folate and

24  Vitamin B12 metabolism, and he'll explain the metabolic

25  pathway and what a person of ordinary skill would understand

1  from that pathway in the context of the other available prior

2  art about pemetrexed.  Now, when a healthy person, eating a

3  healthy diet, levels of folate and vitamin B12 are generally

4  kept at certain levels that allow cells to efficiently

5  reproduce through the process we described.

6          Some people also take over-the-counter multivitamins

7  to supplement their diet.  Either the natural folates or B12

8  from food or from a supplement play a role in the folate

9  pathway or cycle.  And without these vitamins, the cells can't

10  reproduce.  Antifolates have been in use since the 1940s to

11  treat cancer.  Doctors and researchers understand that because

12  the cancer cells reproduce more quickly and uncontrollably

13  than the healthy cells, an antifolate that interferes with

14  cell reproduction could hit the cancer cells harder and spare

15  the healthy cells.

16          In this difference between how the antifolates

17  impact cancer cells and healthy cells is what allows the

18  antifolates to treat cancer.  Doctors and researchers also

19  understand this folate pathway and how the antifolates work.

20  They know that the antifolate competes with the natural

21  folate, competes with -- competes as a different key to get

22  into the lock, and so there was a theoretical understanding

23  that the amount of functional folate in the cells could impact

24  the result obtained with an antifolate.  The fundamental

25  takeaway, the evidence will show, is this:  The whole idea of

1  antifolates is that they can have a differential effect on

2  cancer cells and healthy cells, but exactly how and where

3  that's going to happen is going to take some research.

4          The parties describe some of these theoretical

5  issues during the tutorial, but those theoretical issues are

6  going to be just part of the story.  Here, the prior art goes

7  well beyond the theory into actual research and study of

8  pemetrexed.  And that evidence will tell a person -- would

9  tell a person of ordinary skill in the art that the claims

10 here are obvious.

11         So what would a person of ordinary skill have

12 known about pemetrexed in particular?  They would know it was

13 the most promising antifolate being researched in 1999.  It

14 had gone through preclinical animal studies to Phase 1

15 studies, to Phase 2 studies, and it was beginning phase three

16 studies.

17         As we talked about this morning already, drug

18 development often begins in these preclinical animal

19 experiments.  And here, in antifolate chemotherapy, there was

20 a standard animal model that Lilly had developed using mice.

21 In fact, the model is so standard, the '209 patent itself

22 calls this model standard.

23         We have a publication by John Worzalla and others at

24 Lilly.  It is Trial Exhibit 384, and I'll leave it to the

25 experts to explain exactly how they did this study and

1  precisely what the data showed.  But the conclusion as set

2  forth in this prior art publication about pemetrexed and folic

3  acid, because in this animal study they gave folic acid, along

4  with pemetrexed, needs little explanation.

5          The conclusion right in the abstract is folic acid

6  supplementation was demonstrated to preserve the antitumor

7  activity of pemetrexed while reducing toxicity, and you will

8  hear a number of names for pemetrexed throughout the case.

9  One of them is LY231514.  That was Lilly's internal

10  designation for the compound.

11          There will be evidence that this is how Lilly

12  interpreted this data during the relevant time.  When Lilly

13  sought to add vitamin B12 and folic acid to pemetrexed during

14  clinical trials, they explained why they should be allowed to

15  do so to the FDA, and Lilly cited and interpreted some of the

16  very same prior art references that the defendants are relying

17  on now in that exchange with the FDA.  And when they read

18  those papers, when they told the FDA, if you read the

19  research, this is what it will say, they said what we say it

20  says.

21          Now, one example is that this very paper from John

22  Worzalla and others at Lilly, Lilly presented this to the FDA

23  in 2000, and what did they tell them?  They specifically cited

24  Worzalla, et al. 98.  You can see that near the top of the

25  slide in a discussion of cancer preclinical data, and they

Vol. 1-35

1  said at the very end, "these data support the hypothesis that

2  folic acid supplementation can protect healthy tissue from the

3  toxic effects of pemetrexed with retention of antitumor

4  activity."  So adding folic acid to pemetrexed has this

5  differential effect.  It protects the healthy cells and lets

6  pemetrexed continue to kill the cancer cells.

7          The evidence in the prior art concerning pemetrexed

8  isn't limited to animal studies.  There are also publications

9  about giving pemetrexed to cancer patients.  Prior art

10  contains two abstracts published with the lead author Clet

11  Niyikiza, who is the sole named inventor of the '209 patent.

12          These two abstracts, they will be Trial Exhibits 910

13  and part of 911, were presented at two major cancer

14  conferences in 1998.  At those conferences, Dr. Niyikiza

15  explained that there was a correlation, a relationship between

16  homocysteine, high levels of homocysteine and toxicity from

17  pemetrexed.

18          The experts will again explain these publications,

19  but the conclusions are worth noting.  The bottom pullout

20  here, the conclusion was that elevated baseline homocysteine

21  levels greater than or equal to ten micro molars, highly

22  correlate with severe hematologic and nonhematologic

23  toxicities following treatment with MTA.  MTA stood for

24  multitargeted antifolate and was another name that Lilly had

25  for pemetrexed.

1          In other words, patients who have high levels of

2    homocysteine in their blood which can result from an

3    inadequate nutritional status, and that's what they said in

4    the beginning of this abstract, that they were looking at

5    nutritional status, are more likely to have toxicity from

6    pemetrexed.  So that's in the prior art, too.  Lilly's

7    published the relationship between high levels of homocysteine

8    and toxicity with pemetrexed.

9          The available information -- now these patients

10   didn't receive folic acid, but there was a clinical trial that

11   was also published in the prior art with pemetrexed and

12   pretreatment with folic acid, like the Worzalla mouse study

13   they gave folic acid before pemetrexed.  Those are referred to

14   in the case as the Hammond abstracts, after the first named

15   author, Lisa Hammond.  And those two abstracts were presented

16   at the same major conferences in 1998 as the Niyikiza

17   abstracts, this major American conference and major European

18   conference that Niyikiza and Hammond research are both

19   presented.

20         And one of the abstracts actually explains that this

21   research was done because of the results in the Worzalla

22   study.  As preclinical evaluations indicate that folic acid

23   supplementation increases the therapeutic index of pemetrexed,

24   this study was initiated, so they go from the preclinical

25   model to humans, as most people do.  You see a promising

1    result in preclinicals, you move on to human studies.

2              The positive result of this study is plain on its

3    face.  As stated in Trial Exhibit 911, the conclusion was

4    folic acid supplementation appears to permit pemetrexed dose

5    escalation by ameliorating toxicity.  Reducing toxicity with

6    pemetrexed is a good thing, and that's what folic acid did

7    here.

8              Now, this Hammond study is a Phase 1 clinical trial.

9    As the parties explained during the joint tutorial, this is

10   the first type of study with human beings.  Dr. Ratain will

11   explain the purpose is mainly to find a safe dose schedule for

12   the drug.  Very sick patients, usually who tried other cancer

13   treatments and failed, were ineffective, take part in these

14   trials.  And they all have different types of cancer.  There's

15   no requirement in a Phase 1 that it only be people with

16   breast cancer or lung cancer, pancreatic cancer, it's all

17   kinds of cancer, because all we're looking for is there a safe

18   dose?

19             They don't focus on how well the drug actually works

20   because the patients are very sick, they've had very -- they

21   have different kinds of cancer.  They've had different

22   treatments ahead of time, but the patients are sick, as we

23   talked about.  And so one of the Hammond abstracts includes an

24   important signal for this case.

25             Trial Exhibit 912, they reported that there was one

1  partial response in a patient with metastatic colon cancer has

2  been observed.  That means at least one patient who was very,

3  very sick had metastatic colon cancer, so it started in the

4  colon and it spread beyond that, got at least a little bit

5  better with this dose of folic acid and pemetrexed.  And the

6  evidence will be that this type of response is clearly a

7  therapeutic benefit as contemplated by the construction of the

8  claims.

9          So where would this leave the hypothetical person of

10 ordinary skill in the art?  They would know the theory behind

11 antifolates and the folate pathway.  They would understand

12 that high levels of homocysteine in the blood before -- of a

13 patient before they received pemetrexed means they are more

14 likely to have toxicity.  It is seen that Lilly has pretreated

15 patients with folic acid and that it's reduced toxicity.

16 They've seen they have even done that in a Phase 1 clinical

17 trial, and there are some patients who received a therapeutic

18 benefit from that.

19         Now, a person of ordinary skill in the art would

20 also know how to reduce homocysteine levels in the blood of a

21 patient.  Dr. Green, who studied this for 30 or 40 years, will

22 explain that the prior art is literally chock-full of

23 publications on this subject.  How do you lower homocysteine?

24 And not surprisingly, based on the folate pathway as we talked

25 about, the prior art suggests you give two things.  You give

1  folic acid, and you give vitamin B12.  The Court will hear

2  about a number of these references from Dr. Green.  Let me

3  talk briefly about one example here.

4          The Ubbink article from 1994 is prior art.  It will

5  be Trial Exhibit 1446, and the very first sentence of the

6  abstract sums it up.  "We have previously shown that a modest

7  vitamin supplement containing folic acid, vitamin B12, and

8  vitamin B6 is effective in reducing elevated plasma

9  homocysteine concentrations."  And what does Ubbink mean by "a

10  modest vitamin supplement"?  The evidence will be that this is

11  exactly the doses that are claimed by Lilly in the dependent

12  claims that they are now asserting.  I want to pause on this

13  dosing issue for one more moment on another reference, which

14  is the Lilly patent I mentioned before.

15          The '974 patent will be Trial Exhibit 916 and is

16  an expired patent assigned to Lilly.  It discloses and claims

17  administering certain antifolates with folic acid

18  pretreatment.  Lilly may be arguing in this case that the

19  patent is not directed specifically to pemetrexed, although I

20  think they admit that it covers pemetrexed.  And they told the

21  FDA, as part of this Hatch-Waxman process, that the '974

22  patent covered pemetrexed.

23          What happens under the Hatch-Waxman Act is the brand

24  company has to identify patents that are associated with and

25  that cover a drug, and Trial Exhibit 1386 will be Lilly's

1  letter to the FDA in 2004, identifying patents for pemetrexed.

2  You can see we have pulled out and identified the patent.

3          Question 4.2 is:  What patent claim are you talking

4  about?  It's Claim 20, they say here, which is one of the

5  claims we'll rely on.

6          The next question is:  Does the patent claim

7  referenced in 4.2 claim that approved method of the use of the

8  approved product?  They've checked yes, so they've sworn to

9  the FDA the '974 patent covers pemetrexed.  And just to be

10 certain about it, in 4.2A, they've described what's called the

11 "use code," which they've said, "to reduce toxicity, patients

12 treated with Alimta" -- that's pemetrexed -- "must be

13 instructed to take a low dose oral folic acid preparation or

14 multivitamin with folic acid on a daily basis."

15         So there's really no question that the '974 patent

16 covers pemetrexed, and it's also got basically the same

17 schedule as they have claimed here.  The patent will show you

18 the '974 explains that you can give oral administration of

19 folic acid for periods up to weeks before treatment of the

20 active agent.

21         So let's turn, then, to the differences between the

22 claimed subject matter and the prior art, the second of the

23 gram factors.  Obviousness doesn't require, as I said before,

24 that all of the elements be present in one reference.  The

25 question is:  What's the difference between the reference and

1  the prior art?  And here the evidence will be not very much.

2          The only real difference is adding vitamin B12, and

3  that was disclosed in the -- the prior art explicitly

4  disclosed giving folic acid before the pemetrexed in the

5  Worzalla and Hammond papers, and the difference is simply

6  adding B12.  The prior art we've already reviewed shows that

7  when confronted with this folic acid pretreatment and the

8  correlation with homocysteine, the first thing a person of

9  ordinary skill in the art would do was add B12.  That was the

10  standard way to treat high levels of homocysteine.

11          Now, during the tutorial, the Court also heard about

12  a second marker in patients, methylmalonic acid.  The prior

13  art as a whole will show that a person of ordinary skill in

14  the art did not give vitamin B12 only when they saw a proven

15  relationship or a proven elevated level of methylmalonic acid.

16  Rather, when homocysteine levels were elevated, a person of

17  ordinary skill in the art gives folic acid and B12 to make

18  sure they have the best chance of reducing the homocysteine

19  levels.

20          And that logic is exactly what Lilly used with the

21  FDA.  When they explained to the FDA they wanted to add both

22  folic acid and vitamin B12, they didn't point to MMA levels;

23  they pointed to homocysteine levels.  In 1999, Lilly submitted

24  a safety analysis to the FDA -- it will be Trial Exhibit 75 --

25  and they wrote, as mentioned in the introduction, "Elevated

1  homocysteine may also be caused by vitamin B12 deficiency in a

2  small percentage of patients."

3          There's another reason you will hear about during

4  trial about why a person of ordinary skill in the art would

5  add vitamin B12 with folic acid.  It will be referred to as

6  masking.  The problem that happens is that patients who have a

7  folic acid deficiency exhibit certain symptoms, and the people

8  with B12 deficiency exhibit some of the same symptoms.  If you

9  give only folic acid, you can mask or hide the B12 deficiency

10  and cause irreversible nerve damage that comes from the actual

11  underlying B12 deficiency.

12          And a person of ordinary skill in the art would

13  reasonably expect that the combination of folic acid and

14  vitamin B12 pretreatment together with pemetrexed would result

15  in a therapeutic benefit.  Why?  For the same reason that the

16  folic acid seemed to be working, as Worzalla and Hammond and

17  the Hammond references show, you can change the balance

18  between efficacy and toxicity by increasing functional folate

19  in the healthy cells by giving folic acid.  When a person of

20  ordinary skill in the art knows the folic acid is okay to

21  give, adding the B12 won't change anything.

22          Let me turn to the third of the Graham factors, the

23  skill level of a person of ordinary skill in the art.

24  Usually, there's not much of a dispute about this, and Your

25  Honor already addressed this issue in claim construction.  The

1   Court concluded that a person of ordinary skill in the art can

2   be a medical doctor who specializes in oncology or a medical

3   doctor with extensive experience in the areas of nutritional

4   sciences involving vitamin deficiencies, but that person

5   should work with an oncologist.

6           The defendants agree with that definition.  The

7   patent supports it.  The prior art identifies the nutrition

8   issues.  But the plaintiffs are still fighting against it.

9   Why?  Another expert for the defendants will be Dr. Sarah

10  Morgan.  She's not an oncologist; she's an expert in nutrition

11  who published research concerning methotrexate, another

12  antifolate with folic acid.  And she established in the '90s

13  in the prior art that giving folic acid with methotrexate

14  didn't diminish the efficacy.  And she also observed that if

15  patients were B12-deficient, explicitly in her articles, then

16  you should give them B12 to avoid the masking concern.  So

17  she's going to come in here and explain as a witness the

18  research she did and why at the time there was no concern

19  about giving folic acid and vitamin B12 with an antifolate.

20          The last point I'll make about this is that Lilly

21  may argue that the nutrition literature and Dr. Morgan's

22  literature are irrelevant to the case because they're not

23  about cancer, but the best evidence that that's not true is

24  the Worzalla paper itself, published by Lilly in a journal

25  called *Anticancer Research*, and citing, as you see here,

1  Morgan and co-workers, number ten.  Slide 30 is Dr. Morgan's

2  work.

3           Let me turn to the last of the Graham factors,

4  secondary indicia of non-obviousness.  Here, defendants will

5  present in their rebuttal case, not up front but after

6  plaintiffs go, evidence that the secondary considerations are

7  irrelevant.  As we set forth in our motions in limine, the

8  plaintiffs will be unable to establish a nexus, any connection

9  between the new part of the invention, which is just vitamin

10  B12, and the commercial success or unexpected results or

11  positive results of the combination.

12           What happened here is that although a person of

13  ordinary skill in the art would be motivated to add B12

14  because some patients might need it to lower their

15  homocysteine, it turns out it really doesn't do very much.

16  It's the folic acid that's already in the prior art that

17  really leads to the benefit.  So no sales or results are in

18  turn driven by the invention here of adding B12.

19           The other issue, as we flagged in the motions, is

20  that Lilly had other patents, and when there are other patents

21  out there that prevent commercial development by others,

22  there's not an incentive to develop the product.  So the

23  failure of others to develop it, even if there was money to be

24  made, is not really probative of the obviousness or

25  non-obviousness of the patent.

1          Let me turn, then, to the separate defense of

2    obviousness-type double patenting, which is based on the

3    '974.  We can actually win this one even if we lose

4    obviousness.  They're independent defenses.  And you'll hear

5    from Dr. Ratain about this defense, as well.

6          As a matter of law, this defense begins with the

7    claims of the '974 patent.  We've put claims 15 through 20

8    up on the screen.  Simply put, the claims require giving a

9    certain kind of antifolate and -- giving folic acid before a

10   certain kind of antifolate to reduce toxicity.  And the

11   evidence will be that pemetrexed is this certain kind of

12   antifolate, and folic acid in the doses here is the same dose

13   as the '209 patent.

14         Now, admittedly, the schedule in claim 19 is

15   slightly different; it's one to 24 hours in advance of the

16   antifolate, and not one to three weeks as required by some of

17   the asserted claims, but the '974 patent specifically says

18   that doesn't matter.  It says you can give the patent -- you

19   can give the drug -- the folic acid one to 24 hours in advance

20   or in column six you can give it up to weeks in advance, just

21   like they claimed in the '209 patent.

22         Where does that end up leaving us with this

23   argument?  Exactly the same place with obviousness in the end.

24   We have an antifolate, including pemetrexed, with folic acid.

25   Would it be obvious to add vitamin B12?  The evidence, we

1   suggest, will lead to the conclusion that it would.

2          Let me turn, then, to the other defenses that will

3   be presented for a few minutes, but before I do, I want to

4   talk about the relationship between the two sets of the

5   defenses.  The sets of defenses, the prior art defenses I've

6   already talked about on one hand and these

7   failure-to-disclose-in-the-specification defenses we're about

8   to talk about are basically offered in the alternative.  In

9   trying to defend against the prior art defense, Lilly is

10  contending that the effects of that in folic acid and B12 to

11  pemetrexed are so unpredictable a person of ordinary skill in

12  the art wouldn't be able to figure out how to do it.  But in

13  defending against these failure-to-disclose defenses, they're

14  saying, "Well, yeah, we don't really disclose the dose and

15  schedule of pemetrexed, but a person of ordinary skill in the

16  art could figure out how to do it."  Those positions are

17  fundamentally inconsistent.  That's a problem for them.

18         Now, for us, either way, the patent is invalid.  We

19  can present arguments in the alternative, and for you, if the

20  Court finds that the person of ordinary skill in the art could

21  figure out the dose and schedule of vitamin B12 and folic acid

22  to work with pemetrexed, the claims are obvious.  And if

23  you -- if the Court finds that a person of ordinary skill in

24  the art couldn't figure it out, the claims are invalid for

25  failure to disclose that information.  One or the other, but

1 either way, the patents are invalid.

2          Now let's turn to those defenses briefly.  They're

3 grouped under 35 U.S.C. Section 112.  And you will hear from

4 Dr. Thomas Schulz on behalf of defendants.  Dr. Schulz is the

5 doctor who's most prescribed pemetrexed of, I think, anybody

6 who will testify here, and he will explain the defenses

7 concerning the written description, the lack of enablement and

8 the failure to disclose the best mode.  The focus of this will

9 be on what is the disclosure of the dosing schedule of

10 pemetrexed in the '209 patent.

11          And there's only -- there's no dispute there's only

12 one dosing schedule for an antifolate disclosed.  It's in

13 column eight, lines 46 to 54.  The antifolate is administered

14 in four doses over a two-week period by rapid intravenous

15 injection followed by two weeks of nontherapy.  Dosing is made

16 on days one, four, eight and 11 of any two-week period.

17 Patients will have an initial course of therapy at a dose of

18 five milligrams per meter squared per dose.

19          There's no question that this is not the dose of

20 pemetrexed that Lilly was using when they filed the

21 application in June of 2000.  In order to maintain a monopoly

22 by getting a patent, the statute requires that you teach --

23 you disclose the invention, you teach people how to make it,

24 and if you have a best way of doing it, you disclose that.

25 That makes sense in exchange for the 17-year monopoly.  You're

1   not supposed to disclose a mediocre way or not quite how to do

2   it in exchange for a monopoly.

3           Here the evidence will be that the sole named

4   inventor, Dr. Niyikiza, was involved in developing and

5   analyzing clinical trial results.  He knew the dosing schedule

6   being used was nowhere near the regimen that's in the patent

7   for the antifolate.  Instead, Lilly was dosing pemetrexed once

8   every three weeks, not four times every two weeks, at

9   500 milligrams per meter squared, more than 100 times the

10  amount of pemetrexed at a time and more than 25 times the

11  amount of pemetrexed over a month-long period.

12          Although the '209 patent actually looks like it

13  includes a lot of portions straight out of the clinical trial

14  that was being run, the details about how to dose pemetrexed

15  itself, part of the claims, was nowhere to be found.  Now,

16  Dr. Niyikiza may be here and may testify that he didn't really

17  have a preference for what dosing schedule was used, but the

18  contemporaneous evidence will show he was part of the team

19  that decided on this as the dosing schedule at the time back

20  in 1999 and 2000.

21          Let me conclude for a few minutes with what we

22  expect to hear from Lilly during this case.  First, we expect

23  to hear that a person of ordinary skill in the art would be

24  worried that giving folic acid and/or vitamin B12 with

25  pemetrexed would undermine or eliminate the efficacy of the

1  drug; it wouldn't work as well to treat cancer.  The evidence

2  will probably be that this was a theoretical concern based on

3  the folate pathway and the understanding of how the enzymes

4  work.

5          But in the mind of a person of ordinary skill in the

6  art, that theoretical concern was alleviated by the actual

7  publications with pemetrexed.  They'd know that there was a

8  target spot, a sweet spot, that could be obtained where folic

9  acid and B12 could be used to protect the healthy cells while

10  still allow -- or, yeah, to protect the healthy cells while

11  still allowing pemetrexed to kill the cancer cells, just like

12  Lilly itself demonstrated was possible in their mouse model in

13  the Worzalla case.

14          Second, Lilly may argue that a person of ordinary

15  skill in the art would, in fact, not want to give vitamin B12

16  because it could actually cause a tumor to grow.  So if you

17  give it to cancer patients, that would be a bad idea.  We're

18  going to ask you to look carefully at the evidence because

19  it's weak at best, and when considered as part of the entire

20  record, as part of the prior art as a whole, the evidence will

21  not support the conclusion that a person of ordinary skill in

22  the art would be concerned that vitamin B12 would cause tumor

23  growth.  It's actually contrary to the very things that Lilly

24  did back in 1999 and 2000 and contrary to what Lilly told the

25  FDA.

1          Another document, if I can get this back up -- there
2    we go -- that we'll see is a March 1 -- is meeting minutes
3    that Lilly sent to the FDA on March of -- in March of 2000.
4    It's Trial Exhibit 337.  At this point, Lilly is going back
5    and forth with the FDA about whether to amend their clinical
6    trial protocol to add folic acid and vitamin B12.  And the
7    subject comes up, is vitamin B12 a problem because it will
8    cause tumors to grow?  What does Lilly tell the FDA?  "For
9    vitamin B12, literature searches found no evidence for
10   stimulation of tumor growth by this vitamin."
11          Third, we expect Lilly is going to argue that there
12   were conventional ways to deal with toxicity from pemetrexed.
13   Lilly doesn't deny there was some toxicity with pemetrexed.
14   It's true with most chemotherapy drugs, and there still is
15   even with vitamin supplementation.  We expect Lilly will argue
16   a person of ordinary skill would merely adjust the dose or the
17   schedule of pemetrexed to deal with the toxicity.
18          The evidence will show that this adjustment would
19   create exactly the problem Lilly says that a person of
20   ordinary skill in the art would be concerned about:  It will
21   decrease the efficacy just the same way it decreases toxicity.
22   There's no evidence that there's any differential effect from
23   decreasing the dose or schedule between the healthy cells and
24   the cancer cells.  The only evidence you will hear in the case
25   about a differential effect is that adding folic acid and B12

Vol. 1-51

1  as it related to folic acid in making active folates available

2  is the best way to have a differential effect sparing healthy

3  cells or killing cancer cells.

4            Finally, Lilly will look at the disclosure of the

5  patent and ask you to find that it's sufficient.  They may

6  point to some prior art that's cited in it.  They may argue

7  that a person of ordinary skill in the art could figure out

8  how to use pemetrexed with the invention.  But as I explained,

9  that will be insufficient to save the patent.

10           Fundamentally, Lilly is going to ask you to listen

11 to their lawyers and experts in this case and accept the

12 arguments they're making today.  They'll ask the Court to look

13 at each reference one at a time, and they'll ignore or

14 discredit or attack their own research from the past.  They'll

15 give the Court excuses for what they told the FDA in the past

16 and why it's not inconsistent with what they're arguing today.

17           But the patent statute instructs you to look at the

18 prior art as a whole.  It doesn't require any particular

19 reference to be perfect, or that a person of ordinary skill in

20 the art would be absolutely assured of success.

21           The defendants will ask you to look at the prior art

22 as a whole, as a person of ordinary skill in the art would

23 analyze it, and to conclude that the patent-in-suit is

24 invalid.  Thank you.

25           THE COURT:  Thank you.  Do you want to take a break

1   before you get started?

2           MR. PERLMAN:  Whatever you prefer, Your Honor.

3           THE COURT:  I'm fine.

4           MR. WIESEN:  I'm fine.

5           THE COURT:  Are you ready?  Come on.

6           MR. PERLMAN:  I'm ready.  I have some materials that

7   I'm going to be showing.

8           THE COURT:  You may, Counsel.

9           MR. PERLMAN:  Thank you, Your Honor.

10          The key to this case, the things scientists were

11  focused on, the things scientists were worried about was

12  making sure you don't hurt the efficacy of this very promising

13  cancer drug.

14          In the second half of the 1990s, pemetrexed looked

15  very promising.  You just heard Mr. Wiesen say it.  The

16  literature reported that it had shown efficacy in treating a

17  large number of different kinds of cancer, ranging from

18  colorectal cancer to lung cancer to mesothelioma and more.

19          At the same time, the literature reported that the

20  toxicities that the drug caused were generally manageable and

21  tolerable.  Like all chemotherapy agents, pemetrexed did cause

22  some serious toxicities in some patients.  And a Lilly

23  scientist named Clet Niyikiza, who will testify in this case,

24  came up with an idea for how to protect patients from these

25  side effects.

1          His idea was that if patients were given both

2    vitamin B12 and low levels of folic acid before they were

3    given pemetrexed, this could reduce or eliminate the most

4    serious toxicities associated with the drug without

5    undermining the drug's efficacy in treating cancer.

6          Let me show you Claim 12 of the '209 patent, which

7    is a representative example of Dr. Niyikiza's invention.

8    There is no dispute that the defendants infringed this claim

9    and the others that Lilly has asserted.

10         As you can see, the claim is to an improved method

11   of administering pemetrexed disodium to a patient in need of

12   chemotherapy.  Pemetrexed disodium is the form of pemetrexed

13   in Lilly's product and in the defendant's products.  And the

14   improved way of giving pemetrexed is giving both about 350 to

15   about a thousand micrograms of folic acid, and about 500 to

16   1,500 micrograms of vitamin B12 before giving the patient

17   pemetrexed.

18         The evidence will show that Dr. Niyikiza's idea went

19   against the conventional thinking.  In June 1999, scientists

20   thought that pretreating patients receiving an antifolate with

21   folic acid and vitamin B12 would reduce the antifolate's

22   ability to treat cancer.

23         And there are two principal reasons for that:

24   First, tumors use these vitamins to grow, and giving patients

25   more of the vitamins could cause the tumor to grow more.

1  That's not to say that doctors thought cancer patients should

2  be starved of these vitamins.  Some amounts of folic acid and

3  vitamin B12 are part of a normal diet, and cancer patients

4  were generally told that they should try to eat a normal diet.

5  But, what doctors would not have wanted to have patients

6  consume the amount of folic acid and vitamin B12 that they

7  would get as part of a normal diet and then, in addition, give

8  them even more of these vitamins before starting the cancer

9  therapy.

10       Pretreating patients with folic acid and vitamin B12

11  also would have been expected to reduce the antitumor effect

12  of pemetrexed.  As I told you a few minutes ago, pemetrexed is

13  an antifolate.  There is a competition within the body between

14  folates and antifolates for access to the enzymes that use

15  folates.

16       Giving a patient folic acid and vitamin B12

17  increases the amount of folate available to compete with the

18  antifolate, and therefore makes it harder for the antifolate

19  to do its job, to be effective.  The expectation among

20  scientists, therefore, was that pretreating a patient with

21  folic acid and vitamin B12 would reduce the efficacy of

22  pemetrexed.

23       Your Honor, this is going to be an unusual

24  obviousness case.  In the usual case, you would hear testimony

25  from each side's expert today about whether the invention

1  would have been obvious years before when the patent was

2  filed, and you're going to get that, too, in this case.

3        But, in this case you will also hear contemporaneous

4  evidence that Dr. Niyikiza's idea met with significant

5  resistance inside Lilly, among the expert scientific advisors

6  Lilly retained to help it, and from the FDA.  Lilly had many

7  of the best oncologists in the world advising it on the

8  development of pemetrexed, and the evidence will show that

9  they repeatedly recommended against Dr. Niyikiza's idea

10 because they were concerned that it would reduce the efficacy

11 of pemetrexed.

12        The FDA expressed the same concern.  In 1998, Lilly

13 submitted to the FDA two clinical trial protocols that

14 contemplated giving patients folic acid, vitamin B12, and

15 vitamin B6 before giving them pemetrexed.  In response, just

16 like Lilly's consultants, the FDA expressed concern about the

17 effect of giving vitamins on pemetrexed's efficacy after which

18 Lilly took the vitamins out of the protocol because of that

19 concern.

20        The expectation that vitamin pretreatment would hurt

21 pemetrexed's efficacy would have been a grave concern in June

22 1999.  That is because pemetrexed was showing great promise in

23 its ability to treat multiple kinds of cancer.  And while it

24 had shown the ability to cause serious toxicities in some

25 patients, its toxicities were, by and large, tolerable and

1  manageable.

2            It is important to remember here, Your Honor, that

3  all chemotherapy drugs cause serious toxicity.  We all know

4  that from our life experiences, but because cancer is such a

5  serious and difficult to treat disease, doctors and patients

6  are willing to tolerate a significant amount of toxicity in

7  order to be able to use a drug that has the potential to treat

8  a patient's cancer, far more than you'd accept in other

9  contexts.  And doctors do not want to do anything that will

10  undermine the efficacy of the chemotherapy to fight this

11  deadly disease unless they have no choice.

12            In late 1999, after the June 1999 date that's

13  relevant for the defendant's obviousness case, the calculus

14  here changed dramatically.  Lilly had begun a large-scale

15  global clinical trial of pemetrexed for treating mesothelioma,

16  which is a cancer caused by asbestos, which you may have heard

17  of.

18            In the early parts of this clinical trial, there

19  were an unacceptably high number of drug-related deaths.  Upon

20  realizing this was happening, Lilly undertook a crash project

21  to try to figure out what to do.  And ultimately, in

22  December 1999, because of the concern for patients' safety,

23  Lilly decided to implement Dr. Niyikiza's folic acid and

24  vitamin pretreatment regimen.

25            Lilly and its expert consultants were still worried

1    that this risked hurting the efficacy of the drug, but given

2    the risk to patients that had emerged, they felt they had no

3    choice but to take that risk.

4            The FDA's initial reaction to Lilly's plan was again

5    negative as it continued to believe that adding vitamins would

6    risk the drug's efficacy.  Through a series of submissions,

7    Lilly tried to convince the FDA to allow it to try

8    Dr. Niyikiza's regimen.

9            You heard in the opening, and you're going to hear

10   in this trial, the defendants talk about what Lilly told the

11   FDA in these submissions as if it is some evidence of what the

12   person of ordinary skill in the art would have thought in

13   June 1999.

14           The critical points to remember about this are that

15   these submissions were put together by people who already knew

16   Dr. Niyikiza's invention, and who faced a very different

17   situation in terms of the expected toxicity of the drug than

18   what was publicly known in June 1999.

19           That is the exact opposite of the person of ordinary

20   skill, who considers only what is known in the prior art

21   without using the inventor's own invention as a blueprint to

22   know what to go focus on in hindsight.

23           And perhaps most telling, Your Honor, even after

24   reviewing Lilly's submissions, the FDA still remained

25   unconvinced that Lilly should do this.  Ultimately, the

1  Lilly -- the FDA agreed that Lilly could proceed at its own

2  risk despite the FDA's concerns.  And Lilly did it and it

3  proved to be a resounding success.  The incidence of severe

4  toxicities and death decreased unexpectedly without harming

5  the drug's efficacy.

6          Pemetrexed went on to be approved for the treatment

7  of mesothelioma, becoming the first drug ever approved to be

8  approved for treatment of that disease, and it's also been

9  approved to treat the most common types of lung cancer.

10         Pemetrexed has now been used by almost one million

11 patients, and its cancer-fighting ability has made pemetrexed,

12 which Lilly sells under the name Alimta, an extraordinarily

13 successful product for Lilly, generating billions of dollars

14 in sales, and making it Lilly's second largest-selling product

15 worldwide.

16         The defendant's position is that notwithstanding all

17 of the resistance that Dr. Niyikiza faced to his idea from the

18 experts and consultants, from Lilly, from the FDA, his

19 invention was actually obvious.  They say this despite the

20 fact that in the 50 years that antifolates have been used,

21 there is not a single example in the literature of anyone

22 pretreating any cancer patient with both folic acid and

23 vitamin B12 prior to giving them an antifolate or suggesting

24 that this would be desirable to do.

25         While there are isolated examples of pretreating

1  cancer patients with folic acid, none of these examples used

2  vitamin B12 or even discussed the possibility of using it.

3          As you listen to the evidence, ask yourself, if it

4  was really obvious to pretreat antifolate cancer patients with

5  vitamin B12, wouldn't you expect that in 50 years, somebody

6  would have done it or at least published that they thought it

7  was a good idea?  The evidence will show that they did not

8  because it was not obvious.

9          The defendants start their obviousness case with the

10  proposition that the person of ordinary skill would have been

11  motivated to give cancer patients folic acid before giving

12  them pemetrexed in an attempt to lower the toxicities that had

13  been seen with the drug.  The evidence will show that the

14  person of ordinary skill would not have done this, because

15  they would have thought that it would have reduced the very

16  promising efficacy that the drug had shown.

17          In fact, the person of ordinary skill would have

18  thought that any amount of folic acid that could lower the

19  drug's toxicity, that would be useful for doing that, would

20  also lower the drug's efficacy.  And the reason for that, as

21  you saw in the tutorial, is that pemetrexed's toxicity and its

22  efficacy against cancer, both come from pemetrexed's ability

23  to prevent cells from dividing and growing.

24          This effect is beneficial when it comes to cancer

25  cells and leads to the drug's anti-cancer efficacy.  The same

1   mechanism, though, also prevents certain healthy cells from

2   dividing and growing, which leads to toxicity for the

3   patients.  Giving a folate like folic acid can counteract the

4   side effects, but it was understood in 1999 that doing so

5   would similarly counteract an antifolate's desirable effect on

6   cancer cells.

7          The evidence in the prior art about giving folic

8   acid before giving pemetrexed confirmed the person of ordinary

9   skill's expectation that doing so would reduce the efficacy of

10  pemetrexed.

11         The only published testing of using folic acid with

12  pemetrexed in humans before June 1999 is reported in the

13  Hammond abstracts, which I put excerpts of up on the screen.

14         Both abstracts are about the same Phase 1 study in

15  which patients were given five milligrams of folic acid for

16  five days, starting two days before they received pemetrexed,

17  and the results were discouraging.  As you can see on the

18  slide, out of 33 patients total, there was only one partial

19  response to the drug.

20         By way of comparison, as you can see here, another

21  Phase 1 study of pemetrexed without folic acid yielded four

22  partial responses and six minor responses among 37 patients, a

23  difference that is made all the more striking by the fact that

24  Hammond used higher doses of pemetrexed.

25         Mr. Wiesen talked about comparing Phase 1 trials.

1  The evidence will show that to the person of ordinary skill,

2  the Hammond abstracts confirmed the skilled person's

3  expectation that giving folic acid would reduce the efficacy

4  of pemetrexed.

5          Your Honor, the parties take away very different

6  messages from Hammond.  We look at the one partial response

7  reported in Hammond in comparison to other studies and say

8  that this shows pemetrexed's efficacy was reduced compared to

9  trials without folic acid.

10          The defendants focus on that same single partial

11  response, and say that that means pemetrexed's efficacy was

12  retained.  And what they mean by "retained" is it was not

13  completely eliminated.  And because it wasn't completely

14  eliminated, they say that the person of ordinary skill would

15  have expected from Hammond that even if the patients were

16  pretreated with folic acid, pemetrexed would still be capable

17  of providing some therapeutic benefit to some patient, which

18  is what the phrase "effective amount of pemetrexed" in Lilly's

19  patent claims has been construed to require.

20          We are not suggesting that the skilled person would

21  have expected that using folic acid pretreatment would make

22  pemetrexed completely inactive and useless, but that is not

23  the issue, Your Honor.

24          The question for obviousness is whether the person

25  of ordinary skill would have been motivated to pretreat

1  pemetrexed patients with folic acid when they thought that

2  doing so would significantly reduce the efficacy of the drug.

3          The evidence will show that they would not have

4  been.  The patients who would be treated with pemetrexed had

5  serious, generally life-threatening diseases.  Pemetrexed had

6  been shown to have very promising activity against these

7  terrible diseases with tolerable and manageable toxicity.

8          The person of ordinary skill would not have wanted

9  to dilute the efficacy of pemetrexed in combating patients'

10 cancers, which is what Hammond thought folic acid pretreatment

11 would do.  Hammond, therefore, would have been seen as a step

12 in the wrong direction.  The fact that Hammond, the Hammond

13 regimen, did not completely eliminate the drug's activity did

14 not provide any reason for the person of ordinary skill to

15 want to pursue that regimen.

16         The only other report in the prior art of using

17 folic acid with pemetrexed is the Worzalla article that

18 Mr. Wiesen talked about.  Worzalla did not perform any testing

19 in humans.  Rather, the article reports on testing in mice and

20 on some cell cultures in test tubes.  And what Worzalla showed

21 was exactly what the skilled person would have expected, that

22 the addition of folic acid reduced the activity of pemetrexed.

23         What Worzalla found was that to get the same level

24 of activity in the presence of folic acid, you needed to use

25 100 times more pemetrexed.

1          This is Figure 2 from Worzalla.  Let me walk you

2     through this.  This is in mice, who had been fed a low folate

3     diet because the regular mouse chow has a lot of folate in it.

4          Across the bottom of the graph is the dosage of

5     pemetrexed.  Along the side is the percent inhibition of the

6     tumors, with zero at the bottom and 100 percent inhibition at

7     the top.

8          The circles, which I've highlighted in yellow, shows

9     how much tumor inhibition you get with different amounts of

10    pemetrexed in mice who were not given supplemental folic acid.

11    You see it's way over to the left.

12         The triangles, which I've highlighted in green, show

13    the same thing, but this time for mice that were given folic

14    acid supplementation.  And that's way over to the right now.

15    As you can see, you need 100 times more pemetrexed to get the

16    same effect if you give the mice folic acid because the folic

17    acid is counteracting the pemetrexed.

18         And that's what the authors of Worzalla note in

19    talking about this figure.  They say "Oral folic acid

20    preserved," or like the defendant would say, "retained

21    antitumor activity, albeit at higher dose levels."  That's the

22    same take-away message as from Hammond.  Pemetrexed's activity

23    against tumors is not completely eliminated by folic acid, but

24    it is dramatically reduced; here shown by the need to use

25    much, much higher doses of pemetrexed to get the same effect.

1            Giving mice 100 times more pemetrexed was possible

2    in Worzalla's experimental study in mice.  There are things

3    you can do in testing with mice you would never do with a

4    person.  A person of ordinary skill would have known, though,

5    that in humans you couldn't simply raise the dose of

6    pemetrexed to try to make up for the decrease in activity that

7    pretreating with folic acid causes.

8            In Hammond, they raised the dose of pemetrexed to

9    less than twice the level, not a hundred times, less than

10   twice the level it was in previous studies, and the results

11   suggested that at these higher doses, what you got was

12   toxicity to the kidneys.

13           That's not related to the antifolate effect.  That's

14   what's called an "off-target toxicity."  As you give more

15   drug, all kinds of things can happen, many of them bad.  This

16   would have been of great concern to the person of ordinary

17   skill, and is another reason the person of ordinary skill

18   would not have pursued the Hammond regimen.

19           Hammond and Worzalla are the only references that

20   the defendant relies on that are about administering folic

21   acid with pemetrexed.  Both of them showed that when you do

22   that, the drug's efficacy is reduced.

23           You are going to hear about a number of other

24   references in this case, but the key point, Your Honor, is

25   that none of them would have assuaged the person of ordinary

1   skill's concern that giving folic acid before giving

2   pemetrexed would reduce the efficacy of the pemetrexed.

3            You heard already, and you're going to hear during

4   the trial, about two abstracts that Dr. Niyikiza published in

5   1998 describing early versions of a statistical analysis that

6   he performed called the multivariate analysis, and he'll tell

7   you what's involved in that.

8            In this analysis, he found that patients who had

9   certain levels of homocysteine before they started taking

10  pemetrexed were more likely to have certain toxicities.  But

11  here's the point.  The point of the Niyikiza abstracts was to

12  identify characteristics of the patients who suffered severe

13  toxicities.

14           The abstracts do not propose a solution to this

15  toxicity problem, let alone suggest that pretreating patients

16  with vitamins is the solution.  And more fundamentally, there

17  is nothing in the Niyikiza abstracts that suggests that you

18  can give folic acid to pemetrexed patients to reduce toxicity

19  without reducing the efficacy of the drug, which is what you

20  wouldn't have wanted to do.

21           Let's talk about the '974 patent, which you've heard

22  about already, and I expect you're going to hear repeatedly --

23  it started this morning already -- over the course of this

24  trial that before the '209 patent, Lilly had another patent

25  called the '974 patent that covered the use of folic acid with

1  pemetrexed.  You'll hear it as part of the obviousness case,

2  and you'll hear it as part of the double patenting defense.

3           This is Claim 16 of the '974 patent.  It generically

4  covers administering folic acid prior to administering a broad

5  class of antifolates.  Pemetrexed is one of the myriad

6  antifolates that falls within this class, and so the

7  defendants are correct that the '974 patent protected Lilly's

8  commercial pemetrexed product, and we told the FDA it did

9  because it does, or it did before it expired.

10          The relevant question for this case, though, is

11  whether the '974 patent would have motivated the person of

12  ordinary skill to pretreat pemetrexed patients with folic

13  acid.  And it would not have.  Nothing in the '974 patent

14  would have overcome the person of ordinary skill's concern

15  that giving folic acid before giving pemetrexed would reduce

16  the efficacy of the drug.

17          In fact, the skilled person reading the '974

18  patent would not have focused on pemetrexed.  The '974 patent

19  never mentions pemetrexed either by name or by chemical

20  structure.  It doesn't have any data on pemetrexed.  And it's

21  not addressed to pemetrexed in particular.

22          The drug that the skilled person would have focused

23  on in the '974 patent was lometrexol, which was an earlier

24  antifolate that Lilly was working on that ultimately failed

25  and never reached the market.

1        By June 1999, there had been clinical testing.  This

2   is just a patent.  By 1999, there had been clinical testing of

3   lometrexol in combination with folic acid, and you know what?

4   The results were just what the person of ordinary skill would

5   have expected.  When folic acid was administered, lometrexol's

6   efficacy was significantly reduced.

7        And so in 1999, whatever snippet from the '974

8   patent Mr. Wiesen put up on the screen, the person of ordinary

9   skill would have understood that when you gave folic acid

10  with lometrexol, which is the suggestion, it didn't work.  It

11  made the efficacy worse.  Not reduced the toxicity.  Of

12  course, it did, but it made the efficacy worse.  And that drug

13  failed.

14       The evidence will also show that the only two

15  antifolates approved for cancer treatment in the United States

16  or Europe in June 1999, which are drugs called methotrexate

17  and raltitrexed, both of them had labels warning people

18  against using folic acid in combination with the drug because

19  it could reduce the drug's anti-cancer efficacy, and you'll

20  see that in evidence.

21       Now, Mr. Wiesen talked about Dr. Morgan and her work

22  on rheumatoid arthritis.  You're going to hear evidence in

23  this case about how methotrexate, which is used to treat

24  cancer is also used to treat rheumatoid arthritis, which is an

25  entirely different disease from cancer.  And what you will

1  hear is that in rheumatoid arthritis patients, folic acid

2  reduces the toxicities associated with methotrexate, but it

3  does not impair its efficacy in treating rheumatoid arthritis.

4  But there's a critical distinction to bear in mind, Your

5  Honor, when you hear this evidence.

6           When methotrexate is used to treat cancer, its

7  efficacy and toxicity are caused by the same mechanism, the

8  antifolate mechanism that causes it to prevent cells from

9  dividing and growing.  Giving folic acid can reduce the

10  toxicity, but at the same time, it will reduce the efficacy of

11  the drug.

12           When the drug is used to treat rheumatoid arthritis,

13  its efficacy and toxicity are caused by different mechanisms.

14  The toxicities are still caused by the antifolate mechanism

15  preventing cells from dividing and growing, but the drug's

16  efficacy is not.  What that means is that for rheumatoid

17  arthritis, giving folic acid can reduce the toxicity, but it

18  will not undermine the efficacy.  Very different from cancer.

19           This difference in mechanism is why in June 1999,

20  even though folic acid was given when treating arthritis

21  patients with methotrexate, folic acid pretreatment was not

22  used when methotrexate was used to treat cancer, because doing

23  so would have undermined the drug's anti-cancer efficacy.

24           That doesn't suggest using -- pretreating pemetrexed

25  patients with folic acid.  It suggests exactly the opposite:

1  Don't do it.

2          I want to now focus briefly, Your Honor, on two

3  other aspects of Lilly's claims as they relate to the use of

4  folic acid.  The first thing is that every one of the claims

5  that Lilly is asserting in this case requires the use of 350

6  to 1,000 micrograms of folic acid, or a narrower range.

7  Recall that Hammond used at least five times as much as the

8  upper end of this.  Hammond used five milligrams, or

9  5,000 micrograms of folic acid.  Quite a difference.

10          I expect what you're going to hear, Your Honor, is

11  that the skilled person would have dialed back the amount of

12  folic acid from the amount in Hammond, so as to try to reduce

13  the adverse effect on efficacy, but the problem is, there's

14  nothing in the prior art suggesting that if you do that and

15  lower the dose, you'll still get the reduction in toxicity

16  that you're going to hear is the whole reason to look to

17  Hammond in the first place.

18          And there's nothing that tells you you're going to

19  achieve your goal by using the particular amounts in Lilly's

20  claims.  Giving this amount of folic acid in the

21  cardiovascular literature, no context was known, but there was

22  nothing that said if you did that here, you could reduce

23  toxicity of a cancer drug and also not harm the efficacy of

24  the cancer drug.

25          The second aspect I want to highlight is Claim 19.

1  This claim requires administering folic acid one to three

2  weeks before the administration of pemetrexed.  Hammond, you

3  recall, started folic acid two days before pemetrexed.

4         The evidence will show giving folic acid before you

5  give the drug is potentially feeding the tumor, and the

6  evidence will show that the person of ordinary skill would

7  have been concerned that starting the folic acid

8  supplementation even earlier than Hammond did would feed the

9  tumor even more.  And they would not have been motivated to

10 extend the length of time of the pretreatment.

11        Let's now talk about vitamin B12, pretreating

12 pemetrexed patients with vitamin B12.  What you will hear from

13 the defendants in this case are hindsight reconstructions of

14 reasons why the person of ordinary skill would have wanted to

15 pretreat cancer patients with vitamin B12 in June 1999.

16        For 50 years, scientists had been looking for ways

17 to safely and effectively administer antifolates to treat

18 cancer.  And despite that, the evidence will show that for 50

19 years, no one gave cancer patients vitamin B12 before giving

20 them an antifolate, which is powerful evidence that it was not

21 obvious to do.

22        The closest the defendants are going to come to an

23 example of someone giving a cancer patient vitamin B12 in

24 connection with giving them an antifolate is an article by

25 Farber from 1948.  But Farber didn't pretreat the patients

Vol. 1-71

1  with vitamins and he didn't give them B12.  What Farber did
2  was giver liver extract to patients who were taking one of the
3  first antifolates ever, something called "aminopterin" either
4  simultaneously with the drug or after the patient had already
5  received a dose of the drug.

6          Liver extract we now know contains vitamin B12 so
7  the defendants call this administering vitamin B12.  The
8  evidence will show that the person of ordinary skill wouldn't
9  have understood what Farber did to suggest pretreating
10  patients with vitamin B12, but, Your Honor, even if it did,
11  this is 1948.  It was a suggestion that the art for five
12  decades uniformly rejected.  That is evidence it was not an
13  obvious thing to do.

14          And Farber, by the way, published in *The New England*
15  *Journal of Medicine*, not exactly a minor publication.  In
16  fact, the prior art cautioned against using vitamin B12
17  supplements in cancer patients because of the risk that giving
18  more B12 to a patient could help the patient's tumor to grow.

19          This is the 1998 version of the ViDAL, which is a
20  French medical reference that gives physicians prescribing
21  information for approved drugs.  You're going to hear the
22  defendants call this a dictionary because the French word for
23  this Dictionnaire ViDAL, we'd literally translate in English
24  to dictionary, but what this is is a medical reference that
25  French physicians look to for information about approved

1  products.

2          And look, it says a contraindication.  It warns

3  against giving vitamin B12 to patients with malignant tumors,

4  which is cancer because it can cause the tumor to grow.

5  You'll see other literature in this case that makes the same

6  point, that vitamin B12 can stimulate tumor growth.

7          Mr. Wiesen put up in his opening statement that

8  Lilly made to the FDA in the year 2000, well after the

9  priority date, that they did searches and couldn't find

10  evidence of this happening.  All that means is the person

11  doing the search didn't find it.  Both the ViDAL and other

12  references you will see are part of the relevant art.  They

13  warned against this.  And what you're going to hear from the

14  defendants is there are other references that don't say that.

15          But those references don't say "Go ahead,

16  everything's fine."  They're just silent on the subject.

17  There's not going to be any evidence that the question was put

18  to the authors.  They're just silent.

19          The second point, Your Honor, is because of the role

20  B12 plays in the folate pathway, the person of ordinary skill

21  would have been concerned that pretreating pemetrexed patients

22  with vitamin B12 could reduce the drug's efficacy, because, as

23  we saw on the tutorial, giving more vitamin B12 could increase

24  the amount of folate available in the cell to compete with the

25  pemetrexed.

1        One rationale that you heard this morning and you're

2   going to hear from the defendants for the use of vitamin B12,

3   is that the Niyikiza abstracts showed that elevated

4   homocysteine is correlated with toxicity and that it was known

5   that both folic acid deficiency and vitamin B12 deficiency

6   could cause elevated homocysteine.  Here's one of the Niyikiza

7   abstracts.  In fact, the Niyikiza abstracts report that there

8   was no correlation between toxicity and a host of factors,

9   including levels of MMA, which you recall as a marker for

10  vitamin B12 deficiency.

11        This would have led the person of ordinary skill to

12  conclude that the patient's elevated homocysteine levels were

13  not caused by a vitamin B12 deficiency.  The person of

14  ordinary skill, therefore, would have had no reason to give

15  vitamin B12, particularly where there would be concern that

16  doing so would have the down side effect of reducing the

17  efficacy of the drug.

18        A lot of the nutritional literature you heard

19  Mr. Wiesen talk about, about giving B12 and folic acid to

20  patients, that's not about people with cancer.  That's about

21  making people generally healthier or eliminating a long-term

22  cardiovascular risk.  None of that literature says go ahead

23  and do it and give it to a cancer patient if you think doing

24  so is going to make it harder to treat the cancer.

25        The other rationale the defendants offer for

1  pretreating pemetrexed patients with vitamin B12 is that if
2  you give folic acid without B12, you're going to mask the B12
3  deficiency.  You heard a little bit about this in Mr. Wiesen's
4  opening.  What this is talking about, this is a theoretical
5  concern that the initial clinical symptoms of a folic acid
6  deficiency and a vitamin B12 deficiency are similar to each
7  other, and so if you give folic acid, the symptoms are going
8  to go away.  But if the real underlying concern is actually a
9  B12 deficiency, you won't have addressed it, and the patient
10 could develop certain neurological symptoms later on.  You're
11 lulled into thinking you've handled the problem when you
12 haven't.
13          The evidence will show that the possibility of
14 masking a vitamin B12 deficiency would not have been a concern
15 to the person of ordinary skill.  Indeed, in the examples that
16 the defendant cites of somebody giving a cancer patient folic
17 acid before giving them an antifolate, no one ever gave the
18 patients vitamin B12, and no one raised any concern about
19 potentially masking a vitamin B12 deficiency.  And that's
20 perfectly understandable, because the evidence will show that
21 developing neurological symptoms of a vitamin B12 deficiency
22 is very rare.  And on the occasions when it does happen, it
23 generally takes a very long time to develop, far longer than
24 the typical course of antifolate chemotherapy that would have
25 been contemplated in 1999.

1          The person of ordinary skill would not have risked

2     the efficacy of pemetrexed in treating a patient's serious and

3     potentially life-threatening cancer simply to address the

4     hypothetical possibility that they might have an unknown

5     latent vitamin B12 deficiency, there would likely be ample

6     time to address after the chemotherapy was completed.  And

7     perhaps the best evidence that masking a vitamin B12

8     deficiency would not have been a concern is the practice of

9     giving folic acid to rheumatoid arthritis patients taking

10    methotrexate, which you heard about.

11          These people are often on methotrexate for years to

12    treat their arthritis, and they take folic acid every day to

13    reduce the drug's toxicities.  In fact, they take at least as

14    much and generally more folic acid than the amounts in Lilly's

15    claims.  And yet, the evidence will show that it was not the

16    practice to also give these patients vitamin B12.

17          If doctors were not worried that giving arthritis

18    patients folic acid without vitamin B12 for years at a time

19    would mask a vitamin B12 deficiency, they surely would not

20    have given vitamin B12 to a pemetrexed patient who would only

21    be receiving the same or a lower dose of folic acid for a much

22    shorter period of time, particularly when giving B12 to the

23    pemetrexed patient risks harming the efficacy of the

24    chemotherapy.

25          What I have talked about up until now, Your Honor,

1  are reasons that the person of ordinary skill would not have

2  been motivated to make Dr. Niyikiza's invention.  The evidence

3  will show that there are several objective indicia of

4  non-obviousness, the fourth factor that you saw, which further

5  show that Dr. Niyikiza's invention was not obvious.  I am not

6  going to talk about all of them here, but I do want to touch

7  briefly on two of them.

8           The first is skepticism of others, which can be

9  powerful evidence that an idea was not obvious.  As we've

10  already discussed, Lilly's expert consultants and the FDA

11  repeatedly resisted the idea of pretreating pemetrexed

12  patients with folic acid and vitamin B12 because they were

13  concerned that it would reduce the efficacy of the drug.

14           You will also hear, Your Honor, that in 2004, long

15  before he was ever retained by Lilly as an expert in this

16  case, Dr. Bruce Chabner, who was clinical director of the

17  cancer center at Massachusetts General Hospital, told the Wall

18  Street Journal that when he heard about Lilly's vitamin

19  supplementation plan for pemetrexed, "I thought it was crazy."

20  And you will hear evidence that like Dr. Chabner, other

21  oncologists were skeptical of Dr. Niyikiza's invention.

22  Related to this evidence of skepticism is evidence that

23  Dr. Niyikiza's invention possesses unexpected properties.

24           The reason that Dr. Chabner and others were

25  skeptical is that pretreating patients with folic acid and

Vol. 1-77

1  vitamin B12 would have been expected to reduce the efficacy of

2  the pemetrexed.  Unexpectedly, it does not.  By using

3  Dr. Niyikiza's invention, Lilly was able to reduce the

4  toxicity of pemetrexed while maintaining its efficacy.  And so

5  for all of these reasons, Dr. Niyikiza's invention would not

6  have been obvious in June of 1999.

7          I now want to turn to the defendant's enablement,

8  written description, and best mode arguments.  All these

9  relate in some way to the phrase "effective amount of

10 pemetrexed," which appears in two of the eight claims that

11 Lilly is asserting.

12         Let's talk about enablement first.  What you will

13 hear from the defendants is that the '209 patent doesn't

14 disclose what particular dosages of pemetrexed would be

15 effective in Dr. Niyikiza's regimen and that, therefore, undue

16 experimentation would be required to use Dr. Niyikiza's

17 invention.

18         The evidence from the defendants on this defense

19 will be fundamentally inconsistent with what you hear on their

20 obviousness defense.  They said ours is inconsistent.  I'll

21 tell you why there's is and I'll tell you why ours isn't.

22         For obviousness, the defendants will assert that

23 clear and convincing evidence shows that it was obvious from

24 the prior art how to use a regimen of folic acid, vitamin B12,

25 and an effective amount of pemetrexed.  But when it comes to

1  enablement, a different expert will come in and testify that

2  with both the patent -- so both knowing the inventor's idea to

3  do it and the prior art, the person of ordinary skill would

4  have no idea how to use an effective amount of pemetrexed with

5  folic acid and vitamin B12.

6        Ask yourself, Your Honor, they have the burden on

7  both of these.  How can there be clear and convincing evidence

8  of either defense when they are each contradicted by one of

9  the defendant's own experts?  The reason it's not inconsistent

10  for us, Your Honor, is before Dr. Niyikiza's invention, the

11  person of ordinary skill wouldn't have been motivated to do

12  this.  They wouldn't have wanted to, because they would think

13  it would reduce the drug's efficacy.

14        Once you know Dr. Niyikiza's idea and he tells you

15  to go do it, it's not going to take undo experimentation to go

16  do it.  There's no inconsistency there, and so what the

17  evidence will show is that the defendants are wrong on both

18  defenses, and I have already talked about obviousness.

19        As to enablement, what the evidence will show is

20  that the person of ordinary skill could have used an effective

21  amount of pemetrexed in Dr. Niyikiza's invention without

22  engaging what the law calls "undue experimentation."

23  Mr. Wiesen put up Column 8 of the patent which gives a dosing

24  regimen for an antifolate.

25        The key point I'll leave with you, Your Honor, is

1    there's not going to be any evidence that this regimen

2    wouldn't be effective if you used it with pemetrexed.  He said

3    it's 100 times less pemetrexed.  It's given a lot more often

4    than 500 every three weeks, and Lilly had trials using low

5    amounts of pemetrexed much closer together.  And if you look

6    at the defendant's own trial brief, they say that if the

7    skilled person used this regimen, it's unclear whether the

8    pemetrexed would even be effective.

9            To prove that the skilled person couldn't practice

10   the claims using this regimen, the defendants have the burden

11   to prove by clear and convincing evidence that the regimen is

12   not effective.  And they're not going to be able to do that as

13   their own brief shows.

14           Leaving that aside, the evidence will show that the

15   prior art contained numerous publications disclosing effective

16   dosing regimens for pemetrexed.  The specification of the

17   '209 patent even expressly cites one in the second paragraph.

18   Most importantly, there were multiple publications disclosing

19   the very dose, 500 milligrams per meter squared that was later

20   approved by the FDA, and the literature even disclosed that

21   this regimen was the then current dosage being used in

22   pemetrexed clinical trials.  There is no dispute that this is

23   an effective dose when used with Dr. Niyikiza's regimen.  It's

24   exactly the same dosage that's on Alimta's label today.  The

25   person of ordinary skill would have been familiar with this

Vol. 1-80

1  dose, would have used it, and would have been able to practice

2  Dr. Niyikiza's invention without any difficulty, let alone

3  undue experimentation.

4          What I expect you will hear from the defendants over

5  the course of the trial is that the person of ordinary skill

6  wouldn't have known that these previously known effective

7  dosages of pemetrexed would be effective when used with folic

8  acid and B12 or that the patent doesn't prove that this is the

9  case.  None of that is required, Your Honor.  If the person of

10  ordinary skill would have known of or been able with routine

11  effort to find dosages of pemetrexed to use and those dosages,

12  in fact, worked, then the claims are enabled, and the evidence

13  will show that's exactly the case here.

14          I want to touch briefly on the written description

15  defense, which is similar to the enablement defense.  The

16  issue for written description is whether the invention claimed

17  in the '209 patent is described in that patent, and the

18  evidence will show that it is.  The claims require giving

19  certain amounts of folic acid and vitamin B12 and then giving

20  effective amounts of pemetrexed, and the specification

21  describes doing exactly that.

22          What the defendants are going to say is that the

23  '209 patent does not describe what particular effective

24  amount of pemetrexed to use with Dr. Niyikiza's invention.

25  But the patent doesn't claim particular effective amounts, and

1    so there's no requirement to describe particular effective

2    amounts.

3              In fact, you will hear Dr. Niyikiza's invention is

4    not finding some specific dosage of pemetrexed to be used in

5    his regimen.  The invention is giving certain amounts of folic

6    acid and vitamin B12 in conjunction with any amount of

7    pemetrexed that can provide a therapeutic benefit to a cancer

8    patient, and the evidence will show that the patent describes

9    this invention to the person of ordinary skill.

10             The last thing I want to talk about is the best mode

11   defense.  The question here is whether Dr. Niyikiza had a

12   subjective preference for using particular dosages of

13   pemetrexed in his invention, and if he did, did he conceal

14   those dosages when he filed his patent?

15             The evidence will show that Dr. Niyikiza did not

16   have a preference for any particular dosing regimen for

17   pemetrexed when the '209 patent was filed.  Rather, he

18   believed that his claimed methods of vitamin pretreatment

19   could be used with any amount of pemetrexed that was

20   effective, and you're not going to hear any evidence to the

21   contrary.

22             The evidence that the defendants are going to put

23   forward is just going to serve to show that Dr. Niyikiza was

24   aware that Lilly was using dosages of 500 and 600 milligrams

25   per meter squared in its clinical trials.  Of course he was

1    aware of it, but that doesn't mean that he personally,

2    subjectively had a preference for using these dosages in his

3    invention.

4          You can only put -- you have got to put some dose in

5    the clinical trial, and so you put a dose in the clinical

6    trial and he knew what it was.  It doesn't mean he

7    subjectively believed that that was the best way to practice

8    his invention.  He thought you could practice his invention

9    with any dose that was effective.

10          And, in fact, Your Honor, the only evidence is going

11   to be that Dr. Niyikiza had no preference for any particular

12   dosage.  And in any event, Your Honor, there's no concealment

13   here of the 500 and 600-milligram dosages.  In fact, it's

14   exactly the opposite.

15          The second paragraph of the '209 patent cites a

16   prior art article disclosing precisely these dosages.  In

17   fact, it discloses the 600 dose on the very page that the

18   specification cites and the 500 and 600 dose on the

19   immediately preceding page.  Hardly an act of concealment.

20          Let me sum up, Your Honor.  As you have seen this

21   morning, the defendants are asserting almost every invalidity

22   defense in the patent law.  It's going to be a little bit like

23   a law school exam here for a while.  They bear the burden of

24   proof by clear and convincing evidence on all of them.  The

25   evidence will show that they cannot establish any of these

1  defenses, that Lilly's claims are valid, and that judgment

2  should be entered in Lilly's favor.  Thank you, Your Honor.

3            THE COURT:  Thank you, Counsel.  Okay.  It's 11:00

4  o'clock.  Do you want to take a short break and start with the

5  first witness, or do you want to go to lunch now?  What's your

6  preference, lawyers?

7            MR. PERLMAN:  My preference would be to take a short

8  break and then keep going.  I don't know where Mr. Wiesen is.

9            THE COURT:  Okay.

10           MR. WIESEN:  We're happy to put on the first witness

11 after a short break.

12           THE COURT:  Let's take 15 minutes, and then we'll

13 start with the first witness.

14           THE COURTROOM DEPUTY:  All rise.

15           (Recess at 11:01, until 11:25.)

16           THE COURT:  We are back on the record.  And,

17 Counsel, you may call your first witness.

18           MS. RAPALINO:  Thank you, Your Honor.  My name is

19 Emily Rapalino.

20           THE COURT:  I need you to talk in the mic.

21           MS. RAPALINO:  My name is Emily Rapalino.  I'm with

22 Goodwin Procter representing the defendants.  Defendants call

23 as our first witness Dr. Mark Ratain.

24           THE COURT:  Okay, Dr. Ratain, if you would come

25 right up here.  We know it's tight.

 1          Doctor, if you would remain standing and raise your
 2   right hand.
 3          (The witness is sworn.)
 4          THE COURT:  You may have a seat.
 5          **MARK RATAIN, DEFENDANT'S WITNESS, SWORN**
 6                   **DIRECT EXAMINATION**
 7   BY MS. RAPALINO:
 8   Q.  Good morning, Dr. Ratain.
 9   A.  Good morning.
10          MS. RAPALINO:  Your Honor, before I begin with the
11   direct examination of Dr. Ratain, I just had a ministerial
12   question for the Court about offering exhibits into evidence.
13          Per the parties' stipulation that the Court entered
14   in this case, we did exchange exhibits in advance; and I
15   believe that the parties have worked out any objections to the
16   exhibits that Dr. Ratain intends to discuss today.  And I
17   guess the question is just for efficiency's sake, would you
18   prefer that we offer those exhibits into evidence at the
19   beginning of the testimony, all in a group at the end of the
20   testimony, or as they come up?
21          THE COURT:  And what did you want to say, Counsel?
22          MR. PERLMAN:  My only issue, Your Honor, is if he
23   testifies about the documents, we have no objections to their
24   admission into evidence.  I don't want to just admit the
25   binder and then -- if he doesn't get to all the documents.

*RATAIN - DIRECT/RAPALINO*                  Vol. 1-85

1          MS. RAPALINO:  My proposal would be that we just

2    wait until the conclusion of the direct examination of

3    Dr. Ratain, and then we can offer the exhibits that he's

4    discussed as a list into evidence if that works.

5          THE COURT:  Okay.  Fair enough.  All right.  And you

6    may examine your witness.

7          MS. RAPALINO:  Thank you, Your Honor.

8    BY MS. RAPALINO:

9    Q.  Dr. Ratain, could you please state your full name -- state

10   and spell your full name for the record?

11   A.  Mark Jeffrey Ratain, M-a-r-k, J-e-f-f-r-e-y, R-a-t-a-i-n.

12   Q.  Thank you.  Where do you live, Dr. Ratain?

13   A.  I live in Chicago.

14   Q.  Are you employed?

15   A.  Yes.  I'm employed by the University of Chicago.

16   Q.  What positions do you hold at the University of Chicago?

17   A.  I hold a number of positions.  I'm the Leon O. Jacobson

18   Professor of Medicine.  I'm also the director of the

19   University Center For Personalized Therapeutics, and I'm the

20   associate director for clinical sciences in the university's

21   Comprehensive Cancer Center.

22   Q.  Do you have any other hospital leadership positions?

23   A.  Yes.  The University of Chicago's hospital is called

24   University of Chicago Medicine.  I also have the appointment

25   as chief hospital pharmacologist.

1  Q.  How long have you held positions at the University of

2  Chicago?

3  A.  I've been on the faculty since 1986.

4  Q.  And how long have you been a professor at the University

5  of Chicago?

6  A.  I've been a professor since 1995.

7  Q.  Now, as a professor at the University of Chicago, what are

8  your responsibilities, generally?

9  A.  Well, I have multiple responsibilities.  I'm a practicing

10  physician, so I take care of patients.  I have an active

11  research program related to anti-cancer drugs and to

12  variability in the effects of anti-cancer drugs.  I teach

13  primarily informal teaching of young scientists and young

14  physicians, and I have the administrative positions I

15  mentioned.

16  Q.  I would like to ask you to turn in your binder that we've

17  placed in front of you to Trial Exhibit 1507.

18          MS. RAPALINO:  And, Your Honor, at the break, we

19  took the liberty of providing the Court with copies of the

20  binders, as well.

21  BY MS. RAPALINO:

22  Q.  So, Dr. Ratain, if you would turn to Exhibit 1507 in your

23  binder.

24          THE WITNESS:  Sorry, Your Honor.  I keep hitting the

25  microphone.

```
 1            THE COURT:  It's very sensitive.  So it makes lots
 2    of noise.
 3    BY MS. RAPALINO:
 4    Q.  Is this a copy of your CV, Dr. Ratain?
 5    A.  Yes, it is.
 6    Q.  And did you prepare this document?
 7    A.  I did.
 8    Q.  Does it accurately reflect your education and experience?
 9    A.  Yes, with the exception of additional publications
10    subsequent to the preparation of the document on July 25th,
11    2013.
12    Q.  Okay, but with the exception of those additional
13    publications, this is an accurate reflection of your education
14    and experience?
15    A.  Yes.
16    Q.  Okay.  I want to take a step back and looking at your CV,
17    I want to just talk a little bit about your education.  Where
18    did you go to college?
19    A.  I went to Harvard University in Cambridge, Massachusetts.
20    Q.  When did you graduate?
21    A.  I graduated in 1976.
22    Q.  Did you go to medical school after that?
23    A.  Yes.  I went directly to medical school, and I graduated
24    from Yale University School of Medicine in 1980.
25    Q.  Did you do any postgraduate training after medical school?
```

1  A.  Yes, I did six years of formal postgraduate training,

2  three years in internal medicine at Johns Hopkins Hospital in

3  Baltimore, and a three-year fellowship in hematology-oncology

4  at the University of Chicago Hospitals.

5  Q.  What did you do after you completed your fellowship at the

6  University of Chicago?

7  A.  As I mentioned, I joined the faculty in 1986 directly

8  after completing my training.

9  Q.  And at the time you joined the faculty at the University

10 of Chicago, what were your responsibilities at that time?

11 A.  Well, my responsibilities were somewhat similar to what

12 they are today, although I didn't have any significant

13 administrative responsibilities at that time, and I probably

14 saw a bit more patients than I do today.

15 Q.  Did you do any research at the time you joined the faculty

16 or at the beginning of the 1990s?

17 A.  Yes.  I've had an active research program since 1986,

18 including both laboratory research program and a clinical

19 research program involved in the design, conduct, and analysis

20 of clinical trials; and my primary interests since 1986 has

21 been on understanding variability between patients in response

22 to drugs, especially in regard to variability and toxicity of

23 anti-cancer drugs.

24 Q.  Can you explain just briefly what you mean by variability

25 and toxicity to cancer drugs?

1  A.  Well, when we treat patients with cancer, we follow a

2  standard recipe that's prescribed either based on clinical

3  trials or based on the FDA label.  And as we've heard from the

4  tutorial this morning, patients develop side effects from

5  chemotherapy, but not everybody has the same degree of side

6  effects.  And some patients have a lot more side effects than

7  others.

8          And so understanding that puzzle, that mystery,

9  understanding exactly why some patients have more side effects

10 than others, and then developing approaches to diagnose and

11 treat that variability, that's been a fundamental part of my

12 research program really since day one, since I first started

13 my training in 1983.

14 Q.  Have you ever done any research related to antifolates?

15 A.  Yes, I have.

16 Q.  Can you just briefly describe that research?

17 A.  Well, I did two Phase 1 trials with a Zeneca drug, ZD9331,

18 and I also participated in a Phase 1 trial of a second Zeneca

19 drug, one that was subsequently approved called raltitrexed.

20 Q.  At the time that you were doing that research, were you

21 following the literature related to antifolates?

22 A.  Yes.  I was actively involved in antifolate research.  I

23 would go to meetings.  I would make presentations in sessions

24 and meetings.  In fact, I even remember going to a meeting

25 focused entirely on antifolates in Oxford.

1  Q.  Were you active in any professional oncology organizations

2  over the course of your career?

3  A.  Yes.  I've been intermittently very active in the American

4  Society for Clinical Oncology.  I say "intermittent" because

5  I'm a former officer of the organization and served as

6  secretary/treasurer from 1994 to 1997.  And since then I've

7  had, of course, much less of a role but have still been active

8  in many of their committees.

9  Q.  Can you explain a little bit more about what the American

10  Society of Clinical Oncology is?

11  A.  Yes.  The American Society of Clinical Oncology -- which

12  I'll refer to as "ASCO" because the term will come up again --

13  is the premier international society involving physicians who

14  take care of patients with cancer.

15  Q.  What kind of activities does ASCO engage in?

16  A.  ASCO has a multitude of activities.  Probably its most

17  prominent activity is its annual meeting, which these days

18  consists of about 30,000 people congregating in Chicago every

19  June.  Back in the '90s, it was probably only about 20,000,

20  and we went to much more desirable places like Dallas and

21  Orlando.

22  Q.  Okay.  Have you ever had any involvement with the National

23  Cancer Institute?

24  A.  Yes.  I've been quite closely interactive with the

25  National Cancer Institute since I joined the faculty.  I've

1  been the principal investigator of initially a contract with

2  the National Cancer Institute and subsequently a grant with

3  the Cancer Institute for Phase 1 clinical trials in

4  collaboration with the National Cancer Institute since 1989.

5  Q.  Have you had any leadership positions within the National

6  Cancer Institute?

7  A.  Yes.  In 2005, the National Cancer Institute decided to

8  create an investigational drug steering committee and -- in

9  order to provide input to the National Cancer Institute

10  regarding the best way to design and conduct trials of new

11  anti-cancer agents, and I was elected one of the first two

12  co-chairs of that committee.

13  Q.  Have you been active in any professional organizations

14  outside of the oncology specialty?

15  A.  Yes.  I've also been very active in an organization called

16  "ASCPT," which stands for the American Society for Clinical

17  Pharmacology and Therapeutics, which is the premier

18  international organization that includes academic

19  investigators, government investigators such as the FDA, and

20  industry investigators, all interested in the development of

21  drugs and the administration of drugs to patients.

22  Q.  And are there members of that society who are not

23  oncologists?

24  A.  Yes.  Very few members of that organization are

25  oncologists, which is one of the reasons that it's been such

1  an important organization for me, is to interact freely with

2  investigators interested in drugs from other therapeutic

3  areas.

4  Q.  Have you published in your field?

5  A.  Yes.  I've published just over 400 papers.

6  Q.  Can you describe generally some of the subject matter of

7  your papers without, obviously, giving us detail about 400 of

8  them?

9  A.  Yes.  Well, thank you.  My papers fall into a variety of

10 areas.  Some of them relate to early clinical trials of

11 investigational anti-cancer drugs, such as the kind of studies

12 we're going to be talking about today, both Phase 1 trials and

13 Phase 2 trials.  Many of my papers relate to an area of

14 research that I would -- I have called pharmacodynamics, which

15 is very similar to the analysis that Dr. Niyikiza performed,

16 where one tries to understand variability in the toxicity of a

17 drug and conduct multivariate analyses to sort that out.  And

18 more recently my work has, in a large extent, focused on

19 pharmacogenomics, in now that we understand that a lot of this

20 variability we see from patient to patient is due to one's

21 genetics.

22 Q.  You may have explained this as part of your answer, but

23 just for some clarity, can you explain what the word

24 "pharmacodynamics" means?

25 A.  Thank you.  That's a great question.

1          There are two words that we're going to talk about

2   probably during the course of this trial that sort of sound

3   the same but have very different meanings.  One is

4   "pharmacokinetics," and one is "pharmacodynamics."

5   Pharmacodynamics is what the drug does to the body, which is

6   in contrast to pharmacokinetics, what the body does to the

7   drug.

8   Q.  Okay.  Thank you.

9          Are any of your publications related to antifolates?

10  A.  Yes, they are.

11  Q.  And then do you have any publications that relate

12  generally to toxicity of anti-cancer agents?

13  A.  I have many publications that relate to the toxicity of

14  anti-cancer agents.  That's been a focus of my research in my

15  entire career.

16  Q.  Have you ever had a major editorial role in any journals

17  during the course of your career?

18  A.  Well, yes.  I'm currently coeditor in chief of a journal

19  called *Pharmacokinetics and Genomics*, which relates to this

20  area of research that I just was discussing, the genetic

21  variability in drugs, and I previously served as associate

22  editor for the *Journal of Clinical Oncology*, which is the ASCO

23  journal.

24  Q.  Are you an inventor on any patents?

25  A.  Yes.  I have four issued U.S. patents and two issued

1  foreign patents.

2  Q.  And do any of those patents relate to any issues that are

3  of relevance to this case?

4  A.  Yes.  The patents largely relate to the work I did with an

5  anti-cancer drug called irinotecan, which was approved by the

6  FDA in 1996, and the problem with irinotecan was very similar

7  to the problem with pemetrexed, which is that there was a lot

8  of variability in the toxicity.  Some patients had really

9  horrible, severe toxicity, and we did an analysis, a

10  multivariate analysis, and we worked out an understanding of

11  what the variability in toxicity was due to, which then led to

12  patent filings.

13  Q.  Now, we're going to talk about the term "multivariate

14  analysis" in much more detail later, but just in a couple of

15  sentences can you just give a brief explanation of what a

16  multivariate analysis is?

17  A.  Well, a multivariate analysis is when you have some

18  observation in which you have variability and you're trying to

19  understand things that are related to that variability.  And

20  you have -- instead of just having one concept, such as you

21  want to correlate height and weight, in this scenario you

22  would have multiple different variables, some of which you

23  think might be related, some of which you think probably

24  aren't related, and some which, you know, are closely related

25  to each other.  And you throw all this data into a computer,

1  and you start to analyze it.

2  Q.  Okay.  We'll come back to talk about that a little bit

3  later.

4        Getting back to your background, have you ever won

5  any awards in connection with your work?

6  A.  Yes.  I've won a number of awards.  I'm most proud of the

7  awards I received from societies; professional organizations

8  have honored me.  I mentioned ASCPT.  They gave me a major

9  award a few years ago, the Rawls-Palmer Award.  I also

10 received an award from the American Association of

11 Pharmaceutical Scientists, an award from the American College

12 of Clinical Pharmacology, and I've received awards from other

13 institutions, including MD Anderson Cancer Center in Houston,

14 the University of North Carolina, and the National Cancer

15 Institute.

16 Q.  And generally speaking, what were those awards in

17 recognition of?

18 A.  These awards have been in recognition of my work regarding

19 anti-cancer drugs and the pharmacology, the pharmacokinetics,

20 and pharmacodynamics of anti-cancer drugs.

21        THE COURT:  What do you get?  Do you get money or

22 trophies or --

23        THE WITNESS:  Occasionally I get a little money.

24 The Texans gave me money.  Usually you get a plaque.

25        THE COURT:  Okay.

1          MS. RAPALINO:  Okay.  Your Honor, I've finished

2     the -- Dr. Ratain's qualifications section of the examination,

3     and I'm about to move into a little bit more substance, and I

4     just wonder in terms of taking a break, whether it makes sense

5     to keep going for a little bit.

6          THE COURT:  Let's keep going for a little bit.

7          MS. RAPALINO:  Okay.  No problem.

8     BY MS. RAPALINO:

9     Q.  Now, Dr. Ratain, you've been engaged as an expert in this

10    case; is that right?

11    A.  Yes.

12    Q.  What patent were you asked to testify about?

13    A.  I was asked to testify about the '209 patent that we

14    heard about earlier.

15    Q.  Did you participate in preparing slides to assist you in

16    testifying today?

17    A.  Yes, I did.

18          MS. RAPALINO:  Okay.  Could we pull up Dr. Ratain's

19    first slide?

20    BY MS. RAPALINO:

21    Q.  What specific issues were you asked to consider with

22    respect to the '209 patent?

23    A.  Well, I considered two basic issues:  One on obviousness

24    and one on obviousness-type double patenting.  I considered

25    the obviousness of the '209 patent claims as of June 1999 in

1  view of the prior art, and I considered the issue of

2  obviousness-type double patenting of the '209 patent claims

3  over Claim 20 of the '974 patent.

4  Q.  And were you asked to consider the prior art as of a

5  particular date?

6  A.  Yes.

7  Q.  What date was that?

8  A.  That was June 1999.

9  Q.  What type of prior art did you review in conducting your

10  analysis?

11  A.  Well, I looked at scientific publications, scientific and

12  medical publications, full publications, full articles, what I

13  will refer to as abstracts, which are not the full article.  I

14  also looked at patents that had been published or issued.

15  Q.  How did you obtain the literature that you just described?

16  A.  Well, most of this I obtained through my usual

17  due-diligence process I use in my everyday research, but some

18  was provided to me by counsel.

19  Q.  Were you previously familiar with the literature that you

20  reviewed?

21  A.  Yes.

22  Q.  Did you look at any documents or data that were generated

23  after June 30th of 1999?

24  A.  Yes, I did.

25  Q.  Can you explain a little bit more about that?

*RATAIN - DIRECT/RAPALINO*                    Vol. 1-98

1   A.  Well, I was also asked to consider the secondary

2   considerations, and so there were publications that were

3   relevant to those opinions that were not prior art.

4   Q.  And after forming your opinions in this case, did you

5   review any other documents besides publicly available

6   literature?

7   A.  Yes.  I was able to review a number of documents related

8   to correspondence between Lilly and the FDA.

9   Q.  What conclusions did you reach concerning the obviousness

10  of the asserted claims?

11  A.  Well, the summary of my opinions is shown on this slide,

12  and they are that the claims of the '209 patent would have

13  been obvious to a person of ordinary skill in the art as of

14  June 1999 in view of the prior art.  More specifically, it

15  would have been obvious to add vitamin B12 pretreatment to a

16  regimen of pemetrexed with folic acid pretreatment at the

17  claimed doses and schedules in view of the prior art.

18  Q.  And what conclusions did you reach concerning

19  obviousness-type double patenting in this case?

20  A.  My opinions regarding obviousness-type double patenting

21  are shown on this slide.  A person of ordinary skill in the

22  art as of June 1999 would have considered the asserted claims

23  of the '209 patent to be obvious variance of Claim 20 of

24  the '974 patent.  More specifically, the asserted claims of

25  the '209 patent covering regimens of pemetrexed with vitamin

1  B12 and folic acid pretreatment are obvious variance of Claim

2  20 of the '974 patent, which covers regimens of an

3  antifolate with folic acid pretreatment in view of the prior

4  art.

5  Q.  Okay.  We're going to come back and talk about each of

6  those opinions in much more detail, but before we do that, I

7  want to turn to talking about some of the background science

8  that's relevant here.  Now, we've been talking about the

9  '209 patent.  Very generally, what is the '209 patent

10 directed to?

11 A.  Well, the '209 patent is generally directed to a method

12 of use of pemetrexed, the antifolate we've been talking about

13 this morning, in combination with vitamins.

14 Q.  And what specific vitamins are claimed in the '209

15 patent?

16 A.  This -- the specific claimed vitamins are folic acid and

17 vitamin B12.

18 Q.  What classes of disease is pemetrexed used to treat?

19 A.  Pemetrexed is used to treat two types of cancer, or it's

20 indicated to treat two types of cancer.

21 Q.  Let's start with cancer, then.  Can you explain generally

22 what cancer is?

23 A.  Well, cancer isn't a disease.  Cancer is a process, a

24 group of diseases.  It's really now viewed as a genetic

25 disease in the sense that our cells within the body develop

1  mutations over time, and these mutations can cause a cell to,

2  for lack of a better term, to misbehave and not act like a

3  normal cell and therefore grow without restraint and

4  metastasize.

5  Q.  How is cancer treated?

6  A.  Well, historically, the most effective treatment for

7  cancer from the standpoint of curing the disease has been

8  surgery.  More recently, we've developed other tools:

9  Radiation therapy, of course, which can cure some cancers; and

10 then drug therapies, with chemotherapy being the first example

11 of drug therapies, which unfortunately is not that effective

12 from the standpoint of curing cancer.

13 Q.  What is chemotherapy?

14 A.  Well, when I'm talking to my patients who aren't that

15 familiar with chemotherapy, I explain to them that

16 chemotherapy is essentially poison, and really that's how it

17 all got started.  And so chemotherapy damages the tumor and,

18 unfortunately, also has the complication of damaging the

19 normal, healthy cells.  And the purpose of the chemotherapy is

20 to prevent these uncontrolled tumor cells from continuing to

21 grow and metastasize.

22 Q.  And how does chemotherapy target cancer cells?

23 A.  Well, there are a number of different targets.

24 Classically, the most common targets of chemotherapy have been

25 the DNA, the underlying genetic code for the entire cell, and

1  drugs have been developed that block the production of the

2  building blocks of DNA, such as antifolate drugs, but there

3  are other drugs that actually bind directly to the DNA or

4  prevent the DNA from dividing.

5  Q.  And how does targeting the DNA treat the cancer?

6  A.  Well, if the cell can't make DNA, it will die, and it

7  certainly won't be able to replicate.

8  Q.  So we've been talking a little bit about DNA.  Can you

9  give just sort of an overview of what DNA is?

10 A.  Well, as I mentioned, DNA is the underlying genetic code,

11 and its primary purpose is to direct traffic and direct the

12 entire growth of the cell.  And it does so by providing this

13 code that results in the production of what we call messenger

14 RNA.  There are other kinds of RNA, as well, but RNA conveys a

15 message that allows the cell to learn how to make proteins.

16 Q.  And so what happens when chemotherapy targets that DNA?

17 A.  Well, chemotherapy targets the DNA; then the DNA cannot

18 make the message and the DNA cannot replicate.

19 Q.  Does chemotherapy affect healthy cells?

20 A.  Yes.  Chemotherapy, unfortunately, affects healthy cells,

21 particularly those that are -- have ongoing growth and

22 division.

23 Q.  And what kind of healthy cells typically have ongoing

24 rapid growth and division that are particularly susceptible to

25 chemotherapy?

1   A.  Well, I have a slide that explains this, so there's -- I

2   want to divide this into three areas of rapidly dividing

3   cells.  So, we have bone marrow cells, digestive tract cells

4   and hair follicle cells as three examples of types of rapidly

5   dividing cells.

6   Q.  What happens when chemotherapy targets, for example, the

7   bone marrow cells?

8   A.  Well, the side effect -- the medical term for the side

9   effect is "myelosuppression," and myelosuppression can refer

10  to depression of white cell growth, depression of red cell

11  growth or depression of platelet growth.

12  Q.  What happens to a patient when they have a depression in

13  their white cell growth?

14  A.  When they have a depression in the white cell growth, the

15  number of white cells they make is markedly decreased.

16  Therefore, the number of white cells in the blood goes down,

17  and that puts a patient at risk of infection.

18  Q.  And, similarly, what happens when a patient has a

19  depression in red blood cells?

20  A.  Well, that's -- what happens when there's a depression of

21  red cells is that one becomes anemic, is the medical term, and

22  one has a lower concentration of a red cells, with fatigue

23  being the most common symptom.

24  Q.  And what happens when a patient has a depression of

25  platelets?

1  A.  Well, a depression of platelets is called

2  thrombocytopenia, and that results in bleeding if it's not

3  treated and it's severe.

4  Q.  You said the second type of cell that's rapidly dividing

5  and susceptible to chemotherapy are the digestive tract cells.

6  What happens when those cells are affected by chemotherapy?

7  A.  Well, they -- the digestive tract really runs from the

8  mouth all the way to the rear, and there can be damage

9  anywhere along that digestive tract.  If it's in the mouth,

10  the side effect is called mucositis, reflecting mouth sores.

11  One can also have damage to the intestine, resulting in

12  diarrhea, nausea, vomiting.  And, again, other common side

13  effects such as loss of appetite and weight loss are often due

14  to toxicity to the gastrointestinal tract.

15  Q.  And what happens when chemotherapy impacts the other kind

16  of cell you've listed here, hair follicle cells?

17  A.  When chemotherapy affects the hair follicle, the hair

18  falls out, and the medical term for that is "alopecia."

19  Q.  Now, you mentioned that the '209 patent was directed to

20  the use of pemetrexed with the two vitamins.  So I want to

21  talk about just pemetrexed for a moment, and then we'll talk

22  about folic acid and vitamin B12.  What kind of drug is

23  pemetrexed?

24  A.  Pemetrexed is an antifol or antifolate.

25  Q.  And is pemetrexed marketed in the United States?

1  A.  Yes.  Pemetrexed is, as we heard, is marketed by Eli Lilly

2  and Company under the brand name "Alimta."

3  Q.  And you mentioned that it's approved for treating two

4  types of cancer.  What types of cancer is it approved for

5  treatment of?

6  A.  It's approved for the treatment of mesothelioma, and it's

7  approved for a subset of patients with lung cancer.

8  Q.  Have you seen any other names in the literature for

9  pemetrexed in the 1990s?

10  A.  Yes.  It was commonly referred to as "MTA," which stood

11  for multitargeted antifolate, and it often also went by its

12  Lilly number, LY231514.

13  Q.  Now, the patent claims, you said, also involve folic acid.

14  What is folic acid?

15  A.  Well, folic acid is a form of folate.  It's the form of

16  foliate that is contained in standard multivitamins.

17  Q.  And how is folate used in the body?

18  A.  Well, folate is an important cofactor and is required for

19  the production of many metabolic reactions, particularly those

20  that involved the building blocks of DNA and RNA.

21  Q.  What is a folate deficiency?

22  A.  A folate deficiency is when there's an insufficient amount

23  of folate in the body for the body to adequately perform all

24  of its normal folate-mediated reactions.

25  Q.  And what are some causes of an insufficient amount of

1  folate?

2  A.  Well, there are a number of causes.  Just any chronic

3  disease can lead to folic deficiency; poor diet is a very

4  common cause, and alcoholism, unfortunately, also a cause.

5  Q.  Let's turn to talking about the other vitamin, vitamin

6  B12.  What is vitamin B12?

7  A.  Well, vitamin B12 is a vitamin that is naturally found in

8  animal products, dairy products, and meat.

9  Q.  And is vitamin B12 one compound?

10  A.  Well, from a physician's standpoint, it's really a whole

11  host of compounds, but I understand in this case the term

12  "vitamin 12" as applied to the claims has a specific meaning,

13  cyanocobalamin.

14  Q.  And so when you use the term "vitamin B12," are you

15  limiting yourself to cyanocobalamin, or are there other forms?

16  A.  I will try and -- when I use the word "vitamin B12," I'm

17  referring to all types of vitamin B12, and when I'm referring

18  to "cyanocobalamin," I will try to use the word

19  "cyanocobalamin."

20  Q.  Okay.  What is a vitamin B12 deficiency?

21  A.  A vitamin B12 deficiency is when there's insufficient

22  amounts of vitamin B12 in the body to perform all normal B12

23  functions.

24  Q.  And what are some of the causes of a vitamin B12

25  deficiency?

1  A.  Well, one common cause is problems with the

2  gastrointestinal tract.  Vitamin B12 has a fairly complex

3  process to be absorbed, and so damage to the stomach or damage

4  to the intestines can cause a B12 deficiency.  In addition,

5  the elderly have an increased risk of B12 deficiency, and, of

6  course, individuals who abstain from meat and dairy products

7  are also destined to be B12 deficient and will require B12

8  supplementation.

9  Q.  Now, we heard about this a little bit this morning in the

10 tutorial, but is there any relationship between folate and

11 vitamin B12?

12 A.  Well, yes.  They both -- if either one is deficient, one

13 will get anemia, and also they -- both are required for a

14 particular reaction that is involved in the synthesis of

15 methionine.  The reaction was described this morning called

16 methionine synthase.

17 Q.  And what happens if that reaction -- if there's a

18 deficiency of B12 and that reaction can't proceed?

19 A.  If there's a deficiency of B12 and that reaction can't

20 proceed, then the homocysteine, which is the starting point

21 for that reaction, builds up and there's increased amounts of

22 homocysteine present in the blood.

23 Q.  Okay.  Now, you said earlier that pemetrexed is an

24 antifolate.  Can you describe generally what antifolates are?

25 A.  Well, antifolates are a class of anti-cancer drugs that

*RATAIN - DIRECT/RAPALINO*                     Vol. 1-107

1   have a similar chemical structure to folic acid and block one

2   of the enzymes, the folate pathway that we heard about

3   earlier, and therefore interfere with the synthesis of DNA

4   and/or RNA.

5   Q.  Can you explain a little bit about what enzymes are?

6   A.  Yes.  An enzyme is a protein that has -- that is capable

7   of carrying out a specific biochemical reaction, and so

8   enzymes generally have a particular type of substrate.

9   Enzymes can have more than one substrate, and they will bind

10  to that substrate and -- kind of like a lock and key, and then

11  carry out this chemical reaction, forming one or more

12  products.

13  Q.  And you used the term "substrate."  What is a substrate?

14  A.  Substrate is the starting point for the reaction.

15  Q.  Okay.  And what are some of the -- what are some of the

16  enzymes that antifolates target?

17  A.  Well, there's four that have been identified that are

18  important from the standpoint of a number of different

19  anti-cancer drugs.  We heard the abbreviations this morning:

20  DHFR, dihydrofolate reductace; TS, thymidylate synthase, GARFT

21  and AICARFT.

22  Q.  Thanks.  Now, looking back historically, what were the

23  first antifolates that were developed?

24  A.  Well, the first antifolate that was tested in patients was

25  aminopterin.

1  Q.  And have other antifolates been developed since?

2  A.  Yes, methotrexate has been in clinical use for probably

3  about 50 years now.

4  Q.  What has methotrexate been used for?

5  A.  Methotrexate is used for a variety of different cancers,

6  and it's also used for the treatment of rheumatoid arthritis.

7  Q.  Are there other examples of antifolates that have been in

8  development over the years?

9  A.  There are many antifolates that have been in clinical

10 trials.  There -- we're obviously talking about pemetrexed, of

11 course, which is another antifolate that is approved by the

12 FDA.  There are other Lilly compounds that I will be

13 discussing, lometrexol, and a compound called the '887

14 compound.  I also mentioned my work with raltitrexed and

15 ZD9331, and I will add that raltitrexed is approved in Canada

16 and in some European countries.

17 Q.  What was the state of antifolate drug development in the

18 1990s?

19 A.  This was a very active area, as I mentioned.  There were

20 whole sessions of meetings and whole meetings just on

21 antifolates.

22 Q.  And were any antifolates in clinical trials as of the

23 1990s?

24 A.  Yes.  There are a number of antifolates in clinical trials

25 in the '90s, and all three Lilly compounds that I mentioned

1  and the two I worked on were under development in the 1990s,

2  as examples.

3  Q.  Okay.  You talked earlier about the effect of antifolates

4  on DNA and cells.  How do antifolates get into the cells to

5  exert their effect?

6  A.  Well, there's at least two transporters.  A transporter is

7  a protein that moves a molecule across a cell membrane, the

8  boundary between the inside and outside of the cell.  And the

9  two that are -- have been associated and mediate the transfer

10  of antifolates are the RFC, or reduced folate carrier, and the

11  FBP, or folate binding protein.

12  Q.  Okay.  Let's talk for a moment about the process of drug

13  development.  Generally, can you describe what kind of testing

14  has to be done before a drug can be put into a patient?

15  A.  Well, there's really a large number of steps that are

16  required before the FDA will permit the initiation of clinical

17  trials, and this is -- we call this the preclinical process,

18  the steps that lead up to what's called an IND,

19  Investigational New Drug Application.  So there's a large

20  number of steps.  There's -- first there's the basic discovery

21  of the molecule and the demonstration that the molecule does

22  something, and these kinds of studies are done just in test

23  tubes or against cancer cells growing in a plate.

24  Q.  What comes after that?

25  A.  After that, the next step is, once you know -- once you

1  know you have a drug that works against a cancer cell growing

2  on a plate, the next question is, well, if I give the cancer

3  drug to a mammal, can I get enough drug into the tumor to get

4  anti-cancer effect?  And so there are a number of animal

5  models that have been developed for the testing of anti-cancer

6  drugs, and one particular kind of model is one where human

7  cancers are transplanted into mice.

8  Q.  Is there a name for that kind of model?

9  A.  Yes.  That's called a xenograft model.

10 Q.  And how common was the use of a xenograft model in the

11 1990s?

12 A.  It was one common type of model.  It required a special

13 kind of mouse that did not reject the human cancer.  But,

14 there were many, many different models.

15 Q.  Now, are there other types of preclinical tests that would

16 be done before a drug would make it into a patient?

17 A.  Well, it would be pretty routine, for example, to do

18 pharmacokinetics of the drug in mice, rats, dogs, sometimes

19 rabbits.  And I mentioned that pharmacokinetics is what the

20 body does to the drug, because one of the things you would

21 like to know if you're going to give a drug eventually to

22 patients, you would like to have an idea of how much drug it

23 takes in the blood to work in the patient.  So by doing these

24 studies in animals, you can get that understanding.

25 Q.  And are there any other types of preclinical testing that

1  are done before a drug moves into clinical trials?

2  A.  Yes.  Usually the last type of scientific experiment is

3  what's referred to as toxicology studies, where one wants to

4  really understand the side effect profile of the drug,

5  particularly the side effect profile of the drug at

6  potentially lethal doses and the dosage that results in

7  fatality because, again, that greatly influences the design of

8  the human clinical trials.

9  Q.  Now, assuming that a drug shows promise in these

10 preclinical tests, what's the next stage?

11 A.  Well, as I mentioned, the next step would be, if a company

12 wants to proceed to clinical trials, is they package up all

13 these experiments into a large document reporting the results

14 of all these studies, and in addition, they have to write

15 what's called a protocol for the first Phase 1 trial.  A

16 protocol is a written document that is reviewed by an ethics

17 committee -- and we call them in this country institutional

18 review boards -- that makes sure that the experiment is

19 reasonable and that the consent form is reasonable.  And then

20 that protocol plus all these preclinical data goes to the FDA,

21 and the FDA then makes an assessment as to whether it's

22 reasonable to begin clinical trials.

23 Q.  And if the FDA decides it's reasonable to begin clinical

24 trials, what's the first kind of clinical trial that's

25 conducted?

1   A.   This first kind of clinical trial is what we call a

2   Phase 1 trial; and for cancer drugs, it's performed in cancer

3   patients, cancer patients that -- for whom there is no

4   standard therapy, for whom that are resistant to all approved

5   drugs.

6   Q.   And how are Phase 1 trials for anti-cancer drugs generally

7   designed?

8   A.   Well, it's -- it's a process where the first patients,

9   unfortunately, often get treated at doses that the

10  investigators might believe are too low a dose, because the

11  FDA makes us err on the side of caution.  So you start at a

12  dose that is one-tenth of the dose that you think is the

13  effective dose, and then you increase the dose in groups of

14  patients until you get to what's called the

15  maximally-tolerated dose.

16          And so the purpose of this Phase 1 trial generally

17  is to define the maximum tolerated does.

18  Q.   Is it a goal of a Phase 1 study to evaluate the efficacy

19  of a drug?

20  A.   It's a goal from the patient's perspective to have

21  efficacy.  It's a goal of the physician who is actually

22  treating the patient for the patient to have efficacy, but the

23  study is not a scientific experiment that can measure

24  efficacy.

25  Q.   So can the results of Phase 1 trials be compared to

1  reliably ascertain the relative efficacy of the regimens of

2  two different Phase 1 trials?

3  A.  No.

4  Q.  Why not?

5  A.  Well, as I mentioned, Phase 1 trials have a variety of

6  different doses, and so patients are getting all different

7  doses.

8          In addition, patients have -- basically have tumors

9  that are resistant to prior therapy; and so they may have a

10  disease that will never respond to anything, for example, in a

11  Phase 1 trial, or they might have a disease that has responded

12  in the past, and the patient's physician does not want to

13  re-treat them with the same drug again, and that's a different

14  kind of patient.

15          In addition, over the years, we have more and more

16  drugs approved; and so that patients now that go on Phase 1

17  trials have had many more drugs than patients that had went on

18  Phase 1 trials when I first started doing Phase 1 trials in

19  the 1980s.

20  Q.  So are all the patients receiving a particular drug in

21  various Phase 1 trials?  Do they all have the same kind of

22  cancer?

23  A.  No.  They all have different cancers.

24  Q.  Now, I know you said that Phase 1 studies are not designed

25  to evaluate efficacy of a drug.  Is it possible to glean any

1  information about efficacy from a Phase 1 trial?

2  A.  Well, yes, particularly when one looks at a portfolio of

3  Phase 1 trials; and it's well established that every drug that

4  we have on the market today showed some efficacy in at least

5  one Phase 1 trial.  That's not to say that every Phase 1 trial

6  had at least one patient with efficacy, and it certainly

7  doesn't mean that every patient in a Phase 1 trial showed

8  efficacy.  But, as I always tell my patients, if this drug is

9  going to be approved by the FDA, somebody is going to respond

10  to it in a Phase 1 trial.

11  Q.  Now, what happens after Phase 1 trials if a drug continues

12  in its development?

13  A.  Well, assuming that there is agreement that the Phase 1

14  schedule, in other words, the frequency of administration,

15  every three weeks or weekly or whatever that initial trial

16  was, is the right one, then one would proceed to a Phase 2

17  trial designed to measure the efficacy of a drug in a

18  particular disease with the goal of trying to make an

19  assessment as to whether it's worth investing for a large

20  Phase 3 clinical trial.

21  Q.  And if a company decides that's it's worth the investment

22  for a large Phase 3 clinical trial, can you describe what

23  happens in a Phase 3 clinical trial?

24  A.  Well, a Phase 3 clinical trial must meet very strict

25  regulatory standards; and so there's extensive discussions,

1   both within a company with investigators, and potentially with

2   the FDA -- and certainly today that is almost always done; but

3   generally, even in the '90s, companies would meet with the FDA

4   at the end of Phase 2 to plan Phase 3 trials.  These would be

5   large randomized trials where half the patients get a control

6   group of some standard therapy, and the other half of the

7   patients get the therapy that the company is trying to get

8   approved by the FDA.

9   Q.  And can you describe generally the design of a Phase 3

10  trial?

11  A.  Well, Phase 3 trials are what we call randomized trials.

12  Sometimes they're what we call double-blind trials where

13  nobody knows what the patient is getting, whether they're

14  getting the standard or the experimental, although in

15  oncology, and for example, with pemetrexed, that was not a

16  double-blind trial.  But, the Phase 3 trial, pemetrexed in

17  mesothelioma, for example, compared patients with cisplatin, a

18  standard therapy, versus a combination of cisplatin with

19  pemetrexed.

20  Q.  Okay.  I would like to turn from talking about some of the

21  background science to focusing more on the patent-in-suit in

22  this case.

23          MS. RAPALINO:  And again, before I do that, Your

24  Honor, I just want to check and see whether this might be an

25  appropriate time for a break.  I'm about to turn to something

 1   new.

 2              THE COURT:  If you would like to break now, we can

 3   break now.

 4              MS. RAPALINO:  Okay.  I think maybe we'll take a

 5   lunch break?

 6              THE COURT:  Okay.  We'll take one hour.  We will

 7   resume at 1:00 p.m.  Enjoy your lunch, everyone.

 8              THE COURTROOM DEPUTY:  All rise.

 9              (Recess at 12:07, until 1:19 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      **A F T E R N O O N   S E S S I O N**

2           THE COURT:  Good afternoon.  We are back on the

3    record.  And, witness, you are still under oath.  You were

4    previously sworn this morning, and you may continue with your

5    direct examination.

6           MS. RAPALINO:  Thank you, Your Honor.

7    BY MS. RAPALINO:

8    Q.  Good afternoon, Dr. Ratain.

9    A.  Good afternoon.

10   Q.  I would like to turn to the '209 patent at issue in this

11   case now.  Can you just remind the Court what generally the

12   '209 patent is directed to?

13   A.  The '209 patent is directed to methods of using

14   pemetrexed with folic acid and vitamin B12 pretreatment.

15   Q.  And which claims are currently being asserted in this

16   case?

17   A.  There are currently eight asserted claims, 9, 10, 12, 14,

18   15, 18, 19, and 21.

19   Q.  Are those the only claims that you analyzed in this case?

20   A.  No.  I analyzed all claims of the '209 patent.

21   Q.  Okay.  Let's start with the first two of the asserted

22   claims, Claims 9 and 10.  If you could turn in your binder to

23   Trial Exhibit 1, that's the '209 patent.

24          And if we take a look at Claims 9 and 10 in Trial

25   Exhibit 1, they're at Column 11.  Are Claims 9 and 10

1   dependent or independent claims?

2   A.   They are dependent.

3   Q.   What claim do they ultimately depend from?

4   A.   From Claim 1.

5   Q.   I would like to start by looking at Claim 1.  And could

6   you tell us what Claim 1 covers?

7   A.   Claim 1 covers a method for administering pemetrexed

8   disodium to a patient in need thereof, comprising

9   administering an effective amount of folic acid and an

10  effective amount of a methylmalonic acid-lowering agent,

11  followed by administering an effective amount of pemetrexed

12  disodium wherein, and then there's a list of possible

13  methylmalonic acid-lowering agents.

14  Q.   What's the relevant methylmalonic acid-lowering agent for

15  purposes of this case?

16  A.   Vitamin B12.

17  Q.   Did you apply any claim constructions in rendering your

18  opinions regarding Claim 1?

19  A.   Yes, I did.

20  Q.   Where did you obtain those constructions?

21  A.   I obtained them from counsel, and I understand that these

22  are claim construction that has been based on an opinion of

23  the Court.

24  Q.   Okay.  And is -- does this slide reflect the claim

25  constructions that you applied in this case?

1  A.  Yes.

2  Q.  Okay.  I want to just take a moment and focus on one of

3  those constructions.  It's the construction of the term "an

4  effective amount of pemetrexed disodium."  And the

5  construction you've listed on the slide is "an amount of

6  pemetrexed disodium that is capable of providing a therapeutic

7  benefit to the patient in need thereof."  What is a

8  therapeutic benefit?

9  A.  Well, a therapeutic benefit in the context of a cancer

10  patient is a benefit in quality of life, quantity of life, or

11  potentially in an end point such as a tumor size, where the

12  tumor size may shrink, that would be considered a therapeutic

13  benefit or the patient may have an improvement in symptoms or

14  they may live longer.

15  Q.  Okay.  Let's turn to your opinions in this case.  You

16  indicated earlier that you had concluded that the claims of

17  the '209 patent would have been obvious to a person of

18  ordinary skill in the art.  Have you applied a particular

19  framework in determining whether the asserted claims are

20  obvious?

21  A.  Yes, I have.

22  Q.  And what was the framework that you applied?

23  A.  Well, the first thing I considered was the qualifications

24  of a person of ordinary skill in the art, which I'll refer to

25  as a POSA, just for efficiency, the scope of the prior art,

1  the differences between the prior art in the claims; and then

2  I determined whether the claims were or were not obvious in

3  view of the prior art.

4           In addition, I considered whether the POSA was

5  motivated or not motivated to practice the methods of use in

6  the '209 claims and whether or not the POSA would have had a

7  reasonable expectation of success.

8  Q.  Now, you used the phrase "reasonable expectation of

9  success."  What do you mean when you say "a reasonable

10 expectation of success"?

11 A.  What I mean here is that the POSA would have believed that

12 it was likely that one or more patients would be able to

13 obtain a therapeutic benefit based on using the combination of

14 pemetrexed, folic acid and B12 with the vitamins administered

15 prior to the pemetrexed.

16 Q.  A couple of times you've used the expression "person of

17 ordinary skill in the art" or POSA, as you've abbreviated it.

18 Have you considered what the qualifications and level of skill

19 that the person of ordinary skill in the art would be?

20 A.  Yes, I have.

21 Q.  And what would you consider to be the qualifications of

22 the person of ordinary skill in the art?

23 A.  Well, I defined a POSA for the purpose of my opinions as

24 an individual or a hypothetical person in June of 1999 who

25 would have had a medical degree with additional qualifications

1  or experience in the field of nutritional sciences and/or

2  oncology and practical experience in a clinical setting or

3  academia.  Such a person would have collaborated with

4  individuals in other areas of medicine such as oncology,

5  hematology, clinical pharmacology, nutritional sciences,

6  including biochemistry and/or pharmacology.

7            Such a person would have also collaborated with

8  individuals with expertise regarding the use of antifolates,

9  including the use of antifolates with vitamins.

10 BY MS. RAPALINO:

11 Q.  Okay.  I want to explore a little bit about how you

12 reached that opinion.  What was the problem facing oncologists

13 in the use of antifolates and chemotherapy generally?

14 A.  Well, as I mentioned, my entire career has been focused on

15 trying to understand the variability and toxicity of

16 anti-cancer drugs.  This was a problem for pemetrexed.  There

17 was variability and toxicity, and so a person of ordinary

18 skill in the art was faced with the challenge of trying to

19 understand the variability; and it was known that variability

20 and nutrition was an important contributing factor to the

21 toxicity of pemetrexed and antifolates in general.

22 Q.  And so how did that information contribute to impact your

23 definition of a person of ordinary skill in the art?

24 A.  Well, oncologists have some familiarity with nutrition;

25 but if one is considering trying to develop predictive tests

1    or trying to develop strategies involving manipulation of

2    nutrition, an oncologist would need to interact, collaborate,

3    and consult with an expert in nutritional sciences.

4    Q.  Let's talk about the next part of the analytical framework

5    that you used, which was the scope of the prior art, or the

6    state of the prior art as of June 1999.  What did you find was

7    the state of the prior art with respect to pemetrexed as of

8    June 1999?

9    A.  I found that there was a lot known about pemetrexed in

10   June of 1999.

11   Q.  Can you be more specific?

12   A.  Well, yes.  For the sake of clarity, I've listed five

13   bullet points on this slide; and I would like to go through

14   each of these, but let me just summarize them right now.

15          First of all, pemetrexed was known to be a promising

16   anti-cancer agent.

17          Second, folic acid had been used with antifolates

18   and with pemetrexed specifically to ameliorate toxicity.

19          Third, poor nutrition predicts toxicity of

20   chemotherapy, including antifolates generally and pemetrexed

21   in particular.

22          Four, homocysteine was used as a marker for folate

23   and vitamin B12 deficiency; and finally, vitamin B12 had been

24   used with antifolates.

25   Q.  Okay.  Let's take each of those five bullet points, each

1   of those five categories and talk about them in a little more

2   detail.

3            Let's start with the fact that pemetrexed was known

4   to be a promising anti-cancer agent.  What did the prior art

5   literature say about pemetrexed's activity?

6   A.   Well, there was great enthusiasm in the prior art

7   regarding the activity of pemetrexed.  It was known to be a

8   promising anti-cancer agent.  It was known to be unique among

9   the antifolate drugs in development and that by definition,

10  its name was MultiTargeted Antifolate.  It had showed activity

11  against a variety of tumor types, and its toxicities were

12  fairly typical of anti-cancer agents.

13  Q.   Were there particular references that you looked at that

14  were available to the person of ordinary skill in the art as

15  of June 1999?

16  A.   Yes.

17  Q.   Can you give me some examples?

18  A.   So, a number of these references were contained in a

19  single issue of *Seminars In Oncology* published in April of

20  1999.

21  Q.   And what were the circumstances of the publication of that

22  issue of *Seminars In Oncology* in April of 1999?

23  A.   Well, these were publications based on the Proceedings of

24  Investigators' meeting sponsored by Eli Lilly and Company held

25  in Ixtapa, Mexico in March of 1998.

RATAIN - DIRECT/RAPALINO                    Vol. 1-124

1  Q.  What was the purpose of that meeting in Ixtapa, Mexico in

2  March of 1998?

3  A.  Well, I've been to investigator meetings before; and such

4  meetings are generally designed to bring together experts in

5  the field, especially experts working with a particular drug,

6  to try to come to some consensus about the state-of-the-art

7  and plans for future development.

8  Q.  And would a person of ordinary skill in the art as of June

9  1999 have been aware of this April '99 supplement to *Seminars*

10 *In Oncology*?

11 A.  Yes.

12 Q.  Okay.  I would like to briefly take a look at a couple of

13 the articles from that supplement.  If you could turn in your

14 binder to Trial Exhibit 1151, please.

15         Can you explain to the Court what this article is?

16 A.  Well, this article is entitled "Overview of Phase 2 Trials

17 of MTA, Pemetrexed, and Solid Tumors"; and the first author is

18 Peter O'Dwyer, who is with us today.

19 Q.  And where was this article published?

20 A.  This article was published in *Seminars In Oncology*.

21 Q.  And is that that same supplement that you just mentioned?

22 A.  Yes.  This was one of the articles in that supplement.

23 Q.  And are you familiar with Dr. O'Dwyer?

24 A.  Yes.  We've known each other for a long time.  We work in

25 the same area.  We've collaborated on studies together.

1   Q.   Generally speaking, what is this article about?

2   A.   Well, this article provides an overview of the Phase 2

3   trials of pemetrexed as of the date of this publication, both

4   completed trials and ongoing studies.

5   Q.   Okay.  Let's take a look at the data that's reported in

6   the article.  If you could turn to page 101, Bates Number 789,

7   in Trial Exhibit 1121 and take a look at Table 2.  Can you

8   explain what Table 2 shows here at the top of the page?

9   A.   Well, Table 2 entitled "Phase 2 Activity of MTA,

10  Pemetrexed, and Gastrointestinal Cancers," reports the results

11  of a number of Phase 2 trials in colorectal cancer, pancreas

12  cancer, and cancer of the esophagus.

13  Q.   What does it generally show about the responses in those

14  cancers from pemetrexed?

15  A.   The study showed multiple responses, especially in

16  colorectal cancer; and in addition, there were two responses

17  in pancreatic cancer, including one complete response.

18  Q.   And moving on to Table 3 at the bottom of that same page,

19  what does Table 3 show?

20  A.   Table 3 is focused on the studies of pemetrexed in breast

21  cancer.

22  Q.   And what does it report about responses in that type of

23  cancer?

24  A.   Table 3 reports significant activity responses of

25  pemetrexed in breast cancer.

1  Q.  And if you turn the page and look at Tables 4 and 5 on

2  pages 102 and 103 respectively -- those are Bates Number 790

3  and 791 -- what's reported in those tables?

4  A.  Well, Table 4 is focused on Phase 2 studies in lung

5  cancer, and, again, it shows -- the table shows significant

6  activity of the drug in that disease.

7  Q.  And in Table 5?

8  A.  And Table 5 tabulates the results of Phase 2 studies in

9  four different cancers:  Head and neck cancer, bladder cancer,

10  kidney cancer and cervical cancer; and there were at least two

11  responses in each of these studies.

12  Q.  What does Dr. O'Dwyer's article conclude about the

13  activity of pemetrexed as an anti-cancer agent?

14  A.  Well, the concluding section entitled "Conclusion,"

15  states, "MTA, pemetrexed, has shown a broad spectrum of

16  clinical activity in multiple tumor types, including

17  colorectal, breast, non-small cell lung, pancreatic, head and

18  neck, bladder, and cervical cancers.

19  Q.  And what, if anything, does the O'Dwyer article report

20  about pemetrexed's toxicity?

21  A.  The conclusion states, "The toxicity profile of MTA is

22  typical of an antifolate with myelosuppression being the most

23  common toxicity and mucositis, rash, and fatigue occasionally

24  being dose-limiting."  In other words, these are typical

25  toxicities not only of an antifolate but of chemotherapy in

1   general.

2   Q.  Have you reviewed the entire O'Dwyer article at Trial

3   Exhibit 1151?

4   A.  Yes.

5   Q.  And do the data presented from each of the clinic trials

6   in this article support the conclusions about activity and

7   toxicity of pemetrexed?

8   A.  Yes.

9   Q.  So what would the person of ordinary skill in the art

10  understand about pemetrexed's development and its activity as

11  of June 1999?

12  A.  Well, a person of ordinary skill in the art would

13  understand that pemetrexed was a very exciting drug, had an

14  activity as defined by partial responses in many different

15  solid tumors and that had toxicity that at least appeared to

16  be in the acceptable range.

17  Q.  Let's take a look at another article from this same

18  supplement.  If you could turn to Trial Exhibit 907, please,

19  in your binder.

20          Can you explain what this trial exhibit is?

21  A.  This is an article entitled "MTA summary and conclusions,"

22  and it's the wrap-up article in the same issue of *Seminars in*

23  *Oncology*.

24  Q.  And who is the author of this article?

25  A.  Hilary Calvert.

1  Q.  Do you know who Dr. Calvert is?

2  A.  Yes, I do know Dr. Calvert.  We have worked again in the

3  same field for many years.  Dr. Calvert is an English

4  oncologist and clinical pharmacologist who did a lot of the

5  early work on pemetrexed and other antifolates.

6  Q.  What does Dr. Calvert's article say about the activity of

7  pemetrexed in this summary article?

8  A.  Well, there's a section in the summary article entitled

9  *Does MTA Have Promising Activity*?  I won't go through the

10  first half of this because it basically reiterates and

11  summarizes the work that I just described from the O'Dwyer

12  paper, but the conclusion of this section is noteworthy.

13  Dr. Calvert stated, "Of particular interest is the observation

14  made in the combination Phase 1 study of MTA and cisplatin in

15  which four to seven patients with mesothelioma have been

16  reported as responding.  If confirmed in a larger study, this

17  is a truly exceptional result in a very refractory tumor.

18  Overall, the breadth and consistency of the Phase 2 activity

19  reported with MTA is remarkable and unusual in a new drug of

20  any class at this stage of its development."

21  Q.  So what is Dr. Calvert saying about the activity of

22  pemetrexed?

23  A.  Well, what Dr. Calvert is saying is that he is very

24  impressed, and if one wanted to read this, one could take --

25  could translate this into this is one of the best drugs I've

1   ever seen.

2   Q.  Okay.  And does Dr. Calvert say anything about the

3   targets, pemetrexed targets in the body?

4   A.  Yes.

5   Q.  And what does he say about that?

6   A.  Well, he discusses this in the earlier part of the article

7   and states that "initial testing suggested that it was, in

8   fact, functionally a TS" -- that's thymidylate synthase

9   inhibitor -- "but further evaluation showed that it also

10  inhibited DHFR as well as GARFT and AICARFT."  In other words,

11  he's explicitly reminding everybody that the drug is not just

12  a single targeted antifol, but it inhibits all desirable

13  targets of antifolates.

14  Q.  Now, were there other references as of June 1999 that

15  discuss the promising activity of pemetrexed?

16  A.  Yes.

17  Q.  And just for the record, is this a slide that you've

18  prepared that shows some of the additional prior art

19  references you've reviewed in that regard?

20  A.  Yes.  I have reviewed all of these additional prior art

21  references, and they all support the concept that pemetrexed

22  was known to be a promising anti-cancer agent.

23  Q.  And just for the record, can you read into the record the

24  list of exhibits that you have reviewed in this regard?

25  A.  Yes.  These are Trial Exhibits 401, 1479, 1087, 1009 and

1  78.

2  Q.  Okay.

3           MR. PERLMAN:  Your Honor, this is the issue I was

4  raising before.  If Dr. Ratain is going to have an entry on a

5  slide and just call out the numbers of references in support

6  of a point and not testify about the article directly, I don't

7  know that it's appropriate that the article be admitted.

8  Certainly his testimony is on the stand and it's admitted, but

9  this was the concern I perhaps inartfully tried to raise at

10  the beginning of this.  So I ask for some guidance as to Your

11  Honor's view on this subject.

12           MS. RAPALINO:  Dr. Ratain will likely testify about

13  at least some portion of the articles that are listed on his

14  slides in more detail, and just as a matter of efficiency,

15  these are all articles that are in the record and

16  unobjectionable and that Dr. Ratain has relied on in his

17  expert reports to make these same points.  And so just as a

18  matter of efficiency, rather than have him go into each of the

19  articles and describe in a redundant way that each of them

20  make this same point, we just wanted to get them into the

21  record this way just for a few of them.  It won't be all of

22  them.

23           MR. PERLMAN:  Your Honor, it puts me in a difficult

24  position on cross-examination, because now it's like a

25  deposition where he hasn't really testified about the article

1   on direct.  He just said the article supports this overall

2   point, and I'm left here now to create the record that I have

3   to cross.

4            THE COURT:  Okay.  Well, then you will need to have

5   the doctor refer to the particular portions of these exhibits

6   that support his testimony.

7            MS. RAPALINO:  Okay.

8            THE COURT:  Okay?

9            MS. RAPALINO:  Okay.

10           THE COURT:  We're going to look at 401?

11           MS. RAPALINO:  Well, you know, I think the way we'll

12   do it, is that some of these are going to come up, as I said,

13   in any event.  They're going to come up later in the

14   examination, so to the extent --

15           THE COURT:  Of which witness?

16           MS. RAPALINO:  Of this witness, so to the extent

17   they don't, I may come back and have him just point to the

18   parts of the references that support his part of the opinion,

19   but at least for this particular, this particular list, the

20   majority of these will come up later in the examination.

21           THE COURT:  Very good.

22   BY MS. RAPALINO:

23   Q.  Okay.  Dr. Ratain, I would like to move on to -- well,

24   just before we move on, can you just summarize then what a

25   person of ordinary skill in the art as of June 1999 would have

1  concluded about pemetrexed's activity?

2  A.  A person of ordinary skill in the art in June of 1999

3  would have known that pemetrexed was a unique antifol

4  targeting four different targets, that it had widespread

5  activity, and to some extent remarkable and exceptional

6  activity and that the toxicity of the drug was relatively

7  modest, certainly moderate by oncology standards.

8  Q.  And what would a person of ordinary skill in the art have

9  known about the stage of pemetrexed's development as of June

10 1999?

11 A.  A person of ordinary skill in the art would have also

12 known that pemetrexed was in Phase 3 clinical trials in June

13 of 1999.

14 Q.  Okay.  I would like to then turn to, move to the next

15 category of information that you said was part of the state of

16 the prior art as of June 1999, and that was that folic acid

17 had been used with antifolates and with pemetrexed

18 specifically to ameliorate toxicity.  When was the

19 first documented use of folic acid with an antifolate?

20 A.  That was in 1948.

21 Q.  And what was that first use of folic acid with antifolate

22 in 19 -- with an antifolate in 1948?

23 A.  That was a study by Sidney Farber, published in *The New*

24 *England Journal of Medicine*.

25 Q.  Would you turn in your binder to Trial Exhibit 1443,

1    please?

2           Is this the article that you were referring to?

3    A.  Yes, it is.

4    Q.  And who is Dr. Farber?

5    A.  Well, Dr. Farber is one of the pioneers in oncology, and,

6    in fact, the Dana-Farber Cancer Institute at Harvard Medical

7    School is named for him.

8    Q.  You said this was published in *The New England Journal of*

9    *Medicine*.  Is that a prominent publication?

10   A.  It was and still is a very prominent medical journal.

11   Q.  Now, what does the Farber paper from 1948 report that

12   Dr. Farber administered?

13   A.  Dr. Farber administered crude liver extract as well as

14   folic acid and folic acid conjugates.

15   Q.  And what was the purpose of administering the crude liver

16   extract and the folic acid and its conjugates?

17   A.  Well, Dr. Farber had observed, as noted in the paper,

18   toxic effects included stomatitis.  Stomatitis is the same as

19   mucositis, mouth sores, with early ulceration.  And then

20   Dr. Farber went on to state, "in an attempt to prevent this

21   complication, crude liver extract was employed as were folic

22   acid and folic acid conjugates."

23   Q.  And I think you may have mentioned this, but just to be

24   clear, what was the antifolate that Dr. Farber was

25   administering here?

 1   A.  Aminopterin.

 2   Q.  Has folic acid been administered with any other

 3   antifolates since Dr. Farber's administration of folic acid

 4   with aminopterin?

 5   A.  Yes, it has.

 6   Q.  For which antifolates has folic acid been administered?

 7   A.  It has been -- folic acid has been administered with

 8   methotrexate, with lometrexol, with the Lilly '887 compound,

 9   and it has also been administered with some nonLilly

10   compounds.

11   Q.  Was there literature that described the results of the use

12   of folic acid with these other antifolates?

13   A.  Yes.

14   Q.  Were any of these other antifolates compounds that were

15   being developed by Lilly?

16   A.  Yes.  Lometrexol and the '887 compound were being

17   developed by Eli Lilly.

18   Q.  And did Eli Lilly publish the results of the

19   administration of folic acid with these other Lilly compounds

20   that were antifolates?

21   A.  Yes.  They published extensively on this topic.

22   Q.  And what would a person of ordinary skill in the art in

23   June of 1999 take away from the fact that there were expensive

24   publications on the administration of folic acid with

25   antifolates?

RATAIN - DIRECT/RAPALINO                    Vol. 1-135

1  A.  A person of ordinary skill in the art would understand

2  that the use of folic acid with antifolates was a feasible

3  approach.  They would also understand that Lilly, one of the

4  leaders in antifolate development, was highly committed to

5  using this strategy.

6  Q.  Let's talk about folic acid pretreatment.  In any of these

7  instances where folic acid was given with an antifolate, was

8  folic acid ever used as a pretreatment?

9  A.  Yes.

10  Q.  And were -- was the use of folic acid as a pretreatment

11  published in a prior art?

12  A.  Yes, it was.

13  Q.  Let's take a look at some examples of that, if we could.

14  If you could turn in your binder to Trial Exhibit 1036.

15       And could you explain to the Court what this trial

16  exhibit is?

17  A.  This is a paper that was published in 1996 in the journal

18  *Investigational New Drugs*.  It reports the results of a Phase

19  1 study of the Lilly drug lometrexol given with oral folic

20  acid.

21  Q.  What was the study that's reported in this article

22  designed to test?

23  A.  This study was designed to test if the maximally tolerated

24  dose of lometrexol was higher in conjunction with folic acid

25  supplementation.

1  Q.  And can you explain what you mean by "maximally tolerated

2  dose"?

3  A.  Well, as I explained, Phase 1 studies are designed to ask

4  a relatively simple question:  What is the mathematically

5  highest dose that is tolerable in a relatively small cohort of

6  patients?  And so, there had been prior studies with

7  lometrexol, and the doses that were tolerated were quite low.

8  And so this study was performed to see if you could administer

9  a higher dose.

10 Q.  And what was the design of the study in terms of the

11 timing of folic acid administration?

12 A.  Well, folic acid was given daily as a single 5 milligram

13 tablet for seven days prior to and seven days following

14 lometrexol administration.  And the folic acid was provided by

15 approved prescription services.

16 Q.  What were the results of the study that's reported in

17 Trial Exhibit 1036?

18 A.  Well, this study was considered a success, and as the

19 author stated, "In summary, the work described in this report

20 has demonstrated the lometrexol toxicity can be modulated by

21 folic acid supplementation in patients."

22 Q.  And did you review the data reported in this Trial Exhibit

23 1036?

24 A.  Yes, I did.

25 Q.  Did the data support the conclusion of the authors that

1   folic acid could be used to modulate the toxicity of

2   lometrexol?

3   A.  Yes, because one could increase the maximally tolerated

4   dose of lometrexol compared to prior study in the absence of

5   folic acid supplementation.

6   Q.  Was the use of folic acid pretreatment used with any other

7   antifolates besides lometrexol?

8   A.  Yes, it was.

9   Q.  Which other antifolates are you aware of where there was

10  folic acid pretreatment reported?

11  A.  It was also used with the '887 compound.

12  Q.  And did you review any publications reporting on the

13  results of the use of folic acid pretreatment with the '887

14  compound?

15  A.  Yes, I did.

16  Q.  What publications have you reviewed?

17  A.  This was described and reported in a book chapter by

18  Mendelsohn.

19  Q.  Okay.  Could you turn in your trial exhibit binder to

20  Trial Exhibit 400, please?

21          Is this the book chapter you were referring to?

22  A.  Yes, it is.

23  Q.  Who's the editor of the book?

24  A.  The editor of the book is Ann L. Jackman.

25  Q.  Who is Dr. Jackman?

 1  A.  Dr. Jackman is a scientist in the UK who -- really her

 2  entire career has been the pharmacology of antimetabolites,

 3  including antifolates.  She's not an oncologist, but she's a

 4  cancer researcher.

 5  Q.  And this is Chapter 12 of the book.  Who are the authors

 6  of this chapter of the book?

 7  A.  Well, the authors of the book are three individuals who

 8  were Lilly employees at the time, Mendelsohn, Worzalla, and

 9  Walling.

10  Q.  Generally speaking, what does this chapter discuss?

11  A.  Generally speaking, this chapter discusses two drugs,

12  lometrexol and the successor compound, the compound I've been

13  referring to as the '887 compound.

14  Q.  And does the chapter describe the results of folic acid

15  use with either of those two compounds?

16  A.  Yes, it does.

17  Q.  Okay.  If we could turn in Trial Exhibit 400 to page 271

18  and focusing on Table 6 on page 271.  That's Bates

19  Number 2394.  Can you explain what's reported in Table 6 in

20  the chapter?

21  A.  Yes.  Table 6 is entitled "Effect of increasing folic acid

22  supplementation on the therapeutic index."  Let me just walk

23  the Court through this table.  So first of all, these are

24  animal models of cancer, and there's two different models.

25  One is called the GC3, and one is called the 3CH.  And the

1  former is a rough model of colon cancer, and the latter is a

2  rough model of breast cancer.

3         It also reports the results of two different drugs.

4  On the -- the column all the way to the right is lometrexol,

5  and the second to the right is the successor to lometrexol,

6  the '887 compound.  And then, for each of these drugs and for

7  each of these tumors, four different doses of folic acid were

8  used ranging from doses of 0.6 to 60 milligram per kilogram

9  per day; and in addition, animals were also treated without

10 folic acid supplementation.

11 Q.  Can you explain in the table what therapeutic index means?

12 A.  Yes, therapeutic index is conceptually, is physicians talk

13 about therapeutic index all the time.  It's when you're going

14 to do something or particularly when you're going to prescribe

15 a drug.  It's the concept that you want the benefit to exceed

16 the risk.

17 Q.  And so what does a higher therapeutic index indicate?

18 A.  A higher therapeutic index indicates a better drug, that

19 the benefit relative to the risk is improved.

20 Q.  Okay.  And what are the results that are reported in this

21 table for the use of folic acid with the '887 compound?

22 A.  Generally speaking, the data showed; that is, the folic

23 acid supplementation was increased from zero to higher doses,

24 that there was an increase in the therapeutic index.  In

25 particular, you can see for one of the models, the optimal

1  appeared to be 15 milligram per kilogram per day.  That would

2  be the GC3 colon model and for the C3H model, the optimal

3  folic acid dose was 6 milligram per kilogram per day.

4  Q.  Okay.  And does this same chapter describe any clinical

5  studies using folic acid pretreatment with the '887 compound?

6  A.  Yes, it does.

7  Q.  And if you take a look at page 277 of the chapter, can you

8  explain what the design was, what the administration schedule

9  was of folic acid in the clinical studies using the '887

10  compound?

11  A.  Well, the clinical study using the '887 compound used

12  exactly the same schedule as the clinical study using the

13  lometrexol compound, and that's stated explicitly in the

14  highlighted sentence.  The latter schedule is, therefore,

15  identical to that used in the lometrexol study performed by

16  Laohavinij, et al.

17  Q.  And that study by Laohavinij, et al., what is that study?

18  A.  That is the previous exhibit that we looked at, the Phase

19  1 study of lometrexol.

20  Q.  Okay.  I would like to go back for a moment to page 270 of

21  this chapter from Chapter 12 of Exhibit 400.  What does this

22  chapter say in general regarding folic acid pretreatment?

23  A.  Well, the chapter in general discusses the importance of

24  folate status and makes some explicit statements.

25  Furthermore, dietary supplementation with folic acid may

1   "normalize the dose response for achieving antitumor activity

2   and reduce toxicity to normal tissues by restoring folate

3   pools in tissues having low folate requirements without

4   meeting the high folate demands of rapidly dividing tumor

5   cells."

6   Q.  What would a person of ordinary skill in the art as of

7   June 1999 understand then from this chapter about the role of

8   folic acid?

9   A.  A person of ordinary skill in the art would understand

10  that the use of folic acid with antifols, including GARFT

11  inhibitors or related compounds, was an important concept that

12  was under investigation by Eli Lilly.

13  Q.  And what would they understand specifically about the role

14  folic acid played in reducing toxicity?

15  A.  Well, they would understand that folic acid would

16  potentially allow one to "normalize the dose response."  And

17  that's similar to the concept I discussed earlier, the concept

18  that one would like to understand the variability between

19  patients by normalizing the dose response, the concept would

20  be that you would make it so that the result of any particular

21  dose would be predictable.

22  Q.  Okay.  And I want to look at one last reference that was

23  listed on your slide about the use of folic acid with

24  antifolates and in the context of pretreatment specifically.

25  If we could look at Trial Exhibit 916, please.

1           Can you explain what this trial exhibit is?

2  A.   Yes.   This is the patent that I mentioned earlier, the

3  '974 patent.

4  Q.   And to whom is this patent assigned?

5  A.   This patent is assigned to Eli Lilly and Company.

6  Q.   And when did the patent issue?

7  A.   The patent issued June 8th, 1993.

8  Q.   Generally speaking, what is the patent directed to?

9  A.   The patent is generally directed to the concept of

10 administration of a folate prior to administration of an

11 antifolate.

12 Q.   And what's the purpose of administering the folate prior

13 to the antifolate according to the specification of the

14 patent?

15 A.   Well, it's explicitly stated in the abstract of the patent

16 that "administration of a folate binding protein binding agent

17 in conjunction with use of an antitumor agent, which is a

18 inhibitor of glycinamide ribonucleotide transformylase" --

19 that is GARFT -- "or other antifolate reduces the toxic

20 effects of such agent and provides an enhanced therapeutic

21 index."

22 Q.   So what is the patent saying is the purpose of

23 administration of the folic acid?

24 A.   Well, the patent is saying that one can conceptually

25 utilize folate, a folate binding protein -- a folate binding

1  protein binding agent; and therefore, can reduce toxicity with

2  folate without adversely affecting therapeutic efficacy.

3  Q.  And I think you used the term "folate binding protein

4  binding agent."  In the context of this patent, what is that

5  talking about?

6  A.  Yes, it's kind of convoluted.  A folate binding protein

7  binding agent is folic acid.

8  Q.  Okay.  Let's take a look at Claim 16 of the '974 patent,

9  and what is Claim 16 -- what method does Claim 16 cover?

10 A.  Claim 16 covers a method for reducing the toxicity of a

11 GARFT inhibitor or other antifolate which binds to a folate

12 binding protein.  Any mammal which comprises pretreating the

13 mammal with folic acid before administration of the

14 antifolate, basically.

15 Q.  Okay.  So I noticed that the claim talks about reducing

16 the toxicity of a GAR transformylase inhibitor, and you said

17 that is a GARFT inhibitor?

18 A.  Yes.

19 Q.  Is pemetrexed a GARFT inhibitor?

20 A.  Yes.

21 Q.  How do you know that pemetrexed is a GARFT inhibitor?

22 A.  Well, there's abundant prior art, but this was first

23 reported by Shih, one of the co-inventors of the '974 patent.

24 Q.  Before we turn to a publication by Shih, let's just take a

25 look again at the cover page of the '974 patent.  Who are the

1  named inventors on the '974 patent?

2  A.   The named inventors on the '974 patent are Grindey and

3  Shih.

4  Q.   Okay.  And let's turn now to Trial Exhibit 1087, if we

5  could.  Is this the article by Shih that you were referring

6  to?

7  A.   Yes.

8  Q.   And where is this article by Dr. Shih published?

9  A.   This article was published in *Cancer Research* in 1997.

10 Q.   And what is the Shih paper generally about?

11 A.   The Shih paper is generally about identification of the

12 targets of pemetrexed.

13 Q.   And what does it say about pemetrexed's inhibition of

14 GARFT?

15 A.   The paper explicitly states, "We now report that

16 LY231514," that is pemetrexed, "and its polyglutamates, also

17 markedly inhibit other key folate-requiring enzymes, including

18 dihydrofolate reductase and GARFT."

19 Q.   Okay.  Now, if we go back for a moment to the '974

20 patent at Trial Exhibit 916 and look again at Claim 16, you

21 also mentioned that it covers administration of an antifolate

22 which binds to a folate-binding protein.  And can you just

23 remind the Court again what that means?  What is the

24 folate-binding protein?

25 A.   A folate-binding protein is one of the transporters for

1  folates and antifolates.

2  Q.  And is pemetrexed an antifolate that binds to the

3  folate-binding protein?

4  A.  Yes.

5  Q.  How do you know that?

6  A.  I know that from a paper by Westerhof.

7  Q.  Could you turn in your binder to Trial Exhibit 918,

8  please?

9          Is this the paper by Westerhof that you were

10  referring to?

11  A.  Yes, it is.

12  Q.  And where was this paper published?

13  A.  This paper was published in *Molecular Pharmacology* in

14  1995.

15  Q.  And what is this paper generally about?

16  A.  This paper is generally about the transport of a number of

17  different folate antagonists, including pemetrexed.

18  Q.  And what does it say about the transport of pemetrexed in

19  particular?

20  A.  It specifically states that pemetrexed was transported by

21  both of the transporters that I mentioned earlier this

22  morning, both the reduced folate carrier and the

23  folate-binding protein.

24  Q.  So in view of the Shih paper at Trial Exhibit 1087 that we

25  looked at before and the Westerhof paper at Trial Exhibit 918,

1  what does Lilly's prior art '974 patent tell the person of

2  ordinary skill in the art about folic acid pretreatment with

3  pemetrexed?

4  A.  The -- the person of ordinary skill in the art is taught

5  that one can utilize folic acid pretreatment to reduce the

6  toxicity of pemetrexed.

7  Q.  And what does the '974 patent say about the use of folic

8  acid pretreatment in terms of efficacy?

9  A.  The '974 patent tells -- teaches that the -- that folic

10  acid pretreatment, in combination with an antifolate, will

11  reduce toxicity without adversely affecting therapeutic

12  efficacy.

13  Q.  And where do you see that in the '974 patent?

14  A.  It is highlighted on the screen, and that comes from the

15  background of the invention, Column 1, line 46 or 47 -- 47, I

16  believe.

17  Q.  Okay.  Now, Dr. Ratain, are you familiar with the concept

18  of leucovorin rescue with the antifolate methotrexate?

19  A.  Yes.

20  Q.  What is leucovorin?

21  A.  Leucovorin is one of the reduced folates we heard about

22  this morning.  It's also known as folinic acid.

23  Q.  And what is the concept of leucovorin rescue?

24  A.  Leucovorin rescue is a completely different strategy.

25  It's a -- it's a concept that was very innovative and was --

1   the concept was that one could give lethal doses of

2   methotrexate if one came in with an antidote after a period of

3   time after starting methotrexate.  So the concept is you start

4   the methotrexate, you give these doses of methotrexate that

5   require, absolutely require you to give the rescue, and then

6   once you give the rescue, the patient is generally protected

7   from the side effects of the methotrexate.

8   Q.  Does the goal of leucovorin rescue with that high dose of

9   methotrexate differ from that of folic acid pretreatment with

10  other antifolates?

11  A.  Absolutely.  It's like night and day.

12  Q.  Can you explain what you mean?

13  A.  Well, when we give, when -- the use of folic acid

14  supplementation in low doses is simply to eliminate

15  nutritional deficiencies, even nutritional deficiencies that

16  are unrecognized, so that all patients have about the same

17  amount of folic acid, or at least patients don't have folic

18  acid deficiency.  Whereas, leucovorin rescue is a therapeutic

19  strategy only performed in the context of these lethal doses

20  of methotrexate.

21  Q.  Are there any other differences from a practical

22  standpoint between leucovorin and folic acid?

23  A.  Well, yes.  Folic acid, particularly in the low doses

24  claimed in the '209 patent, is readily available over the

25  counter as part of standard multivitamin supplements, whereas

1  leucovorin, folinic acid, requires a prescription, and is very

2  expensive and even recently has been in short supply.

3  Q.  So if the goal of a person of ordinary skill in the art in

4  June 1999 was to remedy a nutritional deficiency to address

5  toxicity of an antifolate like pemetrexed, would leucovorin

6  rescue have been the preferred approach?

7  A.  Absolutely not.

8  Q.  Why not?

9  A.  Well, for all the reasons I just mentioned.  Furthermore,

10  Morgan -- Dr. Morgan, who we'll be hearing from later this

11  week, I presume -- Dr. Morgan had previously demonstrated, for

12  example, in conjunction with methotrexate that leucovorin

13  blocked the efficacy of methotrexate in patients with

14  rheumatoid arthritis.

15  Q.  Was folic acid pretreatment ever actually used with

16  pemetrexed itself?

17  A.  Yes.

18  Q.  And is there literature reporting on the use of folic acid

19  pretreatment with pemetrexed?

20  A.  Yes.

21  Q.  What literature was there?

22  A.  Well, there's both a preclinical study published by

23  Worzalla, and then there's two abstracts published by Hammond

24  from the Phase 1 clinical trial.

25  Q.  Okay.  Let's start with the preclinical publication by

1   Worzalla.  If you could turn to Trial Exhibit 384, please.

2            Is this the Worzalla reference that you were

3   referring to?

4   A.  Yes.

5   Q.  Where was this article published?

6   A.  This article was published in *Anti-Cancer Research* in

7   1998.

8   Q.  Okay.  I want to pause for a little bit on this reference,

9   and I want to start just by talking generally about the paper.

10  What is the paper generally about?

11  A.  Well, it's a paper generally about the use of folic acid

12  in modulating the toxicity and efficacy of pemetrexed; and

13  it's authored by three then Lilly employees, including

14  Dr. Shih, one of the inventors of the '974 patent.

15  Q.  And what's the background research that led to the study

16  that was conducted in Worzalla?

17  A.  Well, the background is described in the beginning of the

18  paper, the introduction to the paper; and it's building upon

19  prior work that had been performed by both Lilly and others in

20  combining folates with antifolates.  And specifically, the

21  first sentence states, "Several animal studies have indicated

22  that folic acid supplementation in combination with antifolate

23  cancer therapy can prevent delayed toxicity and enhance the

24  therapeutic potential of the GARFT inhibitor, lometrexol, and

25  the TS inhibitor 1843U89."

1   Q.  What other background information led to this Worzalla

2   study?

3   A.  Well, then the authors go on to cite the clinical work

4   with lometrexol as well as Dr. Morgan's work with folic acid

5   and rheumatoid arthritis.  Specifically, they state,

6   "Additional clinical studies demonstrated the protective

7   effects of folic acid against lometrexol toxicity in humans.

8   Morgan and co-workers concluded that a daily supplement of one

9   milligram of folic acid during low-dose methotrexate therapy

10  in patients with rheumatoid arthritis was useful in lessening

11  toxicity without altering efficacy."

12  Q.  And that's at page 3235 of this exhibit?

13  A.  Yes.

14  Q.  Okay.  Who is Dr. Morgan?

15  A.  Dr. Morgan is a physician and nutritional expert at the

16  University of Alabama.

17  Q.  And what is her area of expertise?

18  A.  Her major area of expertise, as I said, is the interface

19  of nutrition and medicine.

20  Q.  And what work is being cited here as relevant to the -- to

21  the study that Dr. Worzalla is conducting?

22  A.  This reference 10 in this paper here is her seminal paper

23  published in the *Annals of Internal Medicine*.

24  Q.  And in the 1990s, were you familiar with the work that

25  Dr. Morgan did that -- that's being referred to here?

1 A.  Yes.  She published it in journals that I subscribe to and

2 read, because I belong to the organizations that publish them.

3 Q.  Okay.  Let's talk about the study that was conducted in

4 the Worzalla paper itself.  What model is being used here to

5 assess the effect of folic acid?

6 A.  This is an animal model of cancer, the type of lymphoma

7 model.

8 Q.  What animal was being used?

9 A.  This was in mice.

10 Q.  In mice.  Can you explain what the study groups of mice

11 were that were used to assess the effect of folic acid?

12 A.  Well, this was a nicely-designed study to address the

13 question of how folate in the diet affects the toxicity and

14 efficacy of pemetrexed, as well as how folic acid

15 supplementation affects the activity and toxicity of

16 pemetrexed.

17       And thus, there were three groups of mice that were

18 evaluated and compared.  There was the low-folate-diet group,

19 mice that received a diet that essentially was devoid of

20 folate; a similar group of mice, but who also received folic

21 acid supplementation; and then there was another group of mice

22 that just got plain old, normal mouse chow.

23 Q.  And what tests did the authors run on these three groups

24 of mice?

25 A.  Well, they were testing for both the antitumor activity,

1  the effect of the pemetrexed on the cancer as measured by

2  percent tumor inhibition, as well as the toxicity of the drug,

3  defined as the percentage of mice that died.

4  Q.  And were the results of these experiments reported in the

5  paper?

6  A.  Yes.

7  Q.  Let's take a look at page 3237 of the article.  And can

8  you tell us what results were reported for the group of mice

9  on the low-folate diet?

10  A.  Well, it stated explicitly in the paper, on page 3237,

11  "For mice on low-folate diet, pemetrexed at 0.3 and 1

12  milligram per kilogram per day produced 100 percent inhibition

13  of tumor growth for tumors measured one day after the

14  completion of a single course of drug treatment.  As noted in

15  Figure 1, higher drug levels yielded unacceptable toxicity."

16  Q.  So generally speaking, then, what were the results

17  reported for the low-folate-diet mice?

18  A.  Well, to summarize this more simply, what they showed was

19  that these mice were very sensitive to the drug, as well as

20  the tumor was very sensitive to the drug, so that at very low

21  doses, there was benefit; but once you got up into what I

22  would call moderate doses, these mice died.

23  Q.  Okay.  And staying on that same page, what results were

24  reported for the mice who were in the low-folate-

25  diet-but-got-folate-supplementation group?

*RATAIN - DIRECT/RAPALINO*                    Vol. 1-153

1  A.  Well -- and, again I'm going to first read right from the

2  paper; and then I'll talk about my interpretation of it.

3          "From mice on low-folate diet that received a folate

4  supplement of 15 milligrams per kilogram per day by oral

5  gavage" -- oral gavage is sort of force feeding of the

6  mouse -- "significant inhibition of tumor growth was noted

7  over a broad dose range, 10 to 1,000 milligram per kilogram

8  per dose.

9          "Moreover, 100 percent inhibition of tumor growth

10 was observed at 30 to 1,000 milligrams per kilogram per dose

11 without any lethality."

12 Q.  Okay.  And so in your own words, what is this article

13 reporting about the results that were seen for the

14 low-folate-plus-folic-acid-supplementation mice?

15 A.  Well, my kids would probably say these mice were

16 invincible.  There was just -- you could give them

17 extraordinary amounts of drug, and you could achieve

18 100 percent inhibition of tumor growth.

19 Q.  What about the lethality that was reported or the toxicity

20 that was reported with respect to these mice?

21 A.  There was no lethality.  These were super mice.

22 Q.  Okay.  And then on that, staying on the same page, what

23 results were reported for the group of mice on the standard

24 diet?

25 A.  Well, what's reported for the mice on the standard diet,

1  this antitumor dose response with folate supplementation was

2  virtually identical to that observed for mice receiving the

3  standard diet.  So, what it's saying now, it's just finished

4  telling us about the super mice; and now it says the dose

5  response was the same as the mice on the standard diet.

6  However, the lethality was significantly greater for the mice

7  on the standard diet.

8  Q.  Okay.  And when it says that the antitumor dose response

9  for this group of standard mice was virtually identical, what

10  measure is it talking about there?  What is the antitumor dose

11  response?

12  A.  The antitumor dose response is the percent inhibition as a

13  function of dose.

14  Q.  Okay.  And that's the inhibition of tumor?

15  A.  That's the inhibition of tumor, yes.  And it's stating it

16  was virtually identical.

17  Q.  What does it report about the lethality or toxicity of the

18  mice on the standard diet?

19  A.  The mice on the standard diet had 100 percent lethality at

20  a dose of 800 milligram per kilogram per day and a 10 percent

21  lethality at a dose of 400 milligram per kilogram per day.

22  Q.  Okay.  Now, is there a figure in the Worzalla paper that

23  reports on the activity and toxicity data for all three of

24  these groups?

25  A.  No.

RATAIN - DIRECT/RAPALINO                    Vol. 1-155

1  Q.  Is there a figure that reports at least some of the data

2  for these groups of mice?

3  A.  Yes.

4  Q.  What figure is that?

5  A.  Figure 2.

6  Q.  Okay.  So if we take a look at Figure 2 -- and that's on

7  page 3238 of Trial Exhibit 384 -- can you explain what's

8  reported in Figure 2 with reference to both the X and Y axes

9  here?

10 A.  Yes.  This is a bit of a complicated figure.  And so let

11 me first orient the Court to the axes.  So, on the X axes, we

12 see drug dosage and milligrams per kilogram on a log scale so

13 that the same distance from 1 to 10 is from 10 to 100.

14        And then we have two different things plotted on the

15 Y axis.  We have solid lines that represent percent

16 inhibition, and that's activity; and we have dotted lines that

17 represent percent lethality.  That's toxicity.

18 Q.  Okay.  And so for which of the three groups of mice that

19 we just discussed, for which of those is there data that's

20 represented in Figure 2?

21 A.  The data that are reported here are for the mice on the

22 low-folate diet, and then for the mice on the low-folate diet

23 with the folate supplementation.

24 Q.  Is there data reported in Figure 2 for the mice on the

25 standard diet?

1  A.  No.

2  Q.  Now, would a person of ordinary skill in the art ignore

3  the data with respect to the standard diet simply because it's

4  not represented in Figure 2?

5  A.  No.  It's plainly stated in the text of the manuscript.

6  Q.  Now, I would like to just have you explain Figure 2 in a

7  little bit more detail.  Can you -- have you prepared a

8  graphic to show what Figure 2 shows just for the

9  low-folate-diet group?

10  A.  Yes, I have.

11  Q.  Okay.  Is this that graphic?

12  A.  This is that graphic.

13  Q.  Okay.  So, can you, again, explain with reference to the

14  lines that you've put on this graphic what Figure 2 is

15  reporting about the low-folate-diet group?

16  A.  Okay.  Up at the top left, with the triangles, shows the

17  percent inhibition, which is 100 percent for the

18  low-folate-diet group mice, and one can see that this activity

19  was obtained at a very low dosage of pemetrexed, dosages of 1

20  milligram per kilogram and less.

21  Q.  Okay.  And what does your figure show about the lethality

22  or toxicity of the low-folate-diet group?

23  A.  Well, the lethality is shown as the vertical purple bars;

24  and one can see that there's lethality at doses of 3 milligram

25  per kilogram and up, with 100 percent lethality at

1  30 milligrams per kilogram.

2  Q.  Have you also prepared a slide to show the data on

3  Figure 2 for the low-folate diet plus

4  folic-acid-supplementation group?

5  A.  Yes, I have.

6  Q.  Okay.  Can we have the next slide?

7        Okay, looking at Slide 69, can you explain what this

8  data shows for the low-folate diet plus

9  folic-acid-supplementation group of mice?

10  A.  Yes.  First of all, there's the plot of the activity,

11  which is shown as the red circles with the solid lines.  And

12  one can see that there's activity of the drug at doses of 3

13  milligram per kilogram and up; and when one gets to doses of

14  about 30 milligram per kilogram, there's 100 percent

15  inhibition.  In other words, the perfect activity.

16  Q.  And where do you see on this figure the data for percent

17  lethality or toxicity in this group of low-folate diet plus

18  folic-acid-supplemented group?

19  A.  Well, as I mentioned earlier, these are the invincible

20  mice; and it's hard to see the lethality because it's zero.

21  But there are little bars plotted at the zero line for the

22  lethality for these mice.

23  Q.  Now, I know you said earlier that the standard-diet group

24  data isn't plotted in Figure 2, but is there information in

25  the -- reported in the Worzalla article that gives you enough

1  information to plot that information on Figure 2?

2  A.  Yes.  The -- if you go back to page 3237, there's a

3  statement, "This antitumor dose response with folate

4  supplementation" -- so that's the group we were just looking

5  at -- "was virtually identical to that observed for mice

6  receiving standard diet."

7         So a person of ordinary skill in the art would read

8  that, that the antitumor dose response for the low-folate diet

9  with folate supplementation is virtually identical to mice

10  receiving a standard diet.

11  Q.  And so have you prepared a graphic plotting what the

12  standard diet data would look like if it were plotted on a

13  figure similar to Figure 2?

14  A.  Yes.  I made the assumption that virtually identical meant

15  the same as identical; and therefore, I plotted that the dose

16  response for the standard-diet group was the same dose

17  response as for the low-folate-diet group with folate

18  supplementation.

19         MR. PERLMAN:  Your Honor, you indicated at the

20  pretrial conference, you would be taking the demonstrative

21  back with you after the testimony.  I understand this is not

22  data actually in the patent, but the doctor's testimony

23  regarding how he prepared this demonstrative is in the record.

24         I think it would be appropriate, so the record

25  doesn't become confused later, that we note the slide number

1  where it is not data actually in the article but the doctor's

2  opinion regarding what the data would look like if it were

3  plotted so that we don't have confusion about whether this is

4  actual data or the doctor's understanding of what it means to

5  have virtually identical data.

6          I don't have an objection to the use of the

7  demonstrative with the understanding of what it is, but I am

8  concerned that as the months go by, we may lose track of this;

9  and there's no number of the slide in the record.

10         MS. RAPALINO:  Sure.  I can just say the number of

11 the slide if that helps.  I think the testimony is clear as to

12 which testimony he's plotting here, but we can just put the

13 number in if that helps.

14         THE COURT:  That would help.

15 BY MS. RAPALINO:

16 Q.  So, is Slide 60 the graphic you've prepared showing how a

17 person of skill in the art would understand the standard diet?

18         THE COURT:  Counsel is standing again.

19         MR. PERLMAN:  It's number 70 on my screen.  I just

20 want to make sure that we don't mess this up.

21         MS. RAPALINO:  I think that's why I said Slide 70.

22         THE COURT:  You said 60.

23         MS. RAPALINO:  I'm sorry.  It's Slide 70, the

24 graphic.

25         MR. PERLMAN:  On this occasion, I was trying to

1  help.

2         MS. RAPALINO:  My apologies.  It's Slide 70.

3         THE COURT:  70.

4         MS. RAPALINO:  I think I'm just not capable of

5  saying the number 70.

6  BY MS. RAPALINO:

7  Q.  Is Slide 70 a graphic you've prepared showing how a person

8  of ordinary skill in the art would plot the data for the

9  standard-diet group on a figure similar to Figure 2?

10 A.  Yes.  And as I said, I took the authors at their word,

11 that virtually identical was identical; and therefore, I

12 plotted the same dose response for the standard-diet group as

13 for the low-folate-diet group with folate supplementation.

14 Q.  Okay.  And could we go back to Slide 70?  There we go.

15         Can you explain with reference to your graphic at

16 Slide 70 what this data reflects with respect to the

17 standard-diet group of mice?

18 A.  Well, it reflects the -- both the percent inhibition for

19 the standard-dose group -- standard-diet group of mice as well

20 as the percent lethality for the standard-diet group of mice

21 by dose.

22 Q.  And which line represents the antitumor inhibition data

23 for the standard-diet group?

24 A.  That's the blue squares and the solid line.

25 Q.  And where is the data for the percent lethality or

1  toxicity for the standard-diet group of mice?

2  A.  The percent lethality is depicted in the blue vertical

3  bars at the right side of the slide, and it's based on data in

4  the text that shows that at a dose of 400 milligram per

5  kilogram per day, there's 10 percent lethality; and at a dose

6  of 800 milligram per kilogram per day, there's 100 percent

7  lethality.

8  Q.  Now, have you prepared a graphic that shows what the data

9  for all three of the mice, the treatment -- the mice group,

10  groups would look like?

11  A.  Yes, I have.

12  Q.  Can we see that graphic?  Okay.  Is Slide 72 that graphic?

13  A.  Yes.

14  Q.  Okay.  And can you explain what we see when we look at the

15  comparison of all three groups in terms of their activity data

16  or percent inhibition of tumor data and their lethality or

17  toxicity data?

18  A.  Yes.  Here one sees all three groups together.  What one

19  sees is the mice that were on the low-folate diet had

20  100 percent inhibition at very low doses, but also were

21  extremely sensitive to the toxicity.

22  Q.  Is that the purple lines on your figure?

23  A.  These are the purple lines and purple triangles, yes.

24          And then the other groups of mice had the same

25  percent inhibition based on the phrase in the manuscript

1  itself, virtually identical; but the mice that were on the

2  standard diet had significant toxicity beginning at doses of

3  400 milligram per kilogram per day, whereas the mice with the

4  folic acid supplementation had no lethality whatsoever.

5  Q.  Now, do you have a slide that shows -- that separates out

6  the data for activity or percent inhibition, the antitumor

7  activity from the lethality or toxicity data?

8  A.  Yes, I do.

9  Q.  And can you explain what's shown here?

10 A.  Yes.  So, on the left is the activity percent inhibition,

11 and on the right is the percent lethality, the toxicity.

12 Q.  And for the record, this is Slide 73?

13 A.  Yes.

14 Q.  Okay.  And so can you explain what you see when you look

15 at the slide on the left with respect to percent inhibition or

16 antitumor activity for each of the three groups of mice?

17 A.  Well, when you look at the antitumor activity in the

18 slide, it looks like there's essentially two groups.  There's

19 a group that has 100 percent inhibition at low doses, and then

20 the remaining animals had 100 percent inhibition at

21 significantly higher doses.

22 Q.  And then what information does the toxicity data on the

23 right-hand side add with respect to the three groups?

24 A.  Well, on the toxicity data, what one sees is that the mice

25 that were on the low-folate diet were very sensitive to the

1   drug and began dying at very modest doses of the drug.  The

2   mice on the standard diet were relatively resistant to the

3   lethality of the drug, with no lethality until you get to

4   400 milligram per kilogram per day, whereas the mice on the

5   low-folate diet plus folic acid were resistant to the lethal

6   effects of pemetrexed.

7   Q.  Now, what conclusions would a person of ordinary skill in

8   the art draw from these data, comparing all three groups of

9   mice?

10  A.  A person of ordinary skill in the art, looking at all

11  three groups of mice, would understand that the mice that did

12  the best were the mice that received the folic acid

13  supplementation.

14  Q.  And then what would they conclude, then, from the

15  comparison of all three groups about the effects of folic acid

16  supplementation?

17  A.  What a person of ordinary skill in the art would conclude

18  was that folic acid supplementation markedly reduced the

19  toxicity of pemetrexed while maintaining antitumor activity.

20  Q.  And did the authors draw any conclusions about the

21  comparison of the low-folate diet plus

22  folic-acid-supplementation group as compared to the

23  standard-diet group?

24  A.  Yes, they did.

25  Q.  And what conclusion did they draw?

1   A.   They concluded, "However, low-folate-diet animals with

2   high levels of folate supplementation demonstrated decreased

3   lethality to pemetrexed compared to conventional-diet animals,

4   suggesting that folate intake can be manipulated to achieve

5   greater therapeutic effects," which is basically what I just

6   said.

7   Q.   And when they say that folate intake can be manipulated to

8   achieve greater therapeutic effect, is that correct based on

9   the data that you analyzed?

10  A.   Yes.

11  Q.   How so?

12  A.   What they mean by manipulate is, you can get folic acid

13  supplementation.   The folic acid supplementation allows you to

14  improve the therapeutic index of pemetrexed.

15  Q.   Did you prepare another graphic that specifically compares

16  the low-folate diet plus folic acid group to the standard-diet

17  group?

18  A.   Yes, I did.

19  Q.   And what do you see -- can you explain what you see when

20  you do this comparison of just the standard-diet group to the

21  low-folate diet plus folic-acid group?   And this is at Slide

22  76.

23  A.   When one compares the standard-diet group versus the

24  low-folate diet plus folic-acid group, one has exactly the

25  same therapeutic effect, the antitumor effect, virtually

1  identical.  Even if we were to draw this differently, we could

2  draw it any way we like as long as we would agree that dose

3  response is virtually identical.

4          But, what one sees is that the percent lethality is

5  only present in the standard diet.  There's absolutely no

6  lethality at all in the mice who receive folic acid

7  supplementation.

8  Q.  Did you prepare a slide where you have broken out the

9  activity data again from the toxicity data?

10  A.  Yes, I have.

11  Q.  And this is at Slide 77.  Can you explain what's shown

12  here?

13  A.  Again, on the left we have the antitumor activity, the

14  percent inhibition; and this slide is drawn to reflect what is

15  stated in the text of the Worzalla paper, that the dose

16  response curve, which is what we're looking at, dose versus

17  response percent inhibition, is virtually identical between

18  standard diet and low-folate diet with folic acid

19  supplementation.

20  Q.  And what do you see when you compare the toxicity or

21  lethality of the two groups, the standard-diet group and the

22  low-folate diet plus folic acid supplementation?

23  A.  Well, you see marked contrast in the lethality between

24  these two groups.  One could say it's like night and day in

25  that there's absolutely no lethality whatsoever with the folic

1  acid supplementation; but with the standard diet, there is a

2  100 percent lethality at a dose of 800 and detectable

3  lethality at 400.

4  Q.  Do the standard-diet mice and the low-folate-diet mice

5  with folic acid supplementation have the same amount of folic

6  acid?

7  A.  No.  The low-folate diet plus folic-acid mice have more

8  folic acid than the standard-diet mice.

9  Q.  So, going back to this comparison of the standard-diet

10  group to the low-folate diet plus folic acid group, what does

11  this tell you about the therapeutic index when -- with folic

12  acid supplementation?

13  A.  Well, I want to remind the Court that therapeutic index is

14  the concept, the ratio of benefit to risk.  We're told by the

15  authors of the paper that the benefit is the same in the two

16  groups, and it's clear that the toxicity is different between

17  the two groups.  And the worse toxicity is with the standard

18  diet; and therefore, the therapeutic index is significantly

19  better for the group that received the folic acid

20  supplementation.

21  Q.  So what would a person of ordinary skill in the art

22  understand about the relative therapeutic index of the

23  low-folate diet plus folic-acid-supplementation group?

24  A.  The person of ordinary skill in the art would conclude

25  exactly what I've been saying.  Folic acid supplementation was

1  demonstrated to preserve the antitumor activity of pemetrexed

2  while reducing toxicity.

3  Q.  Are you aware of any characterizations by Lilly of the

4  Worzalla data?

5  A.  Yes, I am.

6  Q.  And what are you aware of?

7  A.  I'm aware of communications they had with the Food & Drug

8  Administration regarding this same data set.

9           MR. PERLMAN:  Objection.  Those communications

10  postdate the priority date and they are not public, and so

11  they would not have been available to the person of ordinary

12  skill in the art.  And so however Lilly characterized this

13  document after the fact in nonpublic communications cannot be

14  relevant to the obviousness inquiry.

15          MS. RAPALINO:  The doctor's testimony will make

16  clear the relevance of the documents.  It's not about how a

17  person of ordinary skill in the art would understand the data.

18          THE COURT:  Well, how will it be relevant?

19          MS. RAPALINO:  If I can elicit the testimony from

20  Dr. Ratain, he's just going to testify about how the

21  interpretation -- Lilly's interpretation of the data in

22  Worzalla is consistent with his own interpretation and with

23  the interpretation of how a person of ordinary skill in the

24  art would see it.

25          MR. PERLMAN:  Your Honor, that's not medical

1   expertise.  That's not from the perspective of the person of

2   ordinary skill.  That's using the witness as a foil for

3   closing argument.

4            THE COURT:  I'll sustain the objection.  This was

5   after.

6            MS. RAPALINO:  Okay.

7            THE COURT:  Okay?

8   BY MS. RAPALINO:

9   Q.  Let's go back to the Worzalla paper itself, if you could

10  look at page 3238.  What does the Worzalla paper itself say

11  with respect to the future development of pemetrexed based on

12  these data?

13  A.  Basically, the last sentence of this paper, which begins

14  on 3238 and ends on 3239, states, "The combination of folic

15  acid with pemetrexed may provide a mechanism for enhanced

16  clinical antitumor selectivity."

17  Q.  And so, what does that mean?

18  A.  What that means is that the authors are stating that this

19  is an exciting approach that may result in clinical benefit,

20  in other words, benefit in patients, using this combination of

21  folic acid pretreatment followed by pemetrexed.

22  Q.  Were such clinical trials ever carried out as of June 1999

23  with pemetrexed and folic acid?

24  A.  Yes.

25  Q.  And were those -- were there reports in the literature of

1   clinical trials with pemetrexed and folic acid pretreatment?

2   A.  Yes.  There were two abstracts by Hammond.

3   Q.  Okay.  Could you turn in your trial exhibit binder,

4   please, to Trial Exhibits 911 and 912?

5             And if you look at Trial Exhibit 911 at page Bates

6   No. 476, Abstract 620P, is this one of the Hammond abstracts

7   that you were referring to?

8   A.  Yes, it is.

9   Q.  And if you turn to Trial Exhibit 912, Abstract No. 866, is

10  that the other Hammond abstract you were referring to?

11  A.  Yes.

12  Q.  Let's start with the second one at Trial Exhibit 912.

13  Where was this abstract published?

14  A.  This abstract was published as part of the proceedings of

15  the 1998 ASCO meeting.

16  Q.  And is that an important meeting?

17  A.  Yes.  As I mentioned previously, ASCO is the premier

18  international clinical oncology society, and this was a very

19  large meeting.

20  Q.  And can you explain what an "abstract" is?

21  A.  Well, an "abstract" is conceptually, essentially, an

22  application for presentation of a study at a meeting.

23  Q.  Okay.  What's being reported in -- or what was this

24  Phase 1 study that's reported in this Hammond abstract

25  designed to test?

1   A.   This study was specifically designed to test whether

2   administering folic acid pretreatment with pemetrexed would

3   permit the ability to administer higher doses of pemetrexed

4   that had been previously tolerated in the absence of folic

5   acid pretreatment.

6   Q.   Can you describe what was done in this study with respect

7   to the dose of folic acid and the schedule?

8   A.   Yes.   Folic acid was administered at five milligrams daily

9   for five days starting two days before pemetrexed.

10  Q.   And how many treatment -- how many patients were enrolled

11  in this study?

12  A.   Well, at the time that this abstract was submitted, there

13  had been 21 patients that had been enrolled.

14  Q.   And could you read aloud the conclusion in the last

15  sentence of this Hammond abstract?

16  A.   The conclusion is "These results indicate that folic acid

17  supplementation appears to permit pemetrexed dose escalation."

18  Q.   What would a person of ordinary skill in the art as of

19  June 1999 understand from this conclusion?

20  A.   A person of ordinary skill in the art would agree with the

21  conclusion of the authors, and would understand that folic

22  acid supplementation reduced the toxicity of pemetrexed.

23  Q.   Okay.   Let's turn back to the other Hammond abstract at

24  Trial Exhibit 911, and again, it's at Bates No. 4776, Abstract

25  No. 620P.   Where was this abstract published?

1  A.  This abstract was published as a supplement to *Annals of*

2  *Oncology*, which is the journal published by the European

3  Society of Medical Oncology.

4  Q.  And was this also in preparation for a meeting?

5  A.  Yes.  This was the abstract from that society's meeting,

6  what we call ESMO.

7  Q.  And is that an important meeting in oncology?

8  A.  Yes.  That's the major European meeting in oncology.

9  Q.  Would a person of ordinary skill in the art have been

10  aware of that meeting?

11  A.  Yes.

12  Q.  Now, is this reporting on the same study that as the other

13  abstract we just looked at?

14  A.  Yes, it is.

15  Q.  So could you read aloud the conclusion in this Hammond

16  abstract?

17  A.  The conclusion is that "Folic acid supplementation appears

18  to permit pemetrexed dose escalation by ameliorating

19  toxicity."

20  Q.  And what would a person of ordinary skill in the art in

21  1999 have understood from that conclusion?

22  A.  I think a person of ordinary skill in the art would

23  understand the same thing that's stated there, that folic acid

24  supplementation reduces the toxicity of pemetrexed.

25  Q.  Was the Phase 1 study in the Hammond report, in these

1  Hammond abstracts, designed to test the efficacy of pemetrexed

2  with folic acid pretreatment?

3  A.  No.

4  Q.  Why not?

5  A.  Because Phase 1 studies do not test efficacy.  The

6  purpose of these studies was to address the pharmacologic

7  question to see if one could demonstrate the same results that

8  one had previously demonstrated in Worzalla, that one could

9  safely administer higher doses of pemetrexed in the context of

10 folic acid pretreatment.

11 Q.  Now, even if it's not designed to test for the efficacy,

12 is there any signal in either of the Hammond abstracts that

13 there was any therapeutic benefit from the folic acid regimen

14 with pemetrexed that's described in these abstracts?

15 A.  Yes.  If we go back to the ASCO Abstract, Exhibit 912,

16 there was a partial response observed in a patient with

17 metastatic colon cancer.  This is a patient that would have

18 had lots and lots of prior chemotherapy prior to going onto

19 this Phase 1 study.

20 Q.  So, would you say that the treatment regimen in the

21 Hammond abstracts provided a therapeutic benefit?

22 A.  Yes.

23 Q.  And what would a person of ordinary skill in the art

24 understand from reading the two Hammond abstracts?

25 A.  A person of ordinary skill in the art from reading the two

1   Hammond abstracts would understand that number one, folic acid

2   supplementation reduced the toxicity of pemetrexed; and number

3   two, folic acid supplementation with pemetrexed still

4   allowed -- still provided therapeutic benefit.

5   Q.  Okay.  I'd like to move on now to talk about the

6   third category of information that you said was taught by the

7   prior art as of June 1999.  And that's that poor nutrition

8   predicts the toxicity of chemotherapy, including antifolates

9   generally and pemetrexed in particular.  What were some

10  nutritional measures that predicted antifolate toxicity as of

11  June 1999?

12  A.  Well, the major predictor of antifolate toxicity that had

13  been reported and described in the literature was

14  homocysteine.

15  Q.  And can you just briefly remind the Court what

16  homocysteine is?

17  A.  Homocysteine is a blood marker that indicates that

18  there's -- suggests that there's a nutritional deficiency of a

19  vitamin, usually folate or B12, but also potentially another

20  vitamin, B6.

21  Q.  For which antifolates have there been reports of

22  homocysteine as a predictor of toxicity?

23  A.  Well, Morgan had done studies of homocysteine levels and

24  the association with toxicity of methotrexate, and there are

25  also prior art references regarding the association of

RATAIN - DIRECT/RAPALINO                Vol. 1-174

1   homocysteine levels prior to treatment as being associated

2   with the toxicity of pemetrexed.

3   Q.  Okay.  I'd like to focus on those reports about the level

4   of homocysteine being correlated with pemetrexed toxicity.

5   Which prior art references were there that taught about that

6   correlation between elevated homocysteine and toxicity of

7   pemetrexed?

8   A.  Well, there are two abstracts by Niyikiza, and then there

9   are also some references to this work in two articles by

10  Calvert.

11  Q.  Okay.  I'd like to turn to Trial Exhibit 911 again.  And

12  if you could look at Bates No. 473, Abstract No. 609P.  Is

13  this one of the abstracts by Dr. Niyikiza?

14  A.  Yes.

15  Q.  And --

16          MR. PERLMAN:  Your Honor, can I state something to

17  aside confusion later?  One of the Hammond abstracts and one

18  of the Niyikiza abstracts are in the same physical document.

19  So they're both going to be Exhibit 911.

20          Ms. Rapalino just transitioned to it, but I found

21  myself confused by it over the weekend, so I thought I would

22  put on the transcript that fact so that we can avoid confusion

23  later, because often in trials we assume that different

24  documents have different numbers.

25          MS. RAPALINO:  I can clarify that on the record as

 1  well with the witness.

 2            THE COURT:  Okay.  If you would, thank you.

 3  BY MS. RAPALINO:

 4  Q.  Now, Dr. Ratain, where is this Niyikiza abstract

 5  published?

 6  A.  This is published in the same issue, the same supplement

 7  of *Annals of Oncology*, and it was presented in the same

 8  session as the Hammond abstract.

 9  Q.  And can you remind the Court what meeting this was for?

10  A.  This was the 1998 ESMO meeting.

11  Q.  Okay.  Now, generally, what is the subject of this

12  Niyikiza abstract?

13  A.  It's generally about trying to understand predictors of

14  pemetrexed toxicity.

15  Q.  Now, I want to start by looking at the conclusion, and

16  what were -- what was -- what was Dr. Niyikiza's conclusion in

17  this abstract?

18  A.  The major conclusions were "Toxicities resulting from

19  treatment with pemetrexed appear to be predictable from

20  pretreatment homocysteine levels.  Elevated baseline

21  homocysteine levels highly correlate with severe hematologic

22  and nonhematologic toxicities following treatment with

23  pemetrexed."

24  Q.  Before we look at that in any more detail, let's also just

25  look at Trial Exhibit 910.  And I would point you there to

1  Bates No. 786 and to Abstract No. 2139.  And is this the other

2  Niyikiza abstract you referred to?

3  A.  Yes.  This one was presented at the ASCO meeting in the

4  spring of 1998.

5  Q.  And generally, what's the subject of this Niyikiza

6  abstract?

7  A.  It's the same as the other Niyikiza abstract.

8  Q.  And again, if we could just go to the conclusion in this

9  paper, what does this abstract conclude about the correlation

10 between homocysteine and toxicity of pemetrexed?

11 A.  I would describe this more as the results, because it's in

12 the middle of the abstract, but it basically states there was

13 a strong correlation between baseline homocysteine levels and

14 the development of the following toxicities at any time during

15 the study.  And then it goes through and notes neutropenia.

16 This is a decrease in the white blood cells that fight

17 infection; thrombocytopenia, a decrease in the blood cells

18 that clot the blood; mucositis, which is mouth sores; and

19 diarrhea.

20 Q.  Okay.  And if we look at the title of this Niyikiza

21 abstract, it says "Relation of vitamin metabolite profile to

22 toxicity."  Which vitamin metabolites are being looked at in

23 these Niyikiza abstracts?

24 A.  Well, the investigators looked at three different

25 chemicals in the blood.  They looked at homocysteine,

1   cystathionine and methylmalonic acid.

2   Q.  Can you just remind the Court what methylmalonic acid is?

3   A.  Methylmalonic acid is elevated in patients with B12

4   deficiency.

5   Q.  Now, what kind of study did Dr. Niyikiza do to determine

6   the relationship between these vitamin metabolite profiles and

7   toxicity?

8   A.  This was a multivariate statistical analysis.

9   Q.  Have you ever conducted a multivariate statistical

10  analysis?

11  A.  Yes.

12  Q.  How many times?

13  A.  Too many to count.

14  Q.  So are you familiar with how such an analysis is

15  conducted?

16  A.  Yes, I am.

17  Q.  And are you familiar with how to interpret the results of

18  such an analysis?

19  A.  Yes, I am.

20  Q.  Now, if you look at the Niyikiza abstract at Trial

21  Exhibit 910, there's a statement in there that says, "No

22  correlation between toxicity and the remaining prespecified

23  predictors was seen."  Do you see that?

24  A.  I do.

25  Q.  Now, does that mean that a person of ordinary skill in the

1  art would have concluded definitively that there was no

2  correlation between MMA levels and toxicity?

3  A.  No.

4  Q.  Can you explain why not?

5  A.  What one can conclude is that the information regarding

6  the toxicity was captured by the homocysteine levels.  And so

7  that any variable that might be correlated with the

8  homocysteine wouldn't add any information.

9  Q.  Is there any evidence that MMA levels are correlated

10  themselves with homocysteine levels?

11  A.  Yes.  Homocysteine and MMA levels are known to be

12  correlated, particularly in patients with B12 deficiency.

13  Q.  Okay.  And can you explain in a little bit more detail why

14  it is that if MMA levels and homocysteine levels are

15  themselves correlated, you wouldn't see a correlation between

16  MMA and toxicity, even if there were such a correlation?

17  A.  Well, let me explain this in a way that I often use for

18  teaching my junior trainees.  So, let's just say one wanted to

19  do a study of the relationship of foot length to height.  And

20  one had data for right foot length, left foot length and

21  height.

22          And you said, "Well, let's do a multivariate

23  correlation."  And just as background, usually in right-handed

24  people, the left foot is a little bigger than the right, and

25  in left-handed people, the right foot's a little bigger than

RATAIN - DIRECT/RAPALINO                    Vol. 1-179

1   the left.  So they're not perfectly the same.

2          If you did a multivariate analysis, you would,

3   depending on the way the numbers fell out, you would either

4   find that right foot was correlated with height or left foot

5   length was correlated with height, but never in a multivariate

6   analysis would you find that measuring the length of both feet

7   gives you additional information.

8   Q.  Okay.  And why is that?

9   A.  That's because there's just -- they're so tightly

10  correlated, you capture no additional information from knowing

11  the length of both the right foot and the length of the left

12  foot when you already know the length of one of the two feet.

13  Q.  Okay.  So in your analogy, as it relates to this case,

14  what's equivalent here to the right foot and the left foot?

15  A.  It's MMA and homocysteine are kind of like right foot and

16  left foot.

17  Q.  And what would be equivalent here to height?

18  A.  And height would be toxicity.

19  Q.  Okay.  So, in the Niyikiza abstract where it says that no

20  correlation was seen between MMA levels and toxicity, what

21  would that mean to a person of ordinary skill in the art in

22  the context of this multivariate analysis?

23  A.  A person of ordinary skill in the art who understood and

24  read the abstract, and saw that a multivariate analysis was

25  performed, would understand that there's a correlation between

1  homocysteine levels and toxicity, but would not understand

2  whether or not there was a correlation between any of the

3  other variables and toxicity.  One just wouldn't know one way

4  or another.

5  Q.  So what would the person of ordinary skill in the art take

6  away from the Niyikiza abstracts with respect to MMA levels in

7  vitamin B12?

8  A.  One would not know one way or the other whether the

9  elevated homocysteine represented folate deficiency, B12

10 deficiency, or both folate and B12 deficiency.

11 Q.  And so what would the person of skill in the art conclude,

12 then, based on the Niyikiza abstracts?

13 A.  A person of ordinary skill in the art would conclude that

14 a deficiency of folate and/or B12 was associated with the

15 toxicity of pemetrexed.

16 Q.  Now, you mentioned that there were other references that

17 discuss this correlation between homocysteine levels and

18 toxicity from pemetrexed.  What are some other examples of

19 references that talk about that?

20 A.  Well, this -- these abstracts were cited repeatedly by

21 Lilly authors and Lilly investigators, and I noted that it

22 was -- this has been cited in a couple papers by Calvert.

23 Q.  Okay.  Let's take a look at Trial Exhibit 401.

24        Is this one of the papers by Dr. Calvert that

25 discusses the Niyikiza study?

1  A.  Yes.

2  Q.  And where was this article published?

3  A.  This is the first paper, the introductory paper in the

4  issue that resulted from the Ixtapa, Mexico meeting in

5  seminars in oncology.

6  Q.  And what does Dr. Calvert say in this article about the

7  Niyikiza study and the correlation between homocysteine and

8  toxicity?

9  A.  This is described on page -- let's see, I'm having trouble

10  seeing the page.

11          It's Bates 155869.  "The measurement of pretreatment

12  plasma homocysteine has proved to be a sensitive way of

13  predicting the toxicity of pemetrexed."  And then cites

14  Reference 17, which is the Niyikiza ASCO abstract we were just

15  looking at.

16  Q.  Okay.  And then if you turn to Trial Exhibit 907, can you

17  remind the Court again just what this trial exhibit is?

18  A.  This Trial Exhibit 907 is the concluding article, summary

19  and conclusions from the Ixtapa issue.

20  Q.  And if you look at page 106 of this article, what is

21  Dr. Calvert saying here about the Niyikiza study and the

22  correlation between homocysteine and toxicity?

23  A.  He states "The recently presented study of the use of

24  plasma homocysteine as a marker for folate deficiency shows a

25  correlation between elevated pretreatment homocysteine levels

1   and the subsequent occurrence of Grade 3 or 4 toxicity."  And

2   then Reference 418 is the same ASCO abstract we were just

3   looking at.

4   Q.  So what would the combination of these Niyikiza abstracts

5   and these Calvert articles citing to the Niyikiza abstracts,

6   what would all of this tell a person of ordinary skill in the

7   art as of June 1999?

8   A.  These would -- all of these articles and abstracts would

9   teach a person of ordinary skill in the art that homocysteine

10  is associated with pemetrexed toxicity, and that the higher

11  the homocysteine, the greater the probability or severity of

12  pemetrexed toxicity.

13  Q.  Okay.  I'd like to move on now to talk about the fourth

14  category of information.

15         THE COURT:  Counsel, why don't we take our afternoon

16  break.  The court reporter needs a break every hour and 45

17  minutes for his fingers.

18         MS. RAPALINO:  Absolutely.  No problem.  Thank you,

19  Your Honor.

20         THE COURT:  We'll take a 15-minute break and then

21  we'll talk about the next slide.

22         THE COURTROOM DEPUTY:  All rise.

23         (Recess at 2:50, until 3:11)

24         THE COURT:  We're back on the record.  And you may

25  continue, Counsel.

1          MS. RAPALINO:  Thank you, Your Honor.  Before I

2     continue, I just respectfully wanted to ask the Court for some

3     clarification about the basis for your earlier ruling on an

4     objection by Mr. Perlman, just because it will implicate

5     other -- potentially implicate other exhibits for use both

6     with this witness and others.  The exhibit at issue is an FDA

7     correspondence with Eli Lilly back from around the time that

8     the patent application was filed in 2000, and I just wanted to

9     understand the basis for the ruling that --

10         THE COURT:  What was your exhibit number?

11         MS. RAPALINO:  It is Exhibit No. -- I believe

12    it's -- is it 76?  76.

13         THE COURT:  What was your objection again, Counsel?

14    Because it's been a while since --

15         MR. PERLMAN:  Yes.  Your Honor, this is a document

16    that was filed well after June 1999, which is the priority

17    date.  It is not a public document; it is a private

18    communication between Eli Lilly and the FDA.  It would not

19    have been known to the person of ordinary skill in the art.

20    It could not be relevant to the obviousness inquiry.  And all

21    that I believe counsel for the defendants are doing is they

22    want to put Lilly's statement to the witness and have him make

23    an argument that you would make in closing argument about he

24    says what Lilly said, which is not expert testimony by a

25    medical expert.  It's not prior art, so it's not relevant to

1  obviousness.  And so whether or not the document is

2  admissible, it's not appropriate through this witness.

3           That is my objection.

4           THE COURT:  Okay.  So, that would have been a

5  relevance objection, which the Court had sustained.  And can

6  you say how it would be relevant at this stage in the

7  proceedings from this witness?

8           MS. RAPALINO:  Yes.  Just to be clear again,

9  Dr. Ratain had already offered his argument about how a person

10 of ordinary skill in the art would have interpreted a set of

11 data, and this was just being offered as a contemporaneous

12 document around the same time as the filing date about a

13 characterization of the same objective body of data that

14 Dr. Ratain had already formed his opinion about and just

15 confirming that this was a reasonable interpretation of the

16 data as of around the same time as the filing of the patent

17 application.

18          MR. PERLMAN:  And, Your Honor, that may be a

19 perfectly fair argument for a posttrial brief or a closing

20 argument, but it's not an appropriate use of this witness to

21 use him as a foil to simply argue from documents that are not

22 from the relevant time period and are not public and could not

23 reflect what the person of ordinary skill --

24          THE COURT:  You can't help her.  Do you want to talk

25 to your co-counsel?

*RATAIN - DIRECT/RAPALINO*                    Vol. 1-185

1        MR. WIESEN:  If I could, Your Honor.

2        THE COURT:  You may.

3        MS. RAPALINO:  Excuse me, Your Honor.

4        (Off the record.)

5        MS. RAPALINO:  And I guess, Your Honor, I just

6   wanted to seek clarification.  Mr. Perlman offered several

7   reasons for why this document isn't relevant, and I just

8   wanted to understand which of those bases is the reason for

9   excluding it.  In other words, is it related to timing?  Is it

10  anything after the filing date of the patent isn't relevant?

11  Is it the fact that it is a confidential communication?  I

12  just wanted to clarify that so I can apply that ruling

13  consistently for other exhibits that may come up.

14       MR. PERLMAN:  It's all of that, Your Honor.  And

15  they each independently and collectively form the basis of my

16  objection, which was sustained, and I don't think the basis

17  for Your Honor's ruling is especially ambiguous right now, and

18  I don't know that I have anything more to say on the subject.

19       THE COURT:  Okay.

20       All right.  The objection remains sustained based

21  upon relevance with respect to all of the matters argued by

22  counsel.

23       MS. RAPALINO:  Okay.  And so just to be clear, any

24  documents that are after the filing date of the patent-in-suit

25  or are otherwise not -- or are not publicly available are

1  not -- will be considered deemed not relevant to the issue of

2  obviousness?

3           THE COURT:  No.  If you have another one, you offer

4  it, and we'll see if he objects.

5           MS. RAPALINO:  Okay.

6           THE COURT:  Okay?

7  BY MS. RAPALINO:

8  Q.  Okay.  Dr. Ratain, I want to continue where we left off

9  and talk about the fourth category of information that you

10 said was available as part of the state of the art as of

11 June 1999, and that's that homocysteine was used as a marker

12 for folate and vitamin B12 deficiency.  We've heard a little

13 bit about this today, but can you just explain again what you

14 mean by that?

15 A.  What I mean is that if one is going to consider using

16 homocysteine to predict toxicity, one would -- a person of

17 ordinary skill in the art would understand that the most

18 common -- the most likely causes of that in this particular

19 cancer population would be that the patients would have a

20 vitamin deficiency and that vitamin deficiency could be folate

21 deficiency or B12 deficiency.

22 Q.  And was there prior art available as of June 1999 that

23 reported on this correlation between -- or association between

24 elevated homocysteine and a folate or a vitamin B12

25 deficiency?

*RATAIN - DIRECT/RAPALINO*                    Vol. 1-187

1   A.  Yes, there was.

2   Q.  And what prior art is that?

3   A.  Well, I think a really good piece of prior art is a 1993

4   paper by Allen.

5   Q.  Could you turn in your binder to Trial Exhibit 502?

6        Is this the Allen paper that you're referring to?

7   A.  Yes, it is.

8   Q.  And who is Robert Allen?

9   A.  Robert Allen is a physician and nutritional scientist at

10  the University of Colorado who was also Dr. Niyikiza's

11  collaborator and collaborated with other Lilly scientists on a

12  number of other prior art documents.

13  Q.  And where is this exhibit, this paper by Dr. Allen, Trial

14  Exhibit 502, published?

15  A.  It's published in a journal called *The FASEB*, F-A-S-E-B,

16  *Journal* in 1993, and "*FASEB*" is the *Federation of American --*

17  *Federation for American* -- I'm blocking.  I'm sorry.

18  Q.  It's okay.

19  A.  It's a long day.

20  Q.  We can use the abbreviation; it's *The FASEB Journal*.

21        Now, is there anything in this paper by Dr. Allen

22  about the use of homocysteine as an indicator of vitamin B12

23  or folate status?

24  A.  Yes.  This is a carefully written description of the use

25  of the association of various so-called vitamin metabolites

1  and the relationship to folate deficiency and B12 deficiency.

2  Q.  Could you turn in this exhibit to page -- Bates No. ending

3  in 8997?  I'm sorry.  I have the wrong page number.  It's

4  8999.  And looking at Figure 4B, can you explain what this

5  figure shows?

6  A.  Yes.  This is -- this Figure 4B of the Allen paper depicts

7  homocysteine data, serum total homocysteine for 180

8  individuals.  This includes 60 normal subjects, 60 patients

9  that were documented to have B12 deficiency and were receiving

10 B12 supplementation, 60 patients who were documented to have

11 folate deficiency and receiving folate supplementation.

12 Q.  And what does this show about the level of homocysteine

13 for the patients who are vitamin B12 deficient?

14 A.  It shows that the patients that had vitamin B12 deficiency

15 had higher serum total homocysteine concentrations than normal

16 subjects.

17 Q.  And what does this paper show about patients who had a

18 folate deficiency?

19 A.  It shows that patients with folate deficiency had higher

20 homocysteine levels than normal subjects.

21 Q.  And why is homocysteine useful for determining both a

22 folate and a B12 deficiency?

23 A.  Homocysteine is useful as a marker for both folate and B12

24 deficiency because the metabolism of homocysteine requires

25 both folate and B12.

RATAIN - DIRECT/RAPALINO                    Vol. 1-189

1  Q.  Were there techniques available as of June 1999 to measure

2  levels of homocysteine in patients?

3  A.  Yes.  These techniques were pioneered by Dr. Allen and

4  colleagues at the University of Colorado.

5  Q.  And were there assays that were readily available to a

6  person of ordinary skill in the art to use to measure

7  homocysteine levels?

8  A.  Yes.

9  Q.  So what would a person of ordinary skill in the art have

10 understood as of June 1999 from the fact that there was both,

11 on the one hand, a correlation between elevated homocysteine

12 and toxicity of pemetrexed and the fact that there was also an

13 association between elevated homocysteine and folate and

14 vitamin B12 deficiencies?

15 A.  A person of ordinary skill in the art would have

16 understood that a folate and/or B12 deficiency was associated

17 with the toxicity of pemetrexed.

18 Q.  Were there prior art references as of June 1999 that put

19 those two things together and made the point that you just

20 made?

21 A.  Yes.

22 Q.  Let's look at Trial Exhibit 2059.

23         And I would point you to page -- I think it's --

24 well, I'm going to point you to Abstract No. 62.  And can you

25 explain to the Court what this exhibit is?

1  A.  Yes.  This is an abstract from another European meeting

2  called the ECCO, E-C-C-O, European cancer conference that was

3  held in Hamburg, Germany, in September 1977, and the specific

4  abstract, Abstract 62, is an abstract relating a folate status

5  to the toxicity of pemetrexed, and is authored jointly by

6  Lilly authors and the same Dr. Allen we've been just

7  discussing.

8  Q.  And what does it mean when it says -- in the same line

9  where it gives the Abstract No. 62, it also says "poster."

10  What does that mean?

11  A.  Poster -- okay.  As I explained previously, an abstract is

12  essentially a request to present something or an application

13  to present.  And so the abstract is reviewed and considered by

14  a committee of scientists as to whether it's of interest to be

15  presented at the meeting, and so this was deemed to be of

16  sufficient interest to be presented at the meeting.  And so a

17  poster presentation is -- means that you get a board that's,

18  oh, it's probably about six feet by four feet to basically put

19  your data on, and so you wouldn't just put the abstract on the

20  board; you would put all of the data that supports the

21  conclusions here in the abstract.

22  Q.  And what study is this Zervos abstract in this Trial

23  Exhibit 59?  What study is it reporting the data from?

24  A.  It's studies of -- in patients receiving pemetrexed in

25  Phase 2 trials.  It's basically the predecessor to the

RATAIN - DIRECT/RAPALINO                    Vol. 1-191

1   Niyikiza abstracts.

2   Q.  And what does this Zervos abstract say about the

3   implications of the correlation between homocysteine and

4   toxicity in that first paragraph?

5   A.  Well, what it says is, first of all, that "studies in

6   animal models and humans have revealed that folate nutritional

7   status may be correlated with toxicity and antitumor activity

8   of antifolates."  So that's the first sentence.  That's not

9   referring to the data in this abstract.  That's basically

10  saying we knew this before we did the study.

11          And then the second sentence says, "Supplemental

12  folic acid may play a role in protecting against the

13  toxicities associated with antifolate drugs."  Again, that's

14  not based on the data in this abstract.  They're saying, "We

15  knew this.  This is why we did this study."  So, in a sense,

16  these two sentences reflect what a person of ordinary skill in

17  the art knew in 1997.

18  Q.  Okay.  And were there any other prior art references that

19  they made this connection between folate status and toxicity

20  of pemetrexed?

21  A.  Yes.

22  Q.  Let's turn to Trial Exhibit 1151.  And if you could just

23  remind the Court what this exhibit is.

24  A.  This is Dr. O'Dwyer's paper again.

25  Q.  And focusing on page 103 of this O'Dwyer paper, what does

*RATAIN - DIRECT/RAPALINO*                    Vol. 1-192

1  Dr. O'Dwyer say about folate status?

2  A.  Well, the last two sentences of the paper read as follows:

3  "Work by Zervos, et al.," citing the exact same abstract we

4  just looked at, "supports the position that toxicity may be

5  increased in patients with poor nutritional status."  And then

6  not shown on the slide is the next sentence:  "Additional

7  studies are underway to explore the relationship between

8  folate status and toxicity."

9  Q.  Okay.  And if you turn back one page to page 103, what

10 else does Dr. O'Dwyer say about folate status and pemetrexed

11 toxicity?

12 A.  Well, Dr. O'Dwyer also references Niyikiza's work by

13 stating, "The toxicity seen in this study" -- referring to a

14 study in head-and-neck cancer patients, "The toxicity seen in

15 this study is possibly related to nutritional status in this

16 patient population.  This hypothesis is supported by the work

17 of Niyikiza, et al., who have shown that functional folate

18 status is highly correlated to the instance of hematologic

19 toxicity patients who received pemetrexed," and then it's

20 reference 14, which is the Niyikiza 1998 ASCO abstract.

21 Q.  Okay.  Let's go on and talk about the final category of

22 information that you said would have been available as part of

23 the state of the prior art as of June 1999, and that's that

24 vitamin B12 had been used with antifolates.  When -- which --

25 for which antifolates had B12, vitamin B12 been used?

RATAIN - DIRECT/RAPALINO                    Vol. 1-193

1   A.  Vitamin B12 had been used with aminopterin and

2   methotrexate.

3   Q.  Okay.  We've talked a little bit about aminopterin, but

4   can you describe in more detail the use of vitamin B12 with

5   aminopterin?

6   A.  Aminopterin was the first antifolate that was administered

7   to children and reported in 1948 by Sidney Farber, and

8   Dr. Farber used liver extract to try and reduce the toxicity

9   in these children.  And a person of ordinary skill in the art

10  in June of 1999 would be well aware that liver extract was an

11  important source of vitamin B12.

12  Q.  Let's take a look at that Farber exhibit again.

13          If you could turn to page 789, and let's look at

14  Figure 2 as an example.

15  A.  So I'm looking at page 789 of Exhibit 1443, and Figure

16  2 is a graph depicting the course of therapy in one particular

17  patient.

18  Q.  And what does Figure 2 report as the treatment that was

19  given to that patient?

20  A.  The chemotherapy treatment was aminopterin.

21  Q.  And what else was administered to the patient?

22  A.  The patient also received crude liver extract.

23  Q.  Now, would a person of ordinary skill in the art as of

24  June 1999 have known what the active component of crude liver

25  extract was?

1  A.  Yes.

2  Q.  And how would that person have known that?

3  A.  Well, it was described shortly after Dr. Farber's paper

4  that crude liver extract contained vitamin B12, and this was

5  explicitly called out in a 1975 paper by Halperin published in

6  the proceedings of the National Academy of Sciences.

7  Q.  Okay.  Could you turn in your binder to Trial

8  Exhibit 1336?  Is this that Halperin paper that you were just

9  referring to a moment ago?

10  A.  Yes.

11  Q.  Could you turn to page 4022, please?  And what does

12  Dr. Halperin say in this paper about the crude liver extract

13  that was given in the study that's reported in the Farber

14  paper?

15  A.  Well, in this paper there was -- really focused on

16  antifolates combined with folates.  He notes, "Finally, it is

17  only fitting to recall that in 1948 Dr. Sidney Farber treated

18  children with acute leukemia with aminopterin as well as with

19  injections of crude liver extract.  The crude liver extract

20  may well supply these very ill patients not only with vitamin

21  B12 but also with an undetermined dose," and this is a folate,

22  N5 methyltetrahydrofolate.  And this is the concluding

23  paragraph of this paper.

24  Q.  Okay.  Now, you also mentioned that vitamin B12 had been

25  used with methotrexate.  Can you describe that in more detail?

1  A.   Yes.   Dr. Morgan was very explicit in her work to measure

2  baseline vitamin B12 prior to administration of folate and to

3  replete vitamin B12 if patients were deficient.   And so she

4  administered methotrexate with folic acid with B12.

5  Q.   Okay.   Could you turn in your binder to Trial

6  Exhibit 1204, please?   Can you explain what this exhibit is?

7  A.   This is a paper I alluded to earlier that was published in

8  the *Annals of Internal Medicine*, which is the journal of the

9  American College of Physicians.   The society then encompasses

10  all individuals certified in internal medicine.

11  Q.   And what does Dr. Morgan report in this paper?

12  A.   What Dr. Morgan reported here was a prospective randomized

13  placebo controlled trial evaluating whether folic acid

14  supplementation would reduce the toxicity of methotrexate in

15  patients with rheumatoid arthritis.

16  Q.   Now, if you turn to page 834 or Bates Number 696, under

17  laboratory assessments, what does Dr. Morgan say in this

18  article about vitamin B12?

19  A.   What Dr. Morgan says is that at baseline all patients had

20  their vitamin B12 measured.

21  Q.   And what does the article say was the protocol if a

22  patient had an abnormal level of vitamin B12?

23  A.   What the paper says, if the patient had abnormal values

24  for any of the vitamins, and this is vitamin B12 and others,

25  other than folate, the abnormality was treated with single

1  vitamin supplements.  So, if a patient had B12 deficiency,

2  they would receive B12 supplementation.

3  Q.  So, we've talked about aminopterin and methotrexate and

4  their use with vitamin B12 in the prior art.  Was there any

5  suggestion about the use of vitamin B12 with pemetrexed in the

6  prior art?

7  A.  Well, yes.  In other publications that were discussing the

8  importance of nutrition in conjunction with pemetrexed, the

9  point was made that both folate and B12 were potentially

10 important.

11 Q.  Okay.  Let's take a look at one of those articles, if we

12 could turn to Trial Exhibit 401, please.

13        And this is a exhibit we looked at before, but if

14 you could just remind the Court what this exhibit is.

15 A.  As a reminder, this is the first paper in the Ixtapa

16 issue.

17 Q.  And who is the author of this?

18 A.  This is by Hilary Calvert.

19 Q.  And okay.  And what does -- looking at pages 8 and 9 of

20 this paper by Dr. Calvert, what does Dr. Calvert say about

21 vitamin B12 and pemetrexed?

22 A.  Well, what Dr. Calvert says -- and first let me put this

23 in context.  This is a article on overview of folate

24 metabolism in the context of a whole issue on pemetrexed.

25        Within that article, there's a section on clinical

1  measurement of functional folate status; and then he says,

2  "Thus, any functional deficiency, either in B12 or folate,

3  will result in reduction in the flux through methionine

4  synthase and a consequent increase in the plasma level of

5  homocysteine," and then refers to figure 8.  And then Figure

6  8 very explicitly calls out that either folate or B12

7  deficiency affects the metabolism of homocysteine.

8  Q.  And what does Dr. Calvert say in the very next sentence?

9  A.  In the very next sentence, he says, "The measurement of

10  pretreatment plasma homocysteine has proved to be a sensitive

11  way of predicting the toxicity of pemetrexed."

12  Q.  So what would a person of ordinary skill in the art then

13  understand from this paragraph in this figure in Dr. Calvert's

14  1999 paper?

15  A.  Well, one would read the sentence and one would see that

16  the measurement of pretreatment plasma homocysteine is

17  important in predicting the toxicity of pemetrexed; and then a

18  person of ordinary skill in the art would then look at Figure

19  8 and see homocysteine, and then would see that either folate

20  or B12 deficiency would be important considerations in

21  evaluating a pretreatment plasma homocysteine.

22  Q.  So what would a person of ordinary skill in the art be

23  motivated to do with respect to vitamin B12 based on this

24  suggestion in Dr. Calvert's article?

25  A.  In looking at Dr. Calvert's article, a person of ordinary

*RATAIN - DIRECT/RAPALINO*                    Vol. 1-198

1  skill in the art would be motivated to provide both folic acid

2  and B12 supplementation pretreatment prior to pemetrexed.

3  Q.  Is there any other prior art literature that makes a

4  similar suggestion with respect to the addition of vitamin

5  B12?

6  A.  Yes.  There's also a book chapter by Lilly authors.

7  Q.  And is that the same book chapter we looked at earlier?

8  A.  Yes, it is.

9  Q.  I would like to just quickly take a look at that again.

10 If you could turn to Trial Exhibit 400 in your binder.

11             And can you just remind us again what this book

12 chapter is generally about?

13 A.  Exhibit 400 is a book chapter generally about two GARFT

14 inhibitors, lometrexol and the '887 compound.

15 Q.  And if you could turn to page 270, there's a section

16 entitled "Human Folate Status."  Do you see that?

17 A.  I see that.

18 Q.  What's this section generally about?

19 A.  This section is generally about the relationship of folate

20 status in cancer patients to the toxicity of these two GARFT

21 inhibitors.

22 Q.  And what does Mendelsohn say in this chapter that's

23 relevant about vitamin B12?

24 A.  What Mendelsohn and colleagues state is, "The biochemical

25 pathways that utilized folate cofactors also require adequate

RATAIN - DIRECT/RAPALINO                    Vol. 1-199

1  amounts of vitamins B12 and B6.  Thus, the status of all three

2  vitamins in patients may significantly influence the severity

3  of toxicity observed during chemotherapy."

4  Q.  So what would a person of skill in the art again

5  understand from the combination of both Mendelsohn and

6  Calvert I with respect to vitamin B12?

7  A.  A person of ordinary skill in the art would understand

8  that B12 deficiency would be a risk factor for pemetrexed

9  toxicity and similar antifolates.

10  Q.  And what would the person of ordinary skill in the art

11  then be motivated to do based on that information?

12  A.  A person of ordinary skill in the art would be motivated

13  to add B12, provide B12 supplementation prior to chemotherapy

14  in addition to folic acid supplementation.

15  Q.  Okay.  Now that we've talked about the state of the prior

16  art as of June 1999, I want to turn to talking about the

17  specific opinions that you have rendered in this case.  And

18  let's start with your opinions about the obviousness of the --

19  of Claims 9 and 10.

20          Did you compare Claims 9 and 10 -- or the asserted

21  claims generally to the prior art in this case?

22  A.  Yes, I did.

23  Q.  Which prior art did you compare it to?

24  A.  I compared the asserted claims to Worzalla and also to the

25  two Hammond abstracts.

RATAIN - DIRECT/RAPALINO          Vol. 1-200

1   Q.  Okay.  Actually, before we get to those asserted claims,

2   you testified earlier that Claims 9 and 10 are dependent on

3   Claim 1.  So, why don't we start with Claim 1 which you said

4   you had analyzed as well.  Did you compare Claim 1 to the

5   prior art?

6   A.  Yes, I did.

7   Q.  Which prior art was that?

8   A.  The same prior art I just mentioned.

9   Q.  Okay.  So let's start with Worzalla.  That was Trial

10  Exhibit 384.  Can you quickly remind the Court what Trial

11  Exhibit 384, the Worzalla reference, was about?

12  A.  Yes.  The Trial Exhibit 384 is an article by Lilly

13  authors, including the '974 inventor, evaluating the use of

14  folic acid supplementation in mice.  It's the article where we

15  spent a lot of time on the graphs.

16  Q.  And what are the differences between the Worzalla I

17  reference, this Trial Exhibit 384 and Claim 1 of the '209

18  patent?

19  A.  Well, the Worzalla paper did not utilize B12; and

20  second of all, of course, the Worzalla paper reports a study

21  in an animal model cancer, not in patients with cancer.

22  Q.  Okay.  You said that you also compared Claim 1 to the

23  Hammond abstracts.  I know we just talked about it, but can

24  you quickly remind the Court what the Hammond abstracts were

25  about?

RATAIN - DIRECT/RAPALINO                    Vol. 1-201

1  A.  The Hammond abstracts were regarding a Phase 1 trial of

2  pemetrexed with folic acid pretreatment.

3  Q.  And what were the differences between the Hammond

4  abstracts and Claim 1 of the '209 patent?

5  A.  The difference between the Hammond abstracts and Claim 1

6  of the '209 patent is that the Hammond abstracts did not

7  utilize vitamin B12.

8  Q.  So, let's start with the Hammond abstracts.  Would a

9  person of ordinary skill in the art have been motivated to

10  modify the Hammond abstracts?

11  A.  Yes.

12  Q.  What modifications would the person of ordinary skill in

13  the art have been motivated to make to those abstracts, a

14  regimen in those abstracts?

15  A.  A person of ordinary skill in the art would have been

16  motivated to add B12 pretreatment.

17  Q.  And then the same question, starting with the Worzalla I

18  paper.  Would the person of ordinary skill in the art have

19  been motivated to modify what's disclosed in Worzalla I?

20  A.  Yes.

21  Q.  And how -- what modifications would the person of ordinary

22  skill in the art have made to the treatment regimen set forth

23  in the Worzalla I paper?

24  A.  Well, the most obvious modification is to apply the

25  principles taught by Worzalla to the treatment of patients

1  with cancer.  And then, in addition, to administer vitamin

2  B12.

3  Q.  Okay.  So in both instances, for Worzalla and for the

4  Hammond papers, you said a person of ordinary skill in the art

5  would have been motivated to add vitamin B12.  Why would the

6  person of ordinary skill in the art have been motivated to add

7  vitamin B12?

8  A.  Well, it all comes back to the thought processes here; and

9  so a person of ordinary skill in the art who's motivated to

10  try and reduce the toxicity of an antifol that is believed to

11  be due to a nutritional deficiency would understand that to

12  effectively do so, one would potentially need to include both

13  folic acid and B12 as supplementation.

14  Q.  And can you just -- okay.  And is there any other reason

15  why a person of ordinary skill in the art would have been

16  motivated to add vitamin B12 pretreatment to both Worzalla and

17  the Hammond papers?

18  A.  Well, in addition, there would also be a concern about

19  giving folic acid alone, as the literature suggests, that

20  vitamin B12 should be given with folic acid pretreatment to

21  avoid hidden complications of vitamin B12 deficiency.

22  Q.  Okay.  We're going to focus largely on that first reason

23  you talked about with respect to pemetrexed-related toxicity,

24  but can you very briefly just describe in a little bit more

25  detail what you meant by avoiding hidden complications of a

1  vitamin B12 deficiency?

2  A.  Well, this -- there are potential problems if one treats a

3  patient who has a B12 deficiency with folic acid alone.  And

4  this is just basic medicine that we're all taught, that if you

5  suspect a deficiency of either folic acid or B12, you need to

6  make sure that you make the right diagnosis, because if you

7  just treat with folic acid when the patient has B12

8  deficiency, the patient will develop neurologic complications,

9  in theory.  I agree this is a theoretical concern, but it's a

10  theoretical concern that is very serious and irreversible.

11  Q.  Okay.  We're going to hear more about that from other

12  experts in the case, so for the moment I want to focus on the

13  other reasons that you mentioned.  The literature suggested

14  that vitamin B12 could reduce pemetrexed toxicity.  Can you

15  provide more detail about what literature you're referring to

16  when you say that the literature suggested that vitamin B12

17  could reduce pemetrexed toxicity?

18  A.  Well, the logic is as follows:  We've discussed that

19  there's evidence of an association or correlation between

20  homocysteine levels prior to chemotherapy and the instance and

21  severity of pemetrexed toxicity.  We've discussed that there's

22  evidence of an association between folate and/or B12

23  deficiency and an increase in homocysteine levels.

24        And therefore, a person of ordinary skill in the art

25  would understand that folate and/or B12 deficiency could be

1  contributing to severe pemetrexed toxicity; and furthermore,

2  that's explicitly discussed in several prior art references.

3  Q.  So what would the person of ordinary skill in the art then

4  do, starting from Worzalla I or the Hammond abstracts, in

5  view of these teachings in the prior art that we've discussed?

6  A.  A person of ordinary skill in the art would add vitamin

7  B12.

8  Q.  And with respect to Worzalla, what would the person of

9  ordinary skill in the art do with respect to the treatment

10  group?

11  A.  A person of ordinary skill in the art would apply the

12  principles taught in Worzalla to the treatment of patients.

13  Q.  And this may sound like a silly question, but what would

14  be the motivation to move from the mice to treating patients?

15  A.  Well, a person of ordinary skill in the art we have

16  defined as physicians here, and so physicians are interested

17  in helping patients with cancer, and, therefore, would be

18  readily motivated to treat patients rather than doing more

19  experiments in the laboratory.

20  Q.  Okay.  And on the topic of the person of ordinary skill in

21  the art, are you aware that the Court has rendered an

22  opinion -- a preliminary opinion in this case the

23  qualifications of the person of ordinary skill in the art?

24  A.  Yes.

25  Q.  And the Court's opinion was that the person of ordinary

RATAIN - DIRECT/RAPALINO            Vol. 1-205

1    skill in the art can be a medical doctor who specializes in

2    oncology or a medical doctor with extensive experience in the

3    areas of nutritional sciences involving vitamin deficiency.

4    However, as to the latter person, this individual would need

5    to have collaborated with medical oncologists who have

6    knowledge and experience -- sorry.

7              THE COURT:  And, Counsel, do you have an objection?

8              MR. PERLMAN:  I guess my objection is it doesn't

9    sound like there's a question in our future.

10             MS. RAPALINO:  I'm getting there.

11             THE COURT:  If you would just slow down for the

12   court reporter.

13             MS. RAPALINO:  Sure.  I'm sorry about that.

14             Can I start with "however"?

15   BY MS. RAPALINO:

16   Q.  However, as to the latter person, this individual would

17   need to have collaborated with medical oncologists who have

18   knowledge and experience in the treatment of cancer through

19   the use of antifolates.

20             If the Court were to adopt that definition of a

21   person of ordinary skill in the art, would that change your

22   opinions in any way in this case?

23   A.  No.

24   Q.  Okay.  Now, you just testified that a person of ordinary

25   skill in the art, starting with Worzalla or Hammond, would be

1 motivated to add vitamin B12 pretreatment.  Would the person

2 of ordinary skill in the art necessarily supplement all

3 patients with vitamin B12?

4 A.  One, a person of ordinary skill in the art could either

5 supplement all patients with B12 or alternatively, evaluate

6 for the possibility of B12 deficiency using routine diagnostic

7 tests known at the time, and then treat only the B12-deficient

8 patients with B12.

9 Q.  And would the person of ordinary skill in the art have had

10 motivation to treat vitamin B12-deficient patients with

11 vitamin B12 prior to pemetrexed?

12 A.  Yes.  A person of ordinary skill in the art would be

13 motivated to treat B12 deficiency with B12 prior to

14 pemetrexed.

15 Q.  So before we move on to the dependent claims in this case,

16 can you just summarize why the method of Claim 1 of the '209

17 patent would have been obvious to a person of ordinary skill

18 in the art?

19 A.  Well, it's summarized here.  A person of ordinary skill in

20 the art would start with these contemporary prior art

21 references from really 1998 and would understand that there's

22 evidence that folic acid pretreatment was -- would reduce the

23 toxicity of pemetrexed and maintain the therapeutic activity.

24      And therefore, a person of ordinary skill in the art

25 would add vitamin B12 pretreatment to reduce the homocysteine

1  levels known to be correlated with pemetrexed toxicity, as

2  well as to prevent the potential complications of a hidden

3  vitamin B12 deficiency.

4  Q.  Okay.  Let's turn to the asserted claims in this case,

5  starting with Claim 9.  And if you could turn to Trial

6  Exhibit 1 in your binder.

7          What additional limitations does Claim 9 add to the

8  limitations that are already in Claim 1 of the '209 patent?

9  A.  Claim 9 adds the limitation of the folic acid dose from

10 about 350 micrograms to about 1,000 micrograms.

11 Q.  And looking at Claim 10, also in Column 11 of Trial

12 Exhibit 1, what additional limitation does Claim 10 add to

13 Claim 1 of the '209 patent?

14 A.  Claim 10 further narrows the folic acid dose to -- from --

15 to 350 micrograms to 600 micrograms.

16 Q.  Does the additional limitation of a dose range of either

17 350 micrograms to 600 micrograms or 350 micrograms to 1,000

18 micrograms of folic acid render these claims non-obvious?

19 A.  No.

20 Q.  Why not?

21 A.  Because these are standard, routine doses of folic acid

22 included in standard, over-the-counter, readily available

23 multivitamin supplements.

24 Q.  And would this have been well-known to a person of

25 ordinary skill in the art as of June 1999?

1          MR. PERLMAN:  Objection.

2          THE COURT:  Leading.

3   BY MS. RAPALINO:

4   Q.  What would a person of ordinary skill in the art have

5   known about doses of folic acid as of June 1999?

6   A.  A person of ordinary skill in the art would know that

7   these are standard doses of folic acid supplementation.

8   Q.  Dr. Ratain, don't the Hammond abstracts upon which your

9   obviousness positions depend use a 5-milligram dose of folic

10  acid?

11  A.  Yes.

12  Q.  So, why would a person of ordinary skill in the art modify

13  the dose of folic acid that was used in the Hammond abstracts,

14  the 5-milligram dose, to arrive at the claimed doses?

15  A.  Well, there are two basic reasons why one would want to

16  modify the folic acid dose in Hammond.  One relates to

17  convenience, and the other relates to theory.

18  Q.  Okay.  Let's start with the first one, with convenience.

19  Can you explain what you mean by that?

20  A.  Well, 5 milligrams of folic acid is a prescription dose

21  folic acid that's not always available, particularly in the

22  context of a potential international study.

23  Q.  And so what would that mean in terms of the motivation of

24  a person of ordinary skill in the art?

25  A.  A person of ordinary skill in the art, understanding that

1  the goal here is to just give enough folic acid to treat some

2  mild folic acid deficiency, would understand that all they

3  need to do is give enough folic acid that's contained in

4  multivitamins, and, therefore, could just use that lower dose

5  of folic acid than the stronger prescription dose.

6  Q.  And what was the other reason you mentioned, the one that

7  relates to theory for why a person of ordinary skill in the

8  art would modify the dose of Hammond?

9  A.  Well, there's always the theoretical concern that folic

10  acid can reduce the efficacy of antifolates.  And clearly, at

11  very high doses, that's going to be a concern; and at very low

12  doses, it wouldn't be a concern.

13          And it's not clear exactly what the optimal dose is;

14  but therefore, one would be motivated to go down on the dose

15  and use a dose that achieves the goal that one is trying to

16  accomplish.  In this case, the goal is to simply normalize the

17  folate pools, normalize the folate stores, and provide these

18  physiologic replacement doses of folic acid rather than a

19  higher pharmacologic dose of 5 milligrams.

20  Q.  And what doses of folic acid are physiologic doses of

21  folic acid?

22  A.  These are doses in the range of 350 to 1,000 micrograms.

23  Q.  Okay.  Let's turn to Claim 12 of the '209 patent.  What

24  limitations does Claim 12 set forth that are not present, for

25  example, in Claim 1 of the '209 patent?

RATAIN - DIRECT/RAPALINO                    Vol. 1-210

1  A.  Well, if one compares Claim 12 to Claim 1, there's a

2  limitation on the folic acid dose.  There's a limitation on

3  the vitamin B12 dose.

4  Q.  And what's the limitation on the folic acid dose in

5  Claim 12?

6  A.  The limitation of the folic acid dose is that it's the

7  same limitation as in Claim 9, 350 to 1,000 micrograms of

8  folic acid.

9  Q.  And what's the limitation on the vitamin B12 dose in

10  Claim 12?

11  A.  The limitation of the vitamin B12 dose is from about

12  500 micrograms to about 1,500 micrograms of vitamin B12.

13  Q.  Let's look at the next asserted claim, and that's Claim

14  14.  What additional limitations does that claim add?

15  A.  Claim 14 adds the additional limitation of an

16  intramuscular injection of vitamin B12.

17  Q.  And then moving on to Claim 18 of the '209 patent, what

18  additional limitation does claim -- I'm sorry.  I skipped

19  Claim 15.

20        What additional limitation does Claim 15 of the

21  '209 patent add?

22  A.  Well, Claim 15 limits the dose of vitamin B12 to exactly

23  about 1,000 micrograms.

24  Q.  And does it have any limitation on the route of

25  administration?

1  A.  Yes.  It's the same limitation as in Claim 14 of an

2  intramuscular injection.

3  Q.  And then moving on to Claim 18, what additional

4  limitations does Claim 18 add?

5  A.  Claim 18 further limits the folic acid dose to the same as

6  in Claim 10, 350 micrograms to 600 micrograms.

7  Q.  Do any of the limitations on the dose of vitamin B12

8  render these claims non-obvious?

9  A.  No.

10 Q.  Why not?

11 A.  These are all routine, standard, everyday doses of folic

12 acid and B12.

13 Q.  And what would a person of ordinary skill in the art have

14 known about the doses of vitamin B12 as of June 1999?

15 A.  A person of ordinary skill in the art would have known

16 that these doses are just within the range of standard routine

17 doses.

18        THE COURT:  When you say "standard routine doses,"

19 you mean like if I just went to the drugstore and wanted to

20 take B12?

21        THE WITNESS:  No.  These are standard B12 doses for

22 treating B12 deficiency.

23        THE COURT:  Standard as opposed to what?  As opposed

24 to if your doctor gives you a prescription or --

25        THE WITNESS:  Yes.  These doses, if a physician

1  wanted to treat a patient for a B12 deficiency, this is how

2  the patient would be treated.  This would be one option, to

3  treat with a dose of about 1,000 micrograms given as an

4  intramuscular injection.

5          THE COURT:  Okay.  Thank you.

6  BY MS. RAPALINO:

7  Q.  And I think you just said this, but was the route of

8  administration of vitamin B12, does that render these claims

9  non-obvious?

10  A.  Not at all, because an important cause of vitamin B12

11  deficiency is the fact that there's a problem with the

12  gastrointestinal tract.

13  Q.  And so how does that implicate the route of administration

14  of vitamin B12?

15  A.  It would mean that giving vitamin B12 orally would run the

16  risk of not being absorbed; and therefore, if one wanted to be

17  certain that one was treating B12 deficiency, then one would

18  want to give B12 as an intramuscular injection.

19  Q.  And would a person of ordinary skill in the art have been

20  aware of common routes of administration of vitamin B12 as of

21  June 1999?

22  A.  Yes.

23  Q.  Does the '209 patent specification itself say anything

24  about what was known in the prior art with respect to the dose

25  of vitamin B12?

1  A.  Yes, it does.

2  Q.  Okay.  Let's look at Column 5 of the '209 patent.  And

3  starting around line 19 of Column 5, what does the '209

4  patent say was known in the prior art about the dose of

5  vitamin B12?

6  A.  It states that, "The skilled artisan will appreciate that

7  the methylmalonic-lowering agents are effective over a wide

8  dose range."

9       And then it goes on to say, for example, when

10  cobalamin is used as the methylmalonic-lowering agent, the

11  dosage of cobalamin may fall within the range from about

12  0.2 micrograms to about 3,000 micrograms.

13       What it's telling you is that you have a 15,000-fold

14  dose range that would be acceptable for cobalamin, which is

15  not the B12 we're talking about, but is -- was an alternative

16  considered in the -- by the original inventors.

17  Q.  What does the '209 patent say in that same column about

18  adjustments to dose of vitamin B12?

19  A.  In the same column, it adds, "However, it will be

20  understood that the amount of the methylmalonic acid-lowering

21  agent actually administered will be determined by a physician

22  in light of the relevant circumstances, including the

23  condition to be treated, the chosen route of administration,

24  the actual agent administered, the age, weight and response of

25  the individual patient, and the severity of the patient's

1  symptoms.  Therefore, the above dosage ranges are not intended

2  to limit the scope of the invention in any way."

3  Q.  And so what does the '209 patent say about what was

4  known in the prior art about doses of vitamin B12?

5  A.  Well, the '209 patent basically says there's a whole

6  range of doses.  It doesn't really matter that much what the

7  dose is, and the physician should just use routine medical

8  judgment.

9  Q.  Does the '209 patent say anything about the route of

10  administration of vitamin B12 -- I'm sorry -- what was known

11  in the prior art about the route of administration of vitamin

12  B12?

13  A.  Yes.  The patent, the same column, Column 5, specifically

14  says that, "Preferably, the methylmalonic acid-lowering agent

15  is administered as intramuscular injection formulation.  Such

16  formulations are known in the art and are commercially

17  available."

18  Q.  Okay.  Now that we've looked at those dose and route of

19  administration limitations in Claims 12, 14, 15 and 18, let's

20  turn to the last of the asserted claims, Claims 19 and 21.

21       What limitation does Claim 19 add that we haven't

22  already talked about?

23  A.  Claim 19 of the '209 patent adds the limitation of the

24  time interval between folic acid initiation and pemetrexed

25  initiation.

1  Q.  And what is the time interval specified in Claim 19?

2  A.  The time interval is one to three weeks.

3  Q.  And so does the limitation in the time interval of one to

4  three weeks between folic acid administration and the

5  first administration of pemetrexed render Claim 19

6  non-obvious?

7  A.  No.

8  Q.  Why not?

9  A.  Again, the purpose of giving the folic acid is to

10  normalize the potential deficiency of folate in the patient;

11  and, therefore, what one would want to do, especially since

12  one -- if one is motivated to give a low dose, is to start

13  that dose early enough so that the folate can build up over

14  time.

15  Q.  And what would a person of ordinary skill in the art have

16  known about the schedule for folic acid that would allow the

17  dose to build up over time?

18  A.  Well, a person of ordinary skill in the art would know

19  this had been used previously.

20  Q.  And what would they know about that?  Are you referring to

21  specific literature?

22  A.  Yes.

23  Q.  And what literature are you referring to?

24  A.  It's -- there's a discussion of this in two prior art

25  references, basically describing prior trials by Lilly with

1   the GARFT inhibitor, two different GARFT inhibitors where the

2   folic acid was begun a week before the chemotherapy.

3   Q.  Okay.  Generally speaking, as of June 1999, what was the

4   route of administration generally for folic acid?

5   A.  Folic acid was generally given orally.

6   Q.  And would the route of administration for folic acid have

7   been known to a person of ordinary skill in the art as of June

8   1999?

9   A.  Yes.

10  Q.  So you mentioned that there were two prior art references

11  that talked about a schedule of folic acid pretreatment.

12  Let's look at one of those, at Trial Exhibit 400.

13          And actually, I'm sorry.  Let's start with Trial

14  Exhibit 1036, if we could.

15          This is the Laohavinij article that we talked about

16  earlier?

17  A.  Yes.

18  Q.  And what does this study -- what would this study teach a

19  person of ordinary skill in the art about the schedule of

20  folic acid pretreatment with an antifolate?

21  A.  Well, the investigators in this study utilized folic acid

22  given daily beginning seven days prior to the chemotherapy.

23  The chemotherapy was lometrexol, another Lilly antifolate.

24  Q.  And so what would that teach a person of ordinary skill in

25  the art about an appropriate schedule of folic acid

1   pretreatment?

2   A.  This would -- this study would teach a person of ordinary

3   skill in the art to start the folic acid supplementation a

4   week before the chemotherapy.

5   Q.  And if we could turn to Trial Exhibit 400 now.  This is

6   that book chapter from Mendelsohn we looked at earlier.  What

7   would this teach a person of ordinary skill in the art about

8   the schedule of folic acid pretreatment?

9   A.  This paper -- and I'm trying to find the page -- but it

10  basically noted that the '887 compound was tested in Phase 1

11  studies with folic acid supplementation, using the same

12  schedule as with the lometrexol compound, beginning a week

13  prior to the chemotherapy.

14  Q.  And if you could turn to page 277 of this chapter and the

15  first full paragraph, is that -- is that the part of this

16  paper you're referring to?

17  A.  Yes.  There's a sentence, "The latter schedule is,

18  therefore, identical to that used in the lometrexol study

19  performed by Laohavinij, et al.," and it's referring to a

20  study of folic acid with the '887 compound.

21  Q.  Okay.  So what would a prior -- what would a person of

22  ordinary skill in the art then have understood from this prior

23  art literature and from their general knowledge about an

24  appropriate dose of folic acid or appropriate timing of folic

25  acid administration prior to pemetrexed?

1  A.  A person of ordinary skill in the art would understand

2  that it was reasonable and appropriate to begin folic acid

3  supplementation a week or even more than a week before

4  starting chemotherapy.

5  Q.  Okay.  Let's turn back to Trial Exhibit 1 and look at the

6  last claim of the '209 patent.  The last asserted claim,

7  rather, Claim 21.

8          What additional limitations does Claim 21 add that

9  we haven't already discussed with respect to the other

10 asserted claims?

11 A.  Claim 21 of the '209 patent adds the limitation of

12 repeating the intramuscular injection of the vitamin B12 about

13 every six to about every 12 weeks.

14 Q.  And does that schedule of administration of vitamin B12

15 render Claim 21 non-obvious?

16 A.  No.

17 Q.  Why not?

18 A.  Well, because, one, if one is motivated to give vitamin

19 B12, one would know that one needs to give more than a single

20 injection, and one would want to repeat the vitamin B12 at

21 some periodic intervals.  And the patients are given the

22 chemotherapy every three weeks, so it's perfectly reasonable

23 to repeat the injection every six weeks, every nine weeks or

24 every 12 weeks.  That's just a routine medical practice.

25 Q.  Would the person of ordinary skill in the art have been

1  aware of this routine medical practice as of June 1999?

2  A.  Yes.

3  Q.  Now, you mentioned that you also had an opinion regarding

4  the reasonable expectation of the person of ordinary skill in

5  the art.  What conclusion did you reach regarding what

6  reasonable expectation a person of ordinary skill in the art

7  would have had with respect to pemetrexed with folic acid and

8  vitamin B12 pretreatment at the claimed doses and schedules?

9  A.  The person of ordinary skill in the art would have

10 reasonably expected that folic acid and vitamin B12

11 pretreatment with pemetrexed would provide a therapeutic

12 benefit at the claimed dose and schedule.

13 Q.  And what is that opinion based on?

14 A.  It's based on everything we've discussed.

15 Q.  Can you be a little more specific?

16 A.  Sure.  Well, first of all, there was a reasonable

17 expectation that folic acid pretreatment would reduce toxicity

18 and maintain efficacy.  And we've gone through many prior art

19 references on this topic.  And then there would be a

20 reasonable expectation that an addition of vitamin B12 would

21 not impact efficacy.

22 Q.  And what's the basis for your -- for your opinion that the

23 addition of vitamin B12 would not impact the efficacy of

24 pemetrexed with folic acid pretreatment?

25 A.  Well, oncologists give vitamin B12 to cancer patients all

1  the time.  We are constantly telling patients to keep up their

2  nutrition.  We're constantly providing nutritional

3  supplements, both little cans of nutritional supplements that

4  contain B12, some patients get two tube feedings, some

5  patients get total parental nutrition, which is basically

6  intravenous feeding.  All of these nutritional approaches

7  include vitamin B12, and one would never be concerned about

8  the possibility of the vitamin B12 stimulating the tumor

9  growth.

10 Q.  Aren't there references that suggest that vitamin B12

11 could promote tumor growth?

12 A.  Yes.  I've seen them, but only in the context of this

13 litigation.

14 Q.  And why wouldn't those references undermine the reasonable

15 expectation of success of a person of ordinary skill in the

16 art in adding vitamin B12 when treating a patient with cancer?

17 A.  Well, the -- there's clear evidence that from just

18 clinical experience that adding vitamin -- administering

19 vitamin B12 to patients is not harmful.  There's also no

20 teaching in any medical textbooks or any U.S. labels for

21 vitamin B12 that suggests any contraindication for

22 administration of vitamin B12 in cancer patients.

23 Q.  Have you reviewed any labels for vitamin B12 to see

24 whether there were any such contraindications?

25 A.  Yes, I have.

1   Q.   Could you look at Trial Exhibit 1374 in your binder?

2         Can you explain what this trial exhibit is?

3   A.   This is a portion of the 1999 Edition of the *Physicians'*

4   *Desk Reference*.

5   Q.   And what is the *Physicians' Desk Reference*?

6   A.   The *Physicians' Desk Reference* is a privately published

7   compendia of FDA-approved labels for drugs and anything that

8   FDA regulates, any drug products.

9   Q.   And if you look at page Bates No. 2917, what is this

10  excerpt of the *Physicians' Desk Reference* about?

11  A.   Page 2917 of this exhibit is the package insert for a

12  vitamin B12 supplement called Nascobal.

13  Q.   And have you reviewed the contraindications section of

14  this label?

15  A.   Yes, I have.

16  Q.   Have you reviewed the warning section of this label?

17  A.   Yes, I have.

18  Q.   Have you reviewed the precautions section of this label?

19  A.   Yes, I have.

20  Q.   And do any of those sections contain any warning,

21  precaution, suggestion, contraindication that vitamin B12

22  should not be used in a cancer patient?

23  A.   No.

24  Q.   Have you reviewed the entire -- the entirety of this label

25  for the vitamin B12 supplement?

 1   A.  Yes, I have.

 2   Q.  And is there any suggestion in there that vitamin B12

 3   shouldn't be used in cancer?

 4   A.  No.

 5   Q.  Was there any of the literature that you reviewed with

 6   respect to antifolates that supports your opinion that there

 7   would have been no concern about impacting the efficacy of an

 8   antifolate, much less stimulating tumor growth, when you're

 9   giving antifolate with vitamin B12?

10   A.  Well, we also have the first antifolate administration by

11   Farber in 1948, as well as papers that have cited that, and

12   nobody has ever suggested that Dr. Farber did anything wrong

13   by administering crude liver extract to these children with

14   leukemia.

15   Q.  Is there any other -- have you seen any other -- have you

16   reviewed any other documents that suggest that there was no

17   concern in the literature about vitamin B12 stimulating tumor

18   growth?

19          MR. PERLMAN:  Objection.  If I'm jumping ahead on

20   the slide, it appears the answer is going to be another one of

21   these postdated FDA documents that Lilly submitted, and I

22   object for the same reasons as previously stated.

23          MS. RAPALINO:  I think this is a different issues,

24   Your Honor.  This is a party admission about what -- factually

25   about what was or wasn't available in the literature.

1          MR. PERLMAN:  Your Honor, that admission is in the

2    document.  It's there in evidence, and it can be used for

3    whatever it's used for, but it has no bearing on what the

4    person of ordinary skill would have known or thought in

5    June 1999, and Dr. Ratain is not an expert in opining on what

6    search Lilly did or what the fact they couldn't find something

7    that we all know today exists means to this case.  It's not as

8    if there isn't something.  All this proves is whoever did the

9    search in 2000 didn't find it, which doesn't bear on any issue

10   in this case.

11         MS. RAPALINO:  And I think that's a proper subject

12   for cross-examination or for Lilly's experts to testify about,

13   but to the extent Dr. Ratain is aware of evidence that

14   there -- of what was or wasn't available in the literature,

15   factually speaking, as of 2000 --

16         THE COURT:  2000.

17         MS. RAPALINO:  -- which, again, is just cumulative

18   of what wasn't -- things that were variable as of 2000 -- I'm

19   sorry -- things that weren't available as of 2000 would not

20   have been available as of 1999, as well.

21         MR. PERLMAN:  Your Honor, he can testify as to what

22   the person of ordinary skill would have known or not known,

23   but the fact that a year later Lilly said, "Somebody did a

24   search and we didn't find it," doesn't bear on the question of

25   what the person of ordinary skill would have known.  I'm not

1   saying this argument is an improper argument.  It's an

2   improper line of testimony for this witness.

3            THE COURT:  What is your question for this

4   witness --

5            MS. RAPALINO:  I'm going --

6            THE COURT:  -- with respect to this exhibit?  What

7   will your question be?

8            MS. RAPALINO:  Okay.  I'm going to have to turn to

9   the exhibit just to take a look at it really quickly.

10           MR. WIESEN:  May I approach?

11           THE COURT:  You may consult with your co-counsel.

12           (Off the record.)

13           MS. RAPALINO:  Your Honor, if Mr. Perlman is

14   acknowledging that this document is in evidence, then we don't

15   need Dr. Ratain to sponsor it or to offer it into evidence,

16   but, again, if he's not, then I think we just need this

17   witness to sponsor the exhibit and to offer it into evidence

18   and to explain what it says --

19           MR. PERLMAN:  Your Honor --

20           MS. RAPALINO:  -- and what it is.

21           MR. PERLMAN:  Your Honor, this is a Lilly submission

22   to the FDA.  It is admissible into evidence with the

23   appropriate foundation.  The fact that they showed it to their

24   expert and he put it in his expert report doesn't move it into

25   evidence.  My statement that it is an admissible document, it

1  is an admissible document.  They can admit it.  We're not

2  contesting what the document is.  But what I am saying, is to

3  have their expert get on the stand and basically be a parrot

4  for their closing argument is not an appropriate use of the

5  expert.

6          MS. RAPALINO:  Right.  And I think that part of what

7  I want to do is set a foundation with Dr. Ratain for what this

8  document is.  He has experience dealing with FDA, and he can

9  explain what the document is so that we can offer it into

10 evidence.  And then to the extent that any characterization he

11 makes of the document is inadmissible, that would be -- that's

12 okay.  We're just trying to get this document into evidence.

13         MR. PERLMAN:  Your Honor, he doesn't have any

14 personal knowledge of this document.  But if the issue is, can

15 they get this document admitted into evidence, that's not

16 going to be an issue at this trial.

17         MS. RAPALINO:  He's not here as a fact witness; he's

18 an expert witness.  So the fact that he doesn't have personal

19 knowledge isn't really relevant to his ability to testify

20 about it and get it into evidence.

21         MR. PERLMAN:  Of course, it is, Your Honor, because

22 the last argument was, he can lay the foundation for what the

23 document is.  And so now we hear he's not a fact witness and

24 so it doesn't matter if he doesn't know what the document is.

25         MS. RAPALINO:  Right.  No --

1          MR. PERLMAN:  Pardon.  Pardon me.

2          Your Honor, this issue is not about the document.

3   This issue is about what is the appropriate use of a medical

4   expert's testimony to make argument based on a document that

5   is not part of the relevant prior art?  That's the basis of my

6   objection.  This document is separately admissible through

7   other witnesses, Lilly employees who were deposed in this

8   case; they were deposed on this document.  They have the

9   deposition transcripts to authenticate and lay the foundation

10  for this document.  Dr. Ratain knows no more about this

11  document than you and I do in terms of laying a foundation for

12  its admissibility.

13         MS. RAPALINO:  Okay.  I'm just going to disagree.

14  Dr. Ratain does have the expertise to look at this document

15  and determine what it is and lay the foundation for it.  And,

16  you know, I feel like there are potentially many ways to get

17  this document into evidence, but I feel like it's -- you know,

18  part of presenting our case is our determining how we want to

19  get the document into evidence.

20         THE COURT:  And you're not going to ask him

21  questions about the document?

22         MS. RAPALINO:  To the extent that the Court finds

23  those questions objectionable, I won't ask those questions

24  about the document.

25         THE COURT:  You just want to get it in now?

1          MS. RAPALINO:  Yes.

2          MR. PERLMAN:  Get it in.  If they're not going to

3   ask any questions about it, get it in.

4          THE COURT:  All right.  Go ahead and offer it.  He

5   probably won't object to you offering it.

6          MS. RAPALINO:  Okay.

7          MR. PERLMAN:  Okay.  As long as we're not going to

8   have testimony that I don't think is proper.

9   BY MS. RAPALINO:

10  Q.  Dr. Ratain, could you take a look at Trial Exhibit 339 in

11  your binder, please?

12         MR. PERLMAN:  Your Honor, I will stipulate to the

13  admissibility of 337 if it will save having to go through --

14         THE COURT:  Okay.

15         MR. PERLMAN:  -- this exercise, and so we can just

16  move on.

17         THE COURT:  Why don't we do that, and then we can

18  move on.  The parties stipulate to the admissibility of 337.

19                    *(Plaintiff's Exhibit 337 was*

20                    *received in evidence.)*

21         MS. RAPALINO:  Thank you, Your Honor.

22         THE COURT:  Next question.

23  BY MS. RAPALINO:

24  Q.  So, Dr. Ratain, just to sort of reorient us to where we

25  were, can you just summarize the basis for your opinion that a

1  person of ordinary skill in the art would have a reasonable

2  expectation that the addition of vitamin B12 would not impact

3  the efficacy of pemetrexed?

4  A.  Well, as I just discussed, there's abundant use of vitamin

5  B12 by oncologists in patients with cancer and poor nutrition.

6  Prior to this case, I have never, ever heard of a physician

7  being concerned about the risk of giving vitamin B12 to a

8  cancer patient.  And so it just -- it's not a credible

9  concern, in my mind, given my personal experience taking care

10 of cancer patients, my review of the entirety of the prior

11 art, and my review of FDA labels.

12 Q.  Have you ever advised a patient with cancer not to take

13 vitamin B12?

14 A.  Absolutely not.

15 Q.  Okay.  And so now, just to summarize your opinions with

16 respect to obviousness, can you please tell the Court your

17 opinion regarding whether asserted Claims 9, 10, 12, 14, 15,

18 18, 19, and 21 of the '209 patent are obvious?

19 A.  It's my opinion that all the asserted claims of the '209

20 patent are obvious.

21        MS. RAPALINO:  Okay.  I would like to switch topics

22 now and start talking about our double patenting defense and

23 elicit testimony from Dr. Ratain on that.  Is this a -- should

24 I proceed?

25        THE COURT:  Sure.  Go ahead.

1          MS. RAPALINO:  Okay.

2    BY MS. RAPALINO:

3    Q.  Okay.  Let's talk about your opinions on double patenting

4    now.  You previously testified that you rendered opinions in

5    this matter regarding whether the claims of the '209 patent

6    are obvious variance of the '974 patent.  Can you just

7    reiterate your opinion on double patenting?

8    A.  My opinion is that the asserted claims of the '209

9    patent are obvious variance of Claim 20 of the '974 patent.

10   Q.  Okay.  I want to again focus on the asserted claims, and

11   I'm going to ask you whether you had a particular framework

12   for your obviousness-type double patenting opinion?

13   A.  Well, yes.  The approach I used was to first consider the

14   differences between the asserted claims and Claim 20 of the

15   '974 patent and then to analyze whether those differences

16   render the asserted claims obvious variance of Claim 20 of

17   the '974 patent.

18   Q.  Okay.  Let's turn to the '974 patent, which is

19   Exhibit 916 in your exhibit binder.  And can you just remind

20   the Court who owns this nine -- to whom is the '974 patent

21   assigned?

22   A.  Eli Lilly and Company.

23   Q.  And to whom is the '209 patent that's at issue in this

24   case assigned?

25   A.  The same.

1  Q.  Okay.  Let's take a look at Claim 20 of the '209 patent.

2  I'm sorry.  Claim 20 of the '974 patent.

3          Does Claim 20 depend on any other claims?

4  A.  Yes.

5  Q.  From which claims does it depend?

6  A.  Well, Claim 20 depends on -- depends from Claim 19, which

7  depends from Claim 18, which depends from Claim 16.

8  Q.  Okay.  So, taking all the limitations of Claim 20 along

9  with the claim limitations of the claims from which it

10 depends, if you were to rewrite Claim 20 in independent form,

11 what does Claim 20 cover?

12 A.  Well, I've rewritten it in independent form as shown on

13 this slide, and --

14 Q.  By "this slide," you're referring to Slide -- let me see

15 the number here.  Is it 144?

16         THE COURT:  Yes.  144.

17         MS. RAPALINO:  Okay.

18 BY MS. RAPALINO:

19 Q.  Go ahead, Dr. Ratain.

20 A.  And when you do -- when you go through that exercise, you

21 get the following:  A method for reducing the toxicity of a

22 GARFT inhibitor or other antifolate which binds to an FDP in a

23 mammal which comprises pretreating the mammal with about 0.5

24 milligrams to about 30 milligrams of folic acid about one to

25 24 hours before administration of the antifolate.

1  Q.  Now, does Claim 20 of the '974 patent that you just read

2  and as rewritten in independent form, would that cover the

3  approved use of pemetrexed with folic acid and vitamin B12?

4  A.  Yes.

5  Q.  And how do you know that?

6  A.  Well, pemetrexed is -- inhibits GARFT.  It also binds to

7  FBP.  Folic acid is administered earlier, and in addition,

8  I've reviewed documents from the Eli Lilly to the FDA that

9  basically has requested that FDA list the '974 patent in

10 conjunction with the marketing approval of Alimta.

11 Q.  Okay.  Let's turn to Trial Exhibit 1386.

12          And is this that correspondence that you were just

13 referring to?

14 A.  Yes.

15 Q.  Can you explain what this document is?

16 A.  Yes.  This document is a letter from Eli Lilly, John

17 Worzalla, to the FDA Office of Generic Drugs, with a completed

18 FDA Form 3542, which includes the information regarding the

19 '974 patent.

20 Q.  Okay.  And can you turn in this exhibit to a page ending

21 in Bates No. 44004?  What patent is referenced in this form

22 that Lilly submitted to the FDA?

23 A.  Well, in this document, which I should add, this is a form

24 entitled "Patent information submitted upon and after approval

25 of an NDA or supplement."  The specific patent that's listed

1  on this form is the same as the '974 patent.

2  Q.  And if you turn to page 44007 -- sorry -- it's Bates No.

3  44007, and at the top of the page do you see that there's a

4  box that says "patent claim number," and there's a "20"?  What

5  does Lilly say in the next box with respect to Claim 20 of the

6  '974 patent?

7  A.  Lilly stated that the Claim 20 of the '974 patent claims

8  an improved method of use of Alimta.

9  Q.  And if you look at the "use" box just under that on the

10  same page, 44007, what use is indicated as being covered by

11  Claim 20 of the '974 patent?

12  A.  The form indicates that the use that's being covered is

13  the premedication regimen, specifically the vitamin

14  supplementation.  "To reduce toxicity, patients treated with

15  Alimta must be instructed to take a low dose oral folic acid

16  preparation or multivitamin with folic acid on a daily basis."

17  Q.  Okay.  So what is Lilly telling the FDA here about the

18  '974 patent and in particular Claim 20?

19  A.  Lilly is telling the FDA that the '974 patent covers --

20  their use of Alimta covers the vitamin regimen incorporated

21  into the label.

22  Q.  Okay.  I'd like you now to go to Trial Exhibit 916, which

23  again is the '974 patent, and also, if you can, keep a

24  finger in Trial Exhibit 1, which is the '209 patent-in-suit

25  here.  And focusing on the first two of the asserted claims of

1  the '209 patent, Claims 9 and 10, did you do a comparison of

2  these claims to Claim 20 of the '974 patent?

3  A.  Yes, I did.

4  Q.  And have you prepared a chart to walk through that

5  comparison?

6  A.  Yes, I have.

7  Q.  Okay.  And if we look at Slide 147, is this the chart you

8  prepared?

9  A.  Yes.

10  Q.  Okay.  Can you explain with reference to this chart how

11  Claims 9 and 10 of the '209 patent compare to Claim 20 of

12  the '974 patent?

13  A.  Well, there are a number of differences between Claims

14  9 and 10 of the '209 patent when rewritten in this

15  independent form as compared to Claim 20 of the '974 patent.

16  So, the first limitation is that the '209 patent limits the

17  drug to pemetrexed; whereas, the '974 patent limits the drug

18  to a GARFT inhibitor or other antifolate.  And the '209

19  patent limits the administration to a patient in need thereof,

20  and the '974 patent limits the administration to a mammal.

21  Q.  Now, would a person of ordinary -- so is pemetrexed

22  disodium a GARFT inhibitor?

23  A.  Yes, it is.

24  Q.  And is pemetrexed disodium an antifolate which binds to a

25  folate binding protein?

1   A.  Yes.

2   Q.  Would a person of ordinary skill in the art as of

3   June 1999 have had a reason to select pemetrexed or pemetrexed

4   disodium as the drug of choice from amongst the GARFT

5   inhibitors or other antifolates which bind to a folate binding

6   protein?

7   A.  Yes.  It was certainly the most exciting GARFT inhibitor

8   still in development at that time and clearly was probably the

9   most exciting antifolate, period, in development at the time,

10  as demonstrated by some of Dr. Calvert's comments about the

11  remarkable and exceptional clinical activity observed.

12  Q.  And you said that Claims 9 and 10 refer to a patient in

13  need thereof, whereas Claim 20 of the '974 patent talks

14  about a mammal.  Would a person of ordinary skill in the art

15  in June 1999 have had a reason to treat a patient from amongst

16  the many possible mammals?

17  A.  Yes, because a POSA, as defined in this case, is a

18  physician who treats humans.

19  Q.  Okay.  Can we move on to the next limitation in your

20  chart?  And can you explain how those limitations in Claims

21  9 and 10 of the '209 patent compare to the limitation in

22  Claim 20 of the '974 patent?

23  A.  Well, the second limitation of the '209 patent relates

24  to the dose of the folic acid, and it's in the range of 350 to

25  1,000 or 350 to 650 micrograms; whereas, the '974 patent has

1    different units, milligrams, but if we translate these units

2    of milligrams into micrograms, it would be 500 micrograms to

3    about 30,000 micrograms.  So there's an overlap in the folic

4    acid dose range between the Claims 9 and 10 of the '209

5    patent and Claim 20 of the '974 patent.

6    Q.  And would a person of ordinary skill in the art have had a

7    reason to select a dose range falling within the claims of

8    the -- falling within the range of 350 to 1,000 micrograms or

9    350 to 650 micrograms of folic acid?

10   A.  Yes.  These are just obvious variance of the dose

11   limitation in the '974 patent Claim 20.

12   Q.  And I think there might be a typo on the slide, so I just

13   want to point it out to you and ask whether that's the case.

14   If you look at Claim 10 of the '209 patent, what range of

15   folic acid is covered by Claim 10 of the '209 patent?

16   A.  You are correct; it's my mistake.  It's -- Claim 10 of

17   the '209 patent is a range of 350 micrograms to

18   600 micrograms.

19   Q.  And does that change your opinion regarding whether a

20   person of ordinary skill in the art would have selected this

21   dose?

22   A.  No, it does not.

23   Q.  Okay.  And then can we move on to the next limitation in

24   your chart comparing Claims 9 and 10 of the '209 patent to

25   Claim 20 of the '974 patent?

1  A.  Well, the next limitation of Claims 9 and 10 of the '209

2  patent is to add B12 to the regimen, and we've been talking

3  about this earlier today.

4  Q.  And would the addition of vitamin B12 -- well, could you

5  tell us specifically what the limitations are in Claims 9 and

6  10 of the '209 patent with respect to vitamin B12?

7  A.  Well, there's quite a range of options of the B12 dose in

8  Claims 9 and 10.  It can be as trivial as an effective amount

9  of vitamin B12 or it can be a specific dosage of vitamin B12

10  administered intramuscularly, either 500 to 1,500 micrograms

11  or about 1,000 micrograms.

12  Q.  And would the addition of any of those dosages or routes

13  of administration of vitamin B12 have been obvious to a person

14  of ordinary skill in the art as of June 1999?

15  A.  Yes.

16  Q.  And what's the basis for that opinion?

17  A.  For all the reasons we discussed earlier about the

18  obviousness of adding vitamin B12 to the prior art.

19  Q.  Okay.  And can we look at the last limitation on your

20  chart and your comparison between Claims 9 and 10 of the

21  '209 patent and Claim 20 of the '974 patent?

22  A.  Yes.  The last limitation basically is the same.  It's

23  different words.  One has A followed by B, and the other one

24  has A before B.

25  Q.  Okay.  Did you also prepare a chart comparing Claims 12,

1  14, 15, and 18 of the '209 patent to Claim 20 of the '974

2  patent?

3  A.  Yes.

4  Q.  Okay.  And with reference to your chart, can you explain

5  again; can you walk through the first limitation and explain

6  the comparison between Claims 12, 14, 15, and 18 of the '209

7  patent with Claim 20 of the '974 patent?

8  A.  Well, the first and last limitation are exactly the same

9  as what we previously discussed.  The second limitation,

10 again, it has the -- my error on the folic acid dose range.

11 It's 350 to a thousand or 350 to 600 prior to the

12 first administration versus the same dose range for the folic

13 acid.  And the -- and then there's the vitamin B12

14 limitations, which are now slightly different than in the

15 previous claims and which -- and there's no vitamin B12 in

16 Claim 20 of the '974 patent.

17 Q.  And would any of those differences that you've

18 identified -- I'm sorry.  Are those differences that you've

19 identified, would those differences have been obvious to a

20 person of ordinary skill in the art as of June 1999?

21 A.  Yes.

22 Q.  And what's the basis for the obviousness?

23 A.  The same as we've been discussing, the whole reason to add

24 B12 to the prior art, the same reason these are obvious

25 variance of Claim 20 of the '974 patent.

1  Q.  Okay.  Let's move on to talk about Claim 21 of the '209

2  patent.  And have you prepared a chart that shows a comparison

3  between Claim 21 of the '209 patent and Claim 20 of the

4  '974 patent?

5  A.  Yes.

6  Q.  And can you explain with reference to this chart the

7  comparison between Claim 21 of the '209 patent and Claim 20

8  of the '974 patent?

9  A.  Well, the issues are exactly the same as for the previous

10  claims.  Again there's the error on this slide.  The dose

11  range of the folic acid in the '209 patent is 350 to 1,000

12  or 350 to 600.  And the B12 here, it's the same B12 regimen

13  we've been talking about but with the additional limitation of

14  repeating the dose every six -- about every six to about every

15  12 weeks.  Again, this is an obvious variant of Claim 20 of

16  the '974 patent.

17  Q.  And why is the additional limitation of wherein B12 is

18  administered about every six to about every 12 weeks until

19  pemetrexed treatment is discontinued, why is that an obvious

20  variant?

21  A.  And, again, it's for the same reasons I discussed

22  previously.  This would be routine medical practice.

23  Q.  Okay.  And now if we can move on to Claim 19 of the '209

24  patent.  And have you prepared a comparison, a slide showing a

25  comparison of Claim 19 of the '209 patent to Claim 20 of the

1   '974 patent?

2   A.  Yes, I have.

3   Q.  And can you explain the comparison that you've depicted on

4   Slide 150 that compares those two claims?

5   A.  Well, we've previously discussed the first, third, and

6   fourth limitations in the context of the other claims.  The

7   difference on the second limitation is that Claim 19 of the

8   '209 patent states to give the folic acid one to three weeks

9   prior to the first administration of pemetrexed, and I also

10  want to identify the error on the slide, on the dose range of

11  the folic acid.  It's 350 to 1,000 or 350 to 600.

12  Q.  Okay.  And would the schedule of administration of folic

13  acid of one to three weeks prior to the first administration

14  of pemetrexed have been an obvious variant of Claim 20 of the

15  '974 patent?

16  A.  Yes, it would.

17  Q.  And why is that?

18  A.  Again, this is routine medical practice.  It accomplishes

19  the goal of beginning to support and replete the -- with

20  physiological doses of folic acid, one to three weeks prior to

21  the chemotherapy to allow the folate stores to be repleted.

22  Q.  Now, doesn't Claim 20 of the '974 patent specifically

23  identify a different schedule of administration of folic acid

24  of about one to 24 hours prior to administration of the

25  antifolate?

*RATAIN - DIRECT/RAPALINO*                    Vol. 1-240

1  A.   It does say that in the claim, yes.

2  Q.   Is there anything in the specification of the '974 patent

3  about the schedule for administration of folic acid?

4  A.   Yes, there is.

5          MR. PERLMAN:  Objection.

6          THE COURT:  What's your objection, Counsel?

7          MR. PERLMAN:  The objection, Your Honor, is that for

8  double patenting, if that is going to be the defense, it is

9  based on the claims of the prior patent only, not the

10 specification of the prior patent.  If this relevant to the

11 obviousness defense, then the patent as a whole is treated as

12 any other reference in the prior art.  But if this testimony

13 is directed to double patenting, then it is based on the

14 comparison of the claims of the earlier patent to the claims

15 of the later patent.

16          MS. RAPALINO:  And I respectfully disagree about the

17 state of the law.  Double patenting is a comparison of the

18 claims of one patent to the claims of the other, but it's in

19 view of the prior art.  And in this unusual circumstance where

20 the '974 patent is itself prior art to the '209 patent,

21 having been published far more than a year prior to the filing

22 of the application for the '209 patent, the entirety of the

23 patent is available as prior art for what it would have taught

24 to a person of ordinary skill in the art.

25          THE COURT:  Well, I'll overrule and let her present

1  her evidence, and if you have some law that says I should

2  disregard it, then we'll look at that later.

3              MR. PERLMAN:  I'll do it in our later briefing.

4  It's not worth a big thing right now, Your Honor.

5              THE COURT:  All right.  You may continue.

6              MS. RAPALINO:  Thank you.

7  BY MS. RAPALINO:

8  Q.  So if you turn in the specification of the '974 patent to

9  Column 6, what does the '974 patent say about the schedule

10 of administration of folic acid?

11 A.  Well, Column 6 of the '974 patent basically makes it

12 clear that the schedule of the folic acid is not critical.  It

13 states, "Although one single dose of the FBP binding agent,

14 preferably an oral administration of folic acid, should be

15 sufficient to load the folate binding protein, multiple dosing

16 of the FBP binding agent can be employed for periods up to

17 weeks before treatment with the active agent, to ensure that

18 the folate binding protein is sufficiently bound in order to

19 maximize the benefit derived from such pretreatment."

20 Q.  And so what is the '974 patent specification teaching with

21 respect to what would be an appropriate schedule of

22 administration for folic acid prior to administration of

23 pemetrexed?

24 A.  The '974 patent teaches that you could give a single

25 dose shortly before the chemotherapy and also says that you

1  could divide this dose over a period of weeks and start, just

2  simply start with a low dose weeks earlier.

3  Q.  Okay.  And is there anything in the claims, even if we are

4  limited to the claims, is there anything in the claims of the

5  '974 patent that would include a schedule of administration

6  of folic acid for weeks prior to administration of the

7  antifolate or pemetrexed?

8  A.  Well, yes.  Because Claim 18 does not have a limitation

9  regarding the exact interval between starting the folic acid

10  and starting the antifol.

11  Q.  And when you say antifol, is that a shorthand for

12  antifolate?

13  A.  Yes.

14  Q.  Do you have an opinion as to whether a person of ordinary

15  skill in the art would have had a reasonable expectation of

16  success in practicing Claims 9, 10, 12, 14, 15, 18, 19, and 21

17  of the '209 patent in view of the '974 patent?

18  A.  Yes.

19  Q.  And what is that opinion?

20  A.  It's my opinion that a person of ordinary skill in the art

21  would have had a reasonable expectation of success of

22  practicing the -- these claims.

23  Q.  And when you say a reasonable expectation of success, what

24  do you mean by that?

25  A.  What I mean is that a person of ordinary skill in the art

1   would have expected to be able to achieve a therapeutic

2   benefit with the combination of folic acid pretreatment, B12

3   pretreatment, followed by pemetrexed.

4   Q.  Okay.  So Dr. Ratain, I just want to summarize and make

5   sure that your testimony is clear.  In light of everything and

6   all the prior art you've looked at, what did you conclude

7   about the asserted claims of the '209 patent with respect to

8   obviousness?

9   A.  My opinion is that all of the asserted claims are obvious.

10  Q.  And what's the basis for your opinion that all of the

11  asserted claims are obvious?

12  A.  My opinion is that the prior art taught a person of

13  ordinary skill in the art how to modify the prior art to

14  practice the asserted claims.

15  Q.  And would the person of ordinary skill in the art have had

16  a reasonable expectation of success that if they had added

17  vitamin B12 at the claimed doses and schedules to a regimen of

18  vitamin -- I'm sorry, of folic acid pretreatment with

19  pemetrexed, would they have had a reasonable expectation of

20  success?

21  A.  Yes.

22  Q.  And what is your opinion with respect to the asserted

23  claims and obviousness-type double patenting over Claim 20 of

24  the '974 patent?

25  A.  My opinion is that all of the asserted claims of the

1   '209 patent are obvious variance of Claim 20 of the '974

2   patent.

3   Q.  And again, what is the basis for your opinion that they

4   are obvious variance of Claim 20 of the '974 patent?

5   A.  When one rewrites these claims, it's very clear that

6   there's only modest differences, and these modest differences

7   are obvious variance, and the only significant difference is

8   adding the B12.  And a person of ordinary skill in the art

9   would be motivated to add B12 for the same reasons as in my

10  obviousness analysis.

11          MS. RAPALINO:  Thank you, Dr. Ratain.  I'm ready to

12  pass the witness, although it looks like it might be the end

13  of the day.

14          THE COURT:  I think it's the end of the day.  Do you

15  want to start in the morning?  We have to leave at

16  5:00 because they're going to do some work in the back of the

17  courtroom at 5:00.

18          MR. PERLMAN:  Your Honor, I think the parties have

19  an issue they want to discuss with the Court anyway, so if

20  your preference is that I not do 20 minutes, I'll just start

21  fresh in the morning.

22          THE COURT:  That will be fine.

23          MR. PERLMAN:  That's fine with me.

24          THE COURT:  We'll hopefully move a little faster

25  tomorrow.  Look at him.  She got eight hours.  You want eight

Vol. 1-245

1  hours?

2        MR. PERLMAN:  I don't want eight hours, but I do

3  have a 151-page PowerPoint direct.

4        THE COURT:  Hers was 151 also.

5        MR. PERLMAN:  Hers was 151, so I do have more than a

6  ten-minute cross is all I'm trying to express.

7        THE COURT:  All right.  Okay.  All right.  So

8  witness, you may be excused for the evening, and we'll have

9  you back at 9:00 a.m.

10        MR. WIESEN:  Your Honor, as Mr. Perlman suggested,

11  we have one dispute concerning a deposition designation that

12  recently occurred.  We've met and conferred about it.  It's

13  not pressing in that it needs to be decided today, but it is

14  something that, given the possibility that Eli Lilly may want

15  to play some of the designations, we thought we would flag the

16  issue for you and see how you wanted to address it if that's

17  okay.

18        THE COURT:  Fine.

19        MR. WIESEN:  My colleague, Mr. Cottler, will address

20  it for us.  I believe Mr. Genderson will address the issue for

21  Eli Lilly.

22        THE COURT:  Very good.  This is Michael Cottler?

23        MR. COTTLER:  Yes, Your Honor.  And just one

24  housekeeping thing.  I believe Ms. Rapalino needs to move

25  Dr. Ratain's exhibits into evidence before I proceed if that's

 1   okay.

 2          THE COURT:  Come on up.  Come on up.

 3          MS. RAPALINO:  Okay.  Defendants offer the following

 4   trial exhibits into evidence:  Trial Exhibit 1, Trial

 5   Exhibit 1507, 1508, 1151, 907, 401, 1087, 1443, 1036, 400,

 6   916, 1087, 918, 384, 911.  911 as Mr. Perlman mentioned is two

 7   exhibits, the Hammond I abstract as well as the Niyikiza I

 8   abstract.  Trial Exhibit 912, 910, 401, 502, 1443, which I

 9   think I mentioned before.  1336, 1204, 2059, 1374, and 1386.

10   And to the extent that Mr. Perlman was willing to stipulate to

11   the admission of Trial Exhibit 337, I was -- I would also

12   propose that the parties stipulate to the admission of Trial

13   Exhibit 76 and 330.

14          THE COURT:  Come on up, Mr. Perlman.  What is your

15   response?  First, do you have any objection to the

16   first series?

17          MR. PERLMAN:  If I was keeping up, I think that's

18   right, Your Honor.  I would like to reserve the right to check

19   it overnight and if there's a problem, bring it up in the

20   morning.  That was pretty fast.  I guess I do have an

21   objection to admitting exhibits through a witness that the

22   witness didn't talk about and were never put to him.  I don't

23   know off the top of my head what those exhibits are that

24   they're asking me to stipulate to.

25          If there are more Eli Lilly-authored documents

1  submitted to the FDA, I can, I am happy to take a look when I

2  get back to the office what they are, and if they stand in the

3  same footing, I'll do the same stipulation.  But I don't have

4  perfect recall of the number of every exhibit in this case.

5          THE COURT:  Is that fair, Ms. Rapalino?

6          MS. RAPALINO:  That is fair, and I'll represent that

7  those are.  The reason I proposed that was because they are,

8  like the trial exhibits, which we already, which we already

9  have a stipulation.  They are Lilly-authored documents to the

10  FDA.

11          THE COURT:  Okay.  And he will look at those

12  overnight?

13          MR. PERLMAN:  Can I get just the numbers again?

14          MS. RAPALINO:  Seventy-six, 330.

15          MR. PERLMAN:  Seventy-six and 330?  Okay.

16          THE COURT:  337 is the exhibit that's already been

17  stipulated, correct?

18          MS. RAPALINO:  Correct.

19          THE COURT:  Okay.

20          MS. RAPALINO:  And I'm sorry, I may have -- never

21  mind.  We've got them all.

22          THE COURT:  Okay.

23          MS. RAPALINO:  Thank you.

24          THE COURT:  Okay.  Thank you.

25          MR. COTTLER:  Good afternoon, Your Honor.

Vol. 1-248

1          THE COURT:  All right, Mr. Cottler, I'm ready for
2    you.
3          MR. COTTLER:  Thank you, Your Honor.  This is
4    somewhat of an unusual scenario where we have a discovery
5    dispute long after the close of fact discovery, in fact, on
6    the first day of trial.  And we are seeking Your Honor's
7    guidance as to how to proceed with this issue.
8          As you may be aware, the parties had the pleasure of
9    traveling to London to take the deposition of Dr. Hilary
10   Calvert.  Prior to that deposition, you may be aware there was
11   a proceeding that took place in London.  Lilly had opposed the
12   Hague request, both in the U.S. and then following the letter
13   of request, they opposed the English order issuing the
14   deposition.
15         The deposition was granted over Lilly's objections
16   at the end of July, and, in fact, I believe it was the day
17   before the pretrial conference.  Pursuant to Lilly's
18   insistence, defendants had to disclose, give notice of
19   documents that they intended to use with Dr. Calvert prior to
20   the deposition.  Also, Lilly had insisted that the deposition
21   took place, the topics should be narrowed.  The English court
22   did narrow the topics as Lilly insisted.
23         Prior to the deposition, defendants complied with
24   the order that the defendants gave Dr. Calvert notice of
25   documents they intended to use at his deposition.  There were

1    a couple of exceptions.  Those were documents that Dr. Calvert

2    produced the day before the deposition, so obviously those

3    couldn't have been given notice of four days before the

4    deposition.

5              During the deposition, it became evident that

6    Dr. Calvert had prepared for his deposition with counsel for

7    Lilly the day before deposition, and during that preparation,

8    they discussed the topics that would come up at the

9    deposition, and they also looked at documents, some of which

10   hadn't been disclosed to defendants prior to the deposition.

11   And then, at the actual deposition, the counsel for defendants

12   questioned Dr. Calvert for approximately two and a half hours.

13   After that, counsel for Lilly questioned Calvert for about the

14   same amount of time, and here's where the issue comes up.

15             We believe that during counsel for Lilly's

16   questioning, examination of Dr. Calvert, there were a number

17   of questions that came up that sought testimony that was

18   outside the scope of the topics that had been narrowed by the

19   English court.  In fact, a number of those -- a number of the

20   questions fell within the category of topics that was actually

21   once in the letter of request but was subsequently removed.

22             Additionally, there were a number of questions about

23   documents that were introduced at the deposition but hadn't

24   been disclosed to defendants prior to the deposition, so there

25   was no notice of those documents.  There were a number of -- I

1   guess there were a handful of prior references that were shown

2   to Dr. Calvert at the deposition, and there was no prior

3   notice of those documents.  So, Your Honor, we're seeking to

4   preclude Lilly -- let me back up a second.

5           The parties have exchanged designations of

6   Dr. Calvert's deposition pursuant to an agreement.  The

7   parties have also exchanged objections and counter

8   designations.  We know now that Lilly plans to play some of

9   Dr. Calvert's testimony on Friday, if they have time.  And so,

10  we are seeking to preclude Lilly from relying upon any of the

11  testimony that falls within the scope of -- I'm sorry -- that

12  falls within the scope of topics that was excluded from the

13  letter of request in addition to any testimony that was based

14  on exhibits that wasn't disclosed to defendants prior to the

15  deposition.

16          This doesn't need to be resolved right here, right

17  now.  We're here seeking your guidance as to how to proceed.

18  We are prepared to file a brief tonight if Your Honor would

19  like to have this resolved prior to the time that Lilly seeks

20  to play Dr. Calvert's testimony.

21          THE COURT:  Okay.

22          MR. GENDERSON:  Your Honor, may I be heard briefly?

23          THE COURT:  You may.

24          MR. GENDERSON:  Your Honor, Mr. Cottler and I were

25  the lucky ones who --

Vol. 1-251

1          THE COURT:  You're Grossman, correct?

2          MR. GENDERSON:  Genderson -- I'm sorry, Bruce

3   Genderson.

4          THE COURT:  Genderson, okay.  Get my seating chart,

5   okay.

6          MR. GENDERSON:  And I think this could be resolved

7   right now.  I don't see this as a complex issue.  The UK court

8   issued an order that did not require us to do anything.  They

9   effectively adjudicated both of the issues that are being

10  raised here because there was an examiner that the court

11  appointed to be at the deposition.  They raised these issues,

12  they were sustained on some questions and overruled on others.

13  But this is a UK issue that was ruled on by the UK court.

14          The order that Mr. Cottler referred to, Your Honor,

15  was an order that required that the defendants give the

16  witness, not us, but the witness notice.  Because under UK

17  procedure, the witness is entitled to know ahead of time the

18  documents that are being asked.

19          That order didn't require them to give notice to us,

20  and it didn't say anything about us.  We, Mr. -- Dr. Calvert

21  agreed to meet with us for a few hours before the

22  deposition -- the day before the deposition.  I showed him --

23  I actually brought three boxes of documents that I had no

24  idea.  This was all done at the last minute while we were

25  preparing for trial.  I showed him some documents.  The one --

1   some of them he had no recollection of, I didn't use those;

2   others he did and said he was familiar with them.  Those are

3   the only ones I asked.  I gave him -- I don't think I had any

4   obligation to under the order, but I gave him notice.

5        Mr. Cottler made the same objection.  The examiner

6   who was appointed by the Court there overruled it and said

7   they could proceed.  He asked Mr. Calvert if he was familiar

8   with the documents, he said "yes."  He then said you could

9   take up any other issue with the U.S. court as to that.

10        And then, as to whether something was in the scope

11   of the order itself in terms of the questions, Mr. Cottler

12   objected to a number of those questions.  The examiner

13   sustained at least one, I think more of those objections, and

14   I -- and then I was precluded from asking.

15        On many others I explained why it was relevant.  The

16   examiner ruled.  This is a UK issue to protect the witness.

17   It has nothing to do with whether these documents are

18   admissible or relevant here; and indeed, Your Honor, we have a

19   stipulation between the parties that was entered into when we

20   were discussing this whole issue that said no later than two

21   days after Dr. Calvert's deposition, any party must give

22   notice if they intend to use portions of the deposition for

23   any purpose relevant to the case.  It was clear that if the

24   testimony was relevant, it was admissible.  This testimony is

25   relevant.  You heard Mr. --

1           THE COURT:  Did you give notice?

2           MR. GENDERSON:  Yes, we did, Your Honor.  We did do

3   that right after the deposition.  Mr. Perlman explained why

4   this dep -- this is admissible.  This is a witness who was an

5   expert, who was listening to the same information that we

6   heard about today, and the evidence will show he and other

7   experts on this advisory panel kept saying "this is too

8   dangerous.  Don't do it."

9           The reason they want to preclude this evidence is

10  not because we tricked them or we used evidence.  I've never

11  had a deposition where I had to give notice to the other side,

12  and the order didn't require that, only to the witness.  They

13  don't like this evidence because it's very probative of the

14  case, and I think the Court should hear it.

15          The Court could make judgments about how relevant it

16  is, whether Dr. Calvert was properly appraised of the

17  evidence.  Dr. Calvert was -- I did not ask him about a single

18  document that he wasn't familiar with, Your Honor.

19          THE COURT:  Okay.  Thank you.

20          MR. COTTLER:  May I respond?

21          THE COURT:  You may.

22          MR. COTTLER:  Unfortunately, Your Honor, the events

23  that relate to this Hague proceeding were over the course of

24  several months, and I think it would be best, Your Honor, if

25  these issues were addressed in a brief to set forth the whole

1  event, the whole line of events that led to where we are

2  today.  But just to respond to some of Mr. Genderson's points,

3  this is about fundamental fairness.

4          We had -- defendants had asked for a Hague request

5  seeking certain testimony from Dr. Calvert.  Lilly then went

6  ahead and opposed it and sought restriction on the topics the

7  defendants had asked for.  That -- the Hague proceeding

8  wasn't -- it was very time-consuming and burdensome on

9  defendants, and for Lilly to be able to ask questions now that

10  are outside the scope of the narrow topics is just unfair to

11  defendants.  And we submit that fundamental fairness would

12  dictate that Lilly should be precluded from relying upon any

13  testimony that was elicited from outside the scope of the

14  deposition topics.

15          The idea to provide disclosure of documents to

16  Dr. Calvert prior to his deposition, in fact, came from Lilly.

17  In the English Hague proceedings, they have these arguments

18  called "skeleton arguments," and this would be something that

19  Your Honor would see in a brief that we would submit, but

20  essentially, a skeleton argument is a brief that's submitted

21  to an English court prior to a hearing.

22          And the skeleton argument, Lilly had told the court

23  that in the event that the deposition is granted, Calvert

24  should be given advanced notice of any documents.  Lilly

25  didn't specify defendants must give notice, they just said

1  Dr. Calvert must be given notice, and what was agreed upon was
2  that Calvert would be given notice of documents four days
3  before the deposition.  It doesn't sound like Dr. Calvert was
4  given notice of any documents from Lilly four days before the
5  deposition; if any, it was a day before the deposition.
6          But regardless, back to fundamental fairness, just
7  because only defendants were required to give notice to
8  Dr. Calvert doesn't mean that Lilly shouldn't have given
9  notice to defendants of the documents, so the defendants would
10 be prepared to take Dr. Calvert's deposition and be prepared
11 to respond to any testimony that Lilly would elicit from
12 Dr. Calvert.
13         And one more point, Your Honor.  Mr. Genderson had
14 mentioned a stipulation that the parties had entered into, and
15 that stipulation dictated that parties could use any relevant
16 testimony.  That stipulation was entered into, brought before
17 we knew that the topics would be narrowed by the English
18 court.  So, I mean, to the -- the defendants couldn't have
19 anticipated the way in which Dr. Calvert's topics would have
20 been narrowed at the time they entered the stipulation.
21         So to say that the stipulation granted Lilly the
22 right to ask questions that are outside the scope of the
23 narrow topics is just incorrect.  But again, Your Honor, we
24 submit that the facts in this case are best addressed in a
25 brief that could be filed today.

1          THE COURT:  You can have a brief today?

2          MR. COTTLER:  Yes, Your Honor.

3          THE COURT:  Come on back, Mr. Genderson.

4          MR. PERLMAN:  Your Honor, they've known about this

5    issue.  They wait and they obviously --

6          THE COURT:  Prepared a brief already.

7          MR. GENDERSON:  Now we're in the middle of a trial.

8    This is not a complicated issue, Your Honor, and it's already

9    been ruled on by the examiner.  They raised these issues.

10   These are UK procedure issues, and they were overruled, and

11   now they shouldn't have a second bite at this apple.  And the

12   documents I used frankly, Your Honor, were -- 90 percent of

13   them were meeting minutes of meetings that were the topics of

14   the request.

15         The notion that they didn't have any idea what

16   documents I was going to use, the subject of the request for

17   meetings were the antifolate advisory board, and you will see

18   when we play the deposition, Your Honor.  What I used were

19   minutes of those meetings.  How could they not have thought

20   that that was going to be what we were going to do?

21         I didn't bamboozle them with any surprise documents,

22   but there was no requirement.  The order said, give them to

23   Dr. Calvert.  Dr. Calvert didn't object.  This is

24   Dr. Calvert's objection, not their.  And there's no

25   fundamental unfairness.  This is a deposition.

1              THE COURT:  Okay.  All right.  Mr. Cottler, you have

2    a brief already?

3              MR. COTTLER:  We can file it tonight, Your Honor.

4              MR. GENDERSON:  We didn't know this was coming.

5              THE COURT:  I know.  I'll give you time to file a

6    brief, also.  I'll read the briefs, because you're not

7    intending on calling the witness until Friday?

8              MR. GENDERSON:  Friday.  Yes, Your Honor, but I'm

9    not sure since we're in court.

10             THE COURT:  You have a big team.  One of those 20

11   lawyers over here can get something together.  How much time

12   do you need?  He's going to file his tonight and you can

13   respond.

14             MR. PERLMAN:  Okay.  If we intend to play this video

15   on Friday, if we got you something by the end of Wednesday,

16   would that give you sufficient time to rule?

17             THE COURT:  Yes.

18             MR. PERLMAN:  Can I ask -- it sounds like the brief

19   is ready.  Can I ask that it be filed earlier than 11:59 p.m.

20   so that we have some opportunity to work on it this evening?

21             THE COURT:  What time are you going to file it?

22   Probably when they walk out of this room.

23             MR. PERLMAN:  Can they hand me a copy right now and

24   we can get started?

25             THE COURT:  Do you have it?

Vol. 1-258

1          MR. WIESEN:  We have to coordinate the exhibits that

2     go with it, but we'll coordinate it and we'll get it done as

3     quickly as we can.  If we can get them a brief without the

4     exhibit, we will do that.

5          THE COURT:  They can probably hand you a brief

6     without the exhibits right now.

7          MR. PERLMAN:  That would be great.  That would be

8     great, Your Honor.

9          THE COURT:  Get something docketed before 9:00 p.m.

10         MR. WIESEN:  We should be able to do that, Your

11    Honor.

12         MR. PERLMAN:  If we can get started on the brief,

13    we can get started.  You know, probably would have been more

14    efficient to start the talking before they wrote the whole

15    brief.  That's neither here nor there, Your Honor.

16         MR. COTTLER:  Just for -- okay, I'll go ahead.

17    Sorry.  Just for clarification, we just received Lilly's

18    designations this week and exchanged objections on Saturday,

19    and we met and conferred this morning, so this is ripe right

20    now.  We couldn't have resolved this any sooner.

21         THE COURT:  All right.  Well, get your brief

22    docketed by 9:00 p.m., and you can go ahead and give Lilly's

23    attorneys a copy of the brief without the exhibits.  And

24    Lilly, you will have something to me by the end of -- sometime

25    Wednesday night?

Vol. 1-259

1          MR. PERLMAN:  We'll get it to you Wednesday.

2          THE COURT:  And we'll have a ruling for you by

3   Friday morning.

4          MR. PERLMAN:  That would be excellent, Your Honor,

5   and we will go -- just to put it on the table, we'll go ahead

6   and get the video ready to go on the assumption that we can do

7   the full approach, and if you cut it back or you do something,

8   we can always edit.  But what I don't want to do is wait until

9   Friday morning to start that process, because I don't want the

10  Court to be waiting for anything.

11         THE COURT:  That's fine, okay.

12         MR. COTTLER:  Thank you.

13         THE COURT:  Anything else before we adjourn?

14         MR. WIESEN:  Nothing else, Your Honor.

15         THE COURT:  Anything else?

16         MR. PERLMAN:  No.

17         THE COURT:  Okay.  We'll see everyone at 9:00 a.m.,

18  bright and early.

19         THE COURTROOM DEPUTY:  All rise.

20

21         (Proceedings adjourned at 4:59 p.m.)

22                        - - -

23

24

25

Vol. 1-260

1                  CERTIFICATE OF COURT REPORTER

2

3       I, David W. Moxley, hereby certify that the

4   foregoing is a true and correct transcript from

5   reported proceedings in the above-entitled matter.

6

7

8

9   /S/ David W. Moxley            September 27, 2013
    DAVID W. MOXLEY, RMR/CRR/CMRS
10  Official Court Reporter
    Southern District of Indiana
11  Indianapolis Division

12

13

14

15

16

17

18

19

20

21

22

23

24

25